**OPEN JUSTICE BALTIMORE**                        \*       IN THE
1014 West 36th Street #135                       \*
Baltimore, MD 21211                              \*       CIRCUIT COURT
                                                 \*
**ALISSA FIGUEROA**                                      FOR
1014 West 36th Street #135
Baltimore, MD 21211                                      BALTIMORE CITY

and

**BRANDON SODERBERG**
1014 West 36th Street #135
Baltimore, MD 21211                              24 - C - 22 - 00 28 6 1

            Plaintiffs,

v.                                               \*
                                                 \*
**BALTIMORE CITY LAW**                             \*       Case: 24-C-22-002861
**DEPARTMENT**                                     \*       CV File New
100 N. Holliday Street, St. 101                                      $80.00
Baltimore, MD 21202                              **Case No.:**   RIF-New Case
                                                                     $30.00
**JAMES SHEA**                                             Appear Fee
In his official capacity as City Solicitor                           $20.00
100 N. Holliday Street, St. 101                          MLSC
Baltimore, MD 21202                                                  $55.00
                                                         TOTAL       $185.00
**STEPHEN SALSBURY**
In his official capacity as Chief of Staff to            Receipt #202206012485
the City Solicitor                                       Cashier: LGC CCBCCIVI5
100 N. Holliday Street, St. 101                          06/30/22   3:52Pm
Baltimore, MD 21202

**LISA WALDEN**
In her official capacity as Chief Legal
Counsel
100 N. Holliday Street, St. 101
Baltimore, MD 21202

**BALTIMORE POLICE**
**DEPARTMENT**
601 E. Fayette Street
Baltimore, MD 21202

1

**MICHAEL HARRISON**
in his official capacity
as Police Commissioner
601 E. Fayette Street
Baltimore, MD 21202

and

**MAYOR AND CITY COUNCIL OF
BALTIMORE**
100 N. Holliday Street, St. 101
Baltimore, MD 21202

     **Defendants.**


\* \* \* \* \* \* \* \* \* \* \* \* \* \*    \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

NOW COMES, the Plaintiffs, OPEN JUSTICE BALTIMORE, ALISSA FIGUEROA, and
BRANDON SODERBERG, by Counsel, for this complaint against Defendants, BALTIMORE
CITY LAW DEPARTMENT, JAMES SHEA, STEPHEN SALSBURY, LISA WALDEN,
BALTIMORE POLICE DEPARTMENT, MICHAEL HARRISON, and the MAYOR AND CITY
COUNCIL OF BALTIMORE (individuals collectively in their official capacities), and allege as
follows:

### INTRODUCTION

  1.  This is a complaint for injunctive relief and damages under the Maryland
Declaration of Rights and the Constitution of the United States. Defendants, BALTIMORE
CITY LAW DEPARTMENT, JAMES SHEA, STEPHEN SALSBURY, LISA WALDEN,
BALTIMORE POLICE DEPARTMENT, MICHAEL HARRISON, and the MAYOR AND CITY
COUNCIL OF BALTIMORE (all named in their official capacity) have not only refused to
produce public records regarding police misconduct, but have acted in conspiracy to obstruct the
laws of the land and violate rights transcribed to the public in accessing public records of
government affairs.

2

2.      Over the past two and a half years, the Plaintiffs in this case made twenty-one requests for public records to the Baltimore Police Department and the Baltimore City Law Department regarding the police and police misconduct. The Baltimore Police Department and the Baltimore City Law Department have violated the law in their responses to every single request. These requests were all for information relevant to the public interest, and requested records such as officer misconduct files, lists of officers with complaints against them, and even simply a roster of officers on active duty. Ultimately, not a single record has been handed over without a fight, which displays a true pattern and practice of obstructing disclosure and a failure to provide the public with what is already theirs as granted under the Maryland Public Information Act.

3.      Defendants have taken actions to obstruct disclosure of police misconduct records, such as: ignoring record requests outright, knowingly using false disclosure exemptions, deflecting valid requests for fee waivers so to avoid making records accessible, arbitrarily and capriciously denying fee waiver requests, accepting money and not disclosing records for well over a year, using costs to pressure requesters into taking fewer records than they are entitled, and more.

4.      Plaintiffs OPEN JUSTICE BALTIMORE, ALISSA FIGUEROA, and BRANDON SODERBERG, through Counsel, requests that this Court enter judgment in its favor, and order Defendants to produce requested records, provide injunctive relief, award attorney's fees, and grant other proper relief.

## JURISDICTION AND VENUE

5.      Plaintiffs bring claims under 42 U.S.C. § 1983, which imposes civil liability on a person who, under color of State law, deprives any citizen of the United States or other person under the jurisdiction of any right secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983. In this respect, § 1983 is "a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)).

6.      Plaintiffs further bring state constitutional claims. Maryland's Declaration of Rights, Article 19 states "That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the Land, and ought to have justice and right,

freely without sale, fully without any denial, and speedily without delay, according to the Law of the Land."

7.      Jurisdiction and venue properly lie in the Circuit Court of Baltimore City, because it is the location of the Plaintiffs and because Defendants operate in the City of Baltimore.

## PARTIES

8.      Plaintiff Open Justice Baltimore (OJB) is a community organization in Baltimore. Open Justice Baltimore is entitled to the affairs of government and the official acts of public officials and employees per GP § 4-103(a). Open Justice Baltimore combines the power of community action with technology to create data-driven projects that help the community better understand, challenge, and change the criminal justice system. Open Justice Baltimore operates on a minimal budget on only volunteer support, under 501(c)3 fiscal sponsorship. More information can be found on their website openjusticebaltimore.org. Open Justice Baltimore has made numerous public information act requests of Defendants Baltimore City Police Department, which has previously led to litigation and built a familiarity of Defendants with Open Justice Baltimore.

9.      Plaintiff Alissa Figueroa is a media journalist who is producing a documentary on police accountability. Figueroa made Maryland Public Information Act requests to obtain police records regarding officer accountability.

10.     Plaintiff Brandon Soderberg is a journalist and author who recently published a book about the Defendant Baltimore Police Department shedding light on police corruption in Baltimore. Soderberg made public information act requests to obtain police records.

11.     Defendant Baltimore City Law Department (Law Department) is a public agency. Baltimore City acts as legal counsel and custodian of records for the separated agency (and Defendant) Baltimore Police Department (BPD). The Law Department acts as the gatekeeper to most of BPD's records and maintains a pattern and practice of obstructing access to records of BPD, particularly police misconduct records.

12.     Defendant James Shea is the City Solicitor of Baltimore City and is the head of the Baltimore City Law Department. It is under his supervision and operation that the Law Department have maintained a pattern and practice of denying disclosure of police records to the public.

4

13.     Defendant Stephen Salsbury is the Chief of Staff to the City Solicitor. He therefore oversees many actions of the Law Department and its staff. He has supervised the obstruction of disclosure of public records and himself personally obstructed the disclosure of records as a pattern and practice.

14.     Defendant Lisa Walden is the Chief Legal Counsel of the Police Legal Affairs Practice Group, a group in the Baltimore City Law Department. She has supervised the obstruction of disclosure of public records and herself personally obstructed the disclosure of records as a pattern and practice.

15.     Defendant Baltimore Police Department is a public agency that has conspired with all other defendants to deny disclosure of public records

16.     Defendant Michael Harrison in his official capacity is the Police Commissioner for the Baltimore Police Department.

17.     Defendant Mayor and City Council of Baltimore is the municipality that the Baltimore City Law Department and James Shea represents, acts on behalf of, and sets policy on behalf of.

BACKGROUND

18.     Through the PIA, the Maryland General Assembly declared that the public policy of Maryland is to enable citizens to monitor their government as part of their duties as citizens. The General Assembly has enshrined in state law that: "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees." General Provisions (GP) § 4-103. Any reading of the PIA "shall be construed in favor of allowing inspection of a public record, with the least cost and least delay to the person or governmental unit that requests the inspection." *Id.*

19.     The statutory language and function of the PIA were recently supplemented by the Maryland Police Accountability Act of 2021 ("Anton's Law"). As of October 1, 2021, Anton's Law establishes that records relating to the administrative or criminal investigation of misconduct by a law enforcement officer are not personnel records for purposes of certain provisions of the PIA and that a custodian may not deny inspection of records unless narrow exceptions apply.

20. "It is often true that a requestor is at a disadvantage in formulating a PIA request because the requestor does not know what records the agency keeps or how it keeps them. It is part of every agency's mission to be as transparent as the State's sunshine laws, including the PIA, require it to be. A public records request is not an occasion for a game of hide and seek. For that reason, if possible, an agency should in good faith provide some reasonable assistance to the requestor in refining the request for the records the requestor seeks." *Glass v. Anne Arundel County*, 453 Md. 201, 232 (2017).

21. The awesome powers given to the police create a special responsibility to the public and the expectation of public monitoring. That is why Maryland courts have explicitly affirmed "the public has a right to determine for itself whether its law enforcement officials are applying the law fairly, even-handedly, and in a manner free from corruption." *City of Frederick v. Randall Family, LLC.*, 154 Md. App. 543, 574 (2004)

22. This has proven especially necessary with recent findings of corruption in BPD, and the failure of the agency to adequately address and investigate police misconduct. As the United States Department of Justice ("DOJ") explained, "BPD fails to investigate complaints in a timely manner or with effective techniques. When investigations of complaints do proceed, they are hampered from the start by poor investigative techniques and unreasonable delays. These failures limit the Department's ability to discipline its officers..." U.S. Dep't of Justice, Investigation of the Balt. Police Dep't (2016), at 142.

## STATEMENT OF THE FACTS

### I.  Introduction

*Overview*

23. Plaintiff Open Justice Baltimore (OJB), Plaintiff Alissa Figueroa (Figueroa), and Plaintiff Brandon Soderberg (Soderberg) have all requested records from Defendant Baltimore Police Department (BPD) and experienced the same shameful response. The Baltimore City Law Department (Law Department), acting as BPD's records custodian and counsel, has responded in a manner that interferes and obstructs the disclosure of police records, and ultimately, shields the

police from accountability. A review of the Plaintiffs' collective experiences shows that this obstruction is not an occasional occurrence, but the only experience they have encountered.

24.     The Law Department has ignored Plaintiffs outright disregarded mandatory timelines for disclosure, refused to acknowledge and properly consider fee waiver requests, employed whimsical and erroneous accounting, used costs to pressure Plaintiffs into taking less information than Plaintiffs are entitled, sent information other than that requested to avoid disclosing requested information, and more. Plaintiffs do not only allege that Defendants have acted in bad faith, as the Circuit Court for Baltimore City has already found that BPD, as represented by the Law Department, has knowingly and willfully violated the Maryland Public Information Act (MPIA) and have not acted in good faith. Yet, BPD and the Law Department refuse to change their actions in the slightest. As a result, BPD and the Law Department, and their agents, maintain a pattern and practice that violates Plaintiffs' rights and repeatedly forces Plaintiffs to take Defendants to court.

25.     Since Plaintiffs' first MPIA records request in December 2019, not a single full file of an officer's history of misconduct has been disclosed. It should not take another court battle to get two government agencies, one being composed of lawyers, to uphold a base responsibility under Maryland law and disclose government records.

26.     While BPD and the Law Department blame their inability to keep up with records requests and a limited capacity as the fault for MPIA violations, capacity is determined by BPD and the Law Department, their lack of prioritization serves as a poor scapegoat. BPD is allocated over $560 million dollars per year; alternatively said, over half-a-billion dollars. That is more than any other agency in Baltimore City. About one in eight dollars that the Baltimore City government spends per year goes to the Police Department. This amounts to almost one thousand dollars per resident being directed to BPD, more money per resident per capita than any other major U.S. city. Yet, BPD's document compliance has only been staffed year after year with two to three people. BPD has chosen not to care about transparency.

27.     Baltimore City carries one of the most notorious histories of police corruption. Baltimore need not look far back to see the dark stain of the Gun Trace Task Force or the Steptoe Report, which found little change has occurred in the Baltimore Police Department since the Gun

Trace Task Force. Regardless of such horrific police misconduct and failure at change, BPD refuses to work with the public in allowing external transparency and accountability. This case exposes how the Baltimore City Law Department consistently helps BPD in that resistance to change, and ultimately maintains a department riddled with misconduct and community mistrust. The Baltimore City Law Department has long stayed out of view but now must be seen as an active player in protecting the corruption of Baltimore's Police Department.

*BPD and the Law Department have expressed an intent to limit exposure of records and public information.*

28.     The Law Department has made express statements regarding exposure of police misconduct. For instance, the Law Department has made the decision to hire the firm Nathan & Kamionski LLP to represent police officers in wrongful conviction cases. That law firm, originally from Chicago, is notoriously known for its aggressive, and at times, unethical approach to litigation. Lawyers who have opposed the firm in court describe them as being uniquely combative in their approach to cases and using a scorched earth practice. "In my judgment, they were very reckless with allegations," said the former director of the University of Baltimore Innocence Project Clinic, Michele Nethercott. "They'll just fling any accusation, and they don't seem at all concerned with making sure that they have a good-faith basis for it."

29.     Regardless, since 2019 alone, the Law Department has paid $7.3 million to a law firm bent on defending police officers in alleged wrongdoings. This does not just show a prioritization of control over liability, but also a lack of  any interest in making right any historic wrongs perpetrated by the police department, which  the Law Department has publicly confirmed. The Law Department has expressed that this decision was motivated by its concern to protect itself from liability rather than correct wrongs. "City Solicitor Jim Shea defended the firm's practices. He said Baltimore has an obligation to approach these cases aggressively in order to save taxpayer money that might otherwise be paid out in settlements."

**II.     BPD and the Law Department have engaged in a pattern and practice of obstructing OJB's access to misconduct records of BPD officers.**

30.     Between 2019 and 2022, OJB filed four MPIA requests for records on citizen and administrative complaints, also known as officer misconduct complaints, against BPD. BPD has yet to allow OJB access to a single document. Despite constant communication from OJB, BPD

8

has repeatedly obstructed access to public records through strategies including: repeatedly ignored requests, transgressed deadlines, misled Plaintiffs on the ongoing production of records, ignored fee waiver requests, deceitfully approached fee waiver requests, urged a narrowing of requests through intimidation of cost, employed an overly broad use of exemptions to avoid producing documents, and provided minimal records other than the full records that were requested. Any single one of these tactics prevents transparency and forces non-profits like OJB to waste valuable resources to demand that BPD and the Baltimore City Law Department simply follow the law. Together, the sheer volume of and repetition of these inadequate responses to OJB's MPIA requests amounts to a pattern and practice of obstruction that transcends mere delay and presents violations of constitutional rights.

*Summary of Officer Misconduct Complaints Records Requested.*

31.     OJB submitted their first MPIA request for officer misconduct complaints on December 20, 2019 requesting all misconduct complaints against BPD officers closed between January 1, 2019 and December 19, 2019. Ex. 1. OJB specified that officer names and badge numbers be redacted in keeping with the stipulation for record disclosure under statutory and case law at that time. OJB submitted their second MPIA request for officer misconduct complaints against BPD members on January 10, 2020. Ex. 2. This time, OJB requested all open officer misconduct complaints that had been open for over twelve months, recognizing the department notoriously left many complaints open for extended periods of time in a manner that protected officers from accountability under the Law Enforcement Officers' Bill of Rights. Ex. 3.. Over a year later, OJB still had not received any records and made a third MPIA request on October 1st, 2021, requesting both all officer misconduct complaints closed between July 1st 2020 and June 30th 2021, and ones open for more than twelve months. (Ex. 4). When BPD did not grant access, OJB filed their final MPIA request for officer misconduct complaint files earlier this year on March 14th. (Ex. 5). OJB reduced the amount of files they sought in their final request from one year, as they had previously requested, to just six months between July and December 2021.

*Summary of OJB's repeated requests and reasoning for fee waivers.*

32.     OJB included a request for fee waivers based on a public interest in all four of their MPIA requests for officer misconduct reports. (Ex. 1, Ex. 3, Ex. 6, Ex. 5). OJB requested fee waivers under GP § 4-206(e), which authorizes BPD to waive fees when doing so would be "in the public interest." (Ex. 1). OJB stated their requests qualified as pertinent to the public interest since (1) OJB operates within a non-profit, public interest organization that does not generate any beneficiary income, and (2) officer misconduct complaint records concern the public safety, welfare, and legal rights of the general public and hold implications for Maryland taxpayers. (Ex. 1, Ex. 3, Ex. 5, Ex. 6). The fee waiver requests also noted OJB's limited financial means and that the requested records would not generate financial gain. (*Id.*)

33.     Despite OJB's continuous efforts, BPD and the Law Department violated the MPIA in each of their four requests for office misconduct complaints. Both BPD and the Law Department responded to OJB's requests via the evasive strategies described below, which together amount to a pattern and practice of obstruction. BPD and the Law Department's actions repeatedly demonstrate an egregious lack of commitment to transparency and community accountability.

**A. BPD and the Law Department repeatedly transgressed MPIA deadlines for OJB's officer misconduct complaint requests.**

34.     BPD and the Law Department defied the MPIA response deadlines for each of OJB's four officer misconduct complaint requests. Under Maryland Code, General Provisions (GP) § 4-203 agencies have ten business days to deny MPIA requests, and thirty business days to grant requests. BPD did not communicate any denial or request an extension for the first request by the denial deadline on January 7th, 2020, leading OJB to believe BPD approved the request. (Ex. 1). OJB thus filed their second request for officer misconduct complaints three days later on January 10th, 2020. (Ex. 3). BPD again did not communicate any denial or request an extension for the second request within ten days. Likewise, BPD failed to grant either of the first two requests within the statutory thirty-day period. Although OJB waited an additional two days before notifying BPD of their deadline violation in both instances, BPD still did not acknowledge or respond to either request. (Ex. 7, Ex. 8). Three months after OJB's original submissions, Wayne Brooks with the Law Department issued a denial of the first request, while ignoring the second request, on March 17, 2020. (Ex. 9, Ex. 10).

35.     BPD followed a similar practice of disregarding notification deadlines regarding OJB's third and fourth requests for officer misconduct complaints. While BPD acknowledged OJB's request within a week, they again failed to comply with the thirty-day deadline for sending records. (Ex. 11). Their subsequent responses amounted to a constructive denial beyond the ten-day deadline for denying requests. Although BPD acknowledged receipt of OJB's fourth request the day after it was submitted on March 14th, 2022, they have not denied or granted the request to date, putting them again in violation of both the ten and thirty-day response deadlines. (Ex. 14). This makes what should have been a simple response, over three months late.

**B. BPD and the Law Department failed to acknowledge OJB's MPIA request for officer misconduct complaints.**

36.     In the case of OJB's second request for officer misconduct complaints, BPD and the Law Department completely failed to acknowledge the request and all communications related to the request. (Ex. 3). Despite repeated reminders from OJB and BPD's acknowledgement of other requests in the same time frame, BPD never assigned OJB's second request on officer misconduct complaints a case number. (Ex. 9, Ex. 10, acknowledging other requests made in the same time frame). OJB reminded the Law Department's Kay Harding that this and another request had never been acknowledged on March 20, 2020, nearly three months after filing. (Ex. 15). Harding responded asking for details regarding the other request OJB mentioned, but failed to comment on the absence of communication regarding OJB's second officer misconduct complaints request. *Id.* The request lacks a case number and any follow-up from BPD or the Law Department to date.

**C. BPD and the Law Department repeatedly failed to acknowledge OJB's fee waiver requests for officer misconduct complaints records.**

37.     In all instances, BPD failed to acknowledge OJB's initial and clearly stated requests for a fee waiver in their MPIA requests. Refusing to acknowledge a fee waiver request is a way to avoid answering the fee waiver request and make the records accessible. In Wayne Brooks' initial (delayed) response to OJB's first request for officer misconduct complaints, he failed to acknowledge OJB's fee waiver request and merely noted that "waiver and/or reduction of fees are granted on a case by case basis." (Ex. 9). OJB responded to the denial by noting it was not an adequate response to their request, and again asked for consideration of a fee waiver

for a public interest. (Ex. 16). BPD did not respond, and instead assigned Kay Harding from the Law Department to the request. (Ex. 15). Harding quoted Brooks regarding standard fee waiver protocols, again without responding to OJB's specific request. (Ex. 17). When OJB again asked about a fee waiver on March 26th, Harding responded with a promise that the Department would provide a cost estimate for the request with "any available payment options." *Id.* The department sent no subsequent correspondence in response.

38.     OJB renewed their request for a fee waiver after filing a court action for access to the first two officer misconduct records requests. (Ex. 18, Ex. 2). Again, the Law Department failed to acknowledge the fee waiver request and proceeded with questions regarding estimated costs. (Ex. 18). OJB ultimately inquired about a fee waiver for these records twelve times and encountered a complete disregard by BPD and the Law Department. *See* Ex. 9, Ex. 16, Ex. 15, Ex. 17, Exhibit E, and Ex. 2. Eventually, the request was simply denied without explanation.

39.     This refusal to acknowledge and then denial of a proper fee waiver request was taken up to the Maryland Court of Special Appeals where the Court held BPD arbitrarily and capriciously denied the fee waiver request, as there is an inherent public interest in these records. *Open Justice Baltimore v. Baltimore Police Dep't*, No. 122, Sept. Term, 2021, slip op. at 23 (filed Feb. 7, 2022) (unreported) (The Baltimore Police Department "arbitrarily and capriciously denied [Open Justice Baltimore]'s fee waiver requests associated with reproducing those records to which it was entitled."). BPD and the Law Department have filed a writ of certiorari to continue fighting disclosure of police misconduct files until the bitter end.

40.     Finally, BPD has yet to acknowledge OJB's most recent request for a fee waiver in their March 2022 request for half a year of officer misconduct complaint records. (Ex. 5). OJB initially inquired about a fee waiver twice via email and a letter. (Ex. 5, Ex. 14). When Defendants Stephen Salsbury, Julie Hallam, and Ken Hurst acknowledged receipt of the records request without acknowledging the fee waiver request, OJB again responded with a reminder on March 15th that they sought a fee waiver. *See* Ex. 19, Ex. 14. BPD and the Law Department have yet to acknowledge this fee waiver request.

   **D. BPD and the Law Department deceitfully used the fee waiver process as a means to evade their disclosure responsibility.**

12

41.     BPD acknowledged one out of four of OJB's fee waiver requests for officer misconduct complaint records, only to explain that BPD voluntarily chose to make this third request ineligible for a fee waiver by outsourcing administrative duties to a third party. (Ex. 11, Ex. 12, Ex. 13). Ken Hurst stated that BPD is "cognizant of the overwhelming public interest in the review of these [officer misconduct complaint] files" and granted a complete waiver for the Law Department's $745,290 fees. (Ex. 12). However, Brooks explained that despite the fee waiver of the Law Department's portion of the fees, OJB would still ultimately be responsible for $603,870 since the Law Department elected to outsource much of its duties to a third party contractor rather than do the work internally, and the Law Department "could not waive these fees." (Ex. 11, Ex. 12).

42.     OJB pointed out that the Law Department's decision to outsource administrative duties left OJB undoubtedly unable to access any files due to exorbitant and questionable cost. (Ex. 13). The Law Department provided the veneer of a fee waiver while preventing any meaningful access. The Law Department did not provide any meaningful explanation for why they could not waive the portion of the fees outsourced to a third party. The Law Department accepted that under the law the fees were subject to a waiver, then in the same breath chose not to waive a significant amount.. The Law Department's partial waiver of fees still left OJB responsible for hundreds of thousands of dollars in payment—an amount no community organization or individual could realize— and thus did not constitute a fee waiver. (Ex. 12).

43.     It has not only been the review of a fee waiver that has proved to be a questionable practice by BPD and the Law Department. BPD and the Law Department have also provided wildy arbitrary cost estimates for fee waiver calculations regarding OJB's requests for records. In response to OJB's second request for officer misconduct complaints, following a court order, the Law Department reported 769 complaint case files responsive to OJB's request for records from January 1, 2019 to December 19, 2019. (Ex. 20). This generated a total cost of $160,692. *Id.* Notably, this calculation included the use of external vendors. *Id.* On April 7th, 2020, BPD reported the existence of 3,247 complaint files responsive to OJB's third request for between July 1, 2020 and June 30, 2021, generating a total cost of $1,379,258 – over one point three million dollars. (Ex. 21).

44.     These two costs for the exact same files indicate that the amount of BPD files for the same amount of time grew four-fold, creating a much higher fee wall. More importantly though, the total cost for retrieving and processing each file more than doubled between requests, from $208.96 to $424.78 without any justifiable reason. (Ex. 20, Ex. 21).This spike in costs was questionable and concerning given that Anton's Law reduced the number of redactions required for review and disclosure in each file, meaning the time and costs for review should have been reduced.

**E. BPD and the Law Department repeatedly pressured OJB to narrow the scope of their request.**

45.     OJB faced repeated requests to narrow the scope of their third request for officer misconduct complaint records. The Law Department estimated that OJB's request consisted of 3,247 files and would cost $723,120.00 to procure. Ex. 11, Ex. 12. When OJB asked for further clarification regarding the means by which BPD calculated the cost estimate, Kay Harding eluded OJB's questions regarding the cost estimate calculation. Ex. 13. Instead, Harding asked if OJB would like to "narrow the scope" of their request, or if OJB would accept a summary of the files rather than the files themselves. *Id.*

46.     Reducing the request in this manner would significantly diminish the purpose of the request (full transparency) and stifle OJB's attempt to understand what accountability within BPD actually looks like. As OJB explained in response, a narrower scope "leaves out the most critical information – a depiction of the actual investigation (i.e. what does accountability actually look like?)." *Id.* A summary of an investigation does not show how internal investigations unfold or why officers like those on the Gun Trace Task Force were able to maintain so many complaints not sustained, when the allegations ultimately were found to be true. The Law Department offered OJB two untenable options for accessing the officer misconduct complaint files they requested – paying exorbitant fees with little information about how they were calculated, or accepting documents so diminished in information as to be useless for transparency purposes. Combined with their fee estimates, the Law Department's request for OJB to narrow the scope of their third request thus amounted to a constructive denial. *Id.*

**F. BPD and the Law Department employed a broad use of exemptions to avoid allowing OJB access to records they are entitled to view.**

14

47.     BPD and the Law Department applied a broad and indiscriminate use of exemptions to avoid allowing OJB access to records for their first officer misconduct complaints request. The Law Department first ignored and then refused to acknowledge case law that OJB repeatedly cited that made this request for records available; OJB pointed out that their request was drafted to mirror the language of case law which the Circuit Court later affirmed to be true. Ex. 17. In 2013, the Maryland Court of Appeals affirmed an MPIA request to redact names on personnel files to allow for disclosure in the exact manner requested by OJB. *Maryland Dep't of State Police v. Maryland State Conference of NAACP Branches*, 430 Md. 179 (2013). Ex. 16. When OJB drew the case law to BPD and the Law Department's attention, Kay Harding simply declined to acknowledge the matter and continued to deny access to the records outright, forcing the community organization to draw resources and take the matter to court, yet another financial barrier. Ex. 17.

### III. BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to lists of names associated with misconduct investigations.

48.     In early 2022 OJB obtained a list of BPD's 2019 misconduct investigation case numbers with the type of misconduct involved and the outcome of the investigation (provided by the Law Department pursuant to court order from Circuit Court case *Open Justice Baltimore v. Baltimore Police Department, et al., case no. 24-C-20-001269*). Pursuant to expanded access to personnel files as made available under Anton's Law in 2021, OJB submitted a request on February 14th, 2022 for the names of the officers matching each case number on the list of misconduct investigations. Ex. 55. OJB requested the Law Department send this list of names in whatever format was least burdensome to reproduce in the case management system. *Id.* OJB merely requested a disclosure of names, and did not request any corresponding investigation files. The violations surrounding this request are particularly striking because despite receiving a court order to produce a relatively small document, BPD and the Law Department repeatedly transgressed MPIA deadlines and chose not to provide the data in a usable format.

### A. BPD and the Law Department transgressed MPIA response deadlines for OJB's requests for lists of names.

49.     BPD and the Law Department violated the MPIA's thirty-day response deadline by several months. Neither BPD nor the Baltimore City Law Department acknowledged or

responded to OJB's simple request for over thirty-days. OJB finally received a response nearly two months later on March 28th after twice following up on the status of the request. Ex. 55. Rather than acknowledging or granting the request, the Law Department told OJB to submit a *new* MPIA request for the list of names that had been requested on February 14th. *Id.* OJB responded the same day, clarifying that the initial February 14th request was proper and a new request would simply reset the (already violated) timeline for disclosure. *Id.* OJB did not receive a response for another two months.

50.     OJB made an additional MPIA request on March 31st, 2022 for a similar list of names of officers associated with misconduct investigations from 2020 and 2021. *Id.* By the time the Law Department responded to OJB's third reminder on May 31st for these lists, they were nearly two months in violation of the MPIA deadline. *Id.* The Law Department has yet to provide actual production.

**B.  BPD and the Law Department shared the list of names in an unusable format.**

51.     When BPD and the Law Department finally shared the list of names first requested by OJB, they did so in a blatantly inconvenient format. Ex. 56. BPD and the Law Department converted the list into a PDF, which is essentially a screenshot that made the data functionally unusable. *Id.* No data processing could be conducted on the copy of the Excel sheet handed over. It would be clear to any user that a PDF was not truly usable compared to the original, electronically navigable Excel format. OJB requested the information be sent in the native format, and BPD provided the Excel version of the list one week later on June 6th, 2022. *Id.*

**IV.  BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to SIRT records.**

52.     Between December 2019 and January 2020, OJB submitted three MPIA requests for various Special Investigation Response Team (SIRT) investigations. SIRT investigations are criminal investigations conducted by BPD internally on their own officers, in response to incidents of serious misconduct and Level III uses of force (the most escalated uses of force). OJB made accompanying fee waiver requests, but was denied all of them. BPD and the Law Department continuously obstructed access to these public records by delaying responses to requests, employing a broad use of exemptions to disclosure, urging OJB to narrow the requests,

using deceitful fee waiver practices, and repeatedly transgressing MPIA deadlines. OJB only received a small portion of one of the three requests, and only after production was delayed by twenty-one months, negating much relevance in the information.

53.     OJB submitted an MPIA request on December 20, 2019 requesting SIRT investigations that were closed between July 1, 2018 and December 19, 2019. Ex. 23. On January 10, 2020, OJB submitted another MPIA request for SIRT investigations, for files that had been open for over twelve months. Ex. 2. On January 28, 2020, OJB then also submitted an MPIA request for all use of force reports and respective investigations, covering all levels of force, that were closed in 2019 and that had been open for over twelve months. Ex. 22.

54.     All requests included a request for a waiver of fees based on a public interest and concern, as they regarded official actions and the police agency's performance of its public duty. OJB specified particular interests in public safety, welfare, and legal rights of the general public, and implications on the interests of Maryland taxpayers. The requests also noted the requester's nonprofit status, limited financial means, and that the requested records would not be used for financial gain. *See* Ex. 8, Ex. 2.

### A. BPD and the Law Department delayed acknowledgement of OJB's MPIA requests for SIRT investigations.

55.     On January 19th, 2020, the first request was due to OJB. BPD failed to provide the requested records. BPD did not communicate any denial or request an extension. OJB contacted BPD on January 22nd, 2020, acknowledging that the deadline for OJB's first and second requests had passed. *See* Ex. 7, Ex. 23. On February 9th, 2020, the second request was due to OJB. Once again, OJB did not receive any response on either of these two requests until their denial on March 17th, 2020. Ex. 9.

56.     On February 27th, 2020, the third request for use of force records was due. OJB did not receive any response to this request until March 23rd, 2020, when Kay Harding from the Law Department asked for clarification of the request — only after being prompted by OJB — claiming confusion because the third request just seemed the same as the first request. Ex. 15. After OJB again reiterated their separate requests, the Law Department requested an extension for all the requests which was already months overdue. Ex. 17.

17

**B. BPD and the Law Department employed a broad use of exemptions to avoid allowing OJB access to records to which they are entitled.**

57.     BPD and the Law Department initially denied OJB's requests for SIRT and use of force files, arguing that the requests amounted to personnel files and were exempt from public access. Ex. 9. OJB responded with objections to this legal analysis, clarifying that the requested records are investigative files, not personnel records, as was made clear in BPD's own Policy 710. In response, BPD conceded these points and proceeded with the production process by providing cost estimates (ignoring outstanding requests for fee waivers). Ex. 17. While OJB was able to use their legal resources to question the Law Department's false claims of exemption, most community members attempting to access public information do not have these resources. Such overbroad use of exemptions is therefore a tactic to obstruct public access to information.

**C. BPD and the Law Department repeatedly ignored OJB's requests for public interest fee waivers, urging OJB to narrow the scope of their request under the threat of excessive fees.**

58.     On March 17th, 2020 BPD provided an initial denial of the first and second requests and made no response regarding fee waivers. Ex. 9, Ex. 10. After OJB returned with contentions of why BPD was legally obligated to provide the requested records, BPD responded by requesting an extension to the already-lapsed thirty-day production timeline. At this time BPD also asked if OJB would be willing to narrow their SIRT file request, because if they did not it would take many hours and a significant monetary cost to fulfill. *Id.* OJB declined to narrow their request, as to do so would undercut the purpose of the request. In the matter of police accountability, receiving a checkerboard of records allows for potential corruption to continue if it occurs in the unrevealed squares. If another Gun Trace Task Force were operating there is no certainty it would be caught in only a half review. The purpose of the MPIA, and community members utilizing it, is to catch such occurrences. BPD has shown that, from allowing the operation of the Gun Trace Task Force,  it will not hold itself accountable.

59.     After meeting with OJB, Kay Harding informed OJB on March 27th, 2020 that BPD would provide a cost estimate for the 2019 closed SIRT cases. *Id.* By providing this cost estimate, BPD ignored OJB's original fee waiver request. When asked by OJB if the presentation of this cost estimate was a denial of OJB's fee waiver request, Harding responded that BPD stood by their cost estimate and again asked OJB to either narrow their request or provide

reasons why they should be approved for a fee waiver. Ex. 24. Although OJB had already provided this information numerous times in the original requests, OJB responded with a reiteration of the benefits to the public interest. Despite this clarification of the request's importance, the Law Department stated that the fee waiver was denied on April 13th, 2020. *Id.*

60.     Noticing a discrepancy in the spreadsheet of disclosable information and the cost estimate given by the Law Department, OJB asked the Law Department to confirm the number of files for production. Ex. 25. Harding then responded with an amended cost estimate, noting that the original cost estimate had included a number of duplications. The updated cost estimate changed from $1,351,065.50 to $235,277. Ex. 26. If OJB had not pushed back on the Law Department's erroneous fee claims, the Law Department would have charged OJB over one million dollars more than was necessary to complete the information request. This is an extraordinary cost, a casual error of over five hundred percent presented by the Law Department. One million dollars acts as a tremendous barrier to access misconduct records for community organizations. After receiving these cost estimate letters that gave leave to dispute the cost findings, OJB submitted another fee waiver request and was denied on each request. Ex. 27.

**D. BPD's fee waiver pretenses are shown as deceitful attempts to evade their disclosure responsibility.**

61.     OJB was also denied a fee waiver for the January 28th, 2020 request for use of force investigations from 2019. Facing repeated denials of fee waivers and lacking other meaningful recourse, records were unobtainable for any use. Payment was ultimately made to obtain disclosure of the most serious misconduct records, those that amounted to potential criminal conduct throughout the year 2019, by Baltimore Action Legal Team for use in a court action on behalf of OJB. This request amounted to forty files with a cost for production estimated by the Law Department to be $21,880. Ex. 28.

62.     The Law Department was provided its demanded prepayment amount. However, once production of the forty files was complete in November 2021, the Law Department surrendered accounting that showed the amount demanded as prepayment to access the records was actually almost $8,000 too high. In other words, OJB was forced to prepay 50% more than the actual production cost to get the records. At this point, OJB was within their rights to request another public interest fee waiver for the return of the prepaid funds, and did so. Ex. 29. OJB

believed they were entitled to a public interest fee waiver because BPD and the Law Department had recently accepted the public interest of similar records and granted a fee waiver (ultimately facetiously). OJB had recently been granted a fee waiver in the public interest for a large swath of investigative records of less serious classification and therefore less public importance. Ex. 12. However, while this fee waiver was granted, it only applied to the Law Department's work and charged an additional $600,000 for contractor work that the Law Department claimed was "out of its hands", which a community organization like OJB clearly could not pay. *Id,* Ex. 13. Yet, with BPD and the Law Department having admitted the public interest of these lesser records, the more serious SIRT records presumably should receive a public interest fee waiver as well because they focused on matters of greater seriousness such as the grave misconduct of police officers. When the table turned though, the request for a waiver of these fees was simply denied without reason. Ex. 29.

63.     The only meaningful comparison between the two cases here reveals that when a fee waiver was granted, it still required hundreds of thousands of dollars to obtain disclosure and was never really obtainable to the requester, but when a fee waiver was within the community's reach, it was denied without rational cause. BPD and the Law Department acted in bad faith when they offered the fee waiver for the work they could do but not what they chose to outsource; unable to continue to fight the public interest of disclosing police misconduct records the Law Department simply tried a new argument: picking arbitrary amounts to outsource and charge to maintain a fee wall. This schtick failed however when no reason existed to deny the public interest of records of greater seriousness and it was too late to claim outsourcing, BPD and the Law Department simply decided to act in bad faith without shame.

**E.  BPD and the Law Department repeatedly transgressed  MPIA deadlines.**

64.     In June 2020, having been denied all relevant public interest fee waivers, the Law Department was paid for the production of forty SIRT files from 2019. The Law Department did not produce the first of these files until the eve of a court hearing five months later, presumably to preempt comment on their incomplete disclosure obligations. The entirety of the records were not produced for fifteen months after payment, nearly twenty-two months after the original request was submitted. This delay egregiously violated the thirty-day window for production mandated by MPIA guidelines. More importantly, by the time OJB received the requested files,

the files had decreased significantly in relevance to the public. Only providing the disclosure of moot files allows an agency to denounce troubles found in old files while preventing the public from ever seeing current issues. Such extreme delays in production amount to obstruction when delays render the released information irrelevant.

### V.   BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to Robert Dohony's records.

65.     In February 2020, having faced serious and repeated difficulties accessing larger record requests, OJB attempted to make a simpler request – the records of Robert Dohony, a single officer. Ex. 31. As in each prior request, OJB requested a fee waiver for the public interest. Public interest concerns were particularly acute in Dohony's case given a recent criminal indictment against him. BPD and the Law Department repeatedly attempted to thwart OJB's access to the records through a variety of now-familiar methods: transgressing the MPIA deadline for responding to Dohony's records request, repeatedly and egregiously ignoring OJB's fee waiver requests, suggesting OJB narrow their request for Dohony's records, and employing an overly broad use of exemptions to avoid granting OJB access to Dohony's records. To date, no records have been provided.

### A.   BPD and the Law Department transgressed MPIA deadlines regarding OJB's requests for Robert Dohony's records.

66.     BPD and the Law Department defied the MPIA response and denial deadlines for OJB's February 3rd, 2020 request for Robert Dohony's records. Wayne Brooks with the Law Department emailed OJB on February 25th, but his response did not actually address OJB's MPIA request. Ex. 32. OJB requested Dohony's internal investigations of BPD officers, but Brooks paid no attention to the specificity of OJB's request and instead denied the request due to the large number of investigations Dohony had conducted on the general public. *Id.* Brooks' response claimed exemptions from having to disclose these records, under GP § 4-311 and 351. *Id.* OJB clarified the scope of the request the next day and followed-up again the subsequent week, but the Law Department failed to grant access to the requests or inquire about an extension by the thirty-day MPIA deadline on March 16th, 2020. *Id.* The next day, twenty days *after* the MPIA deadline for denying requests, the Law Department partially denied OJB access and approximately two months following the MPIA deadline, on April 20th, 2020, Kay Harding with

the Law Department provided an overly burdensome cost estimate for the remaining available records. Ex. 9; Ex. 24.

**B. BPD and the Law Department repeatedly ignored OJB's fee waiver request for Robert Dohony's records.**

67.    BPD engaged in particularly blatant attempts to disregard OJB's fee waiver request throughout the Dohony records request process. OJB requested a fee waiver for the public interest no less than five times in over a month of continual correspondence, repeatedly explaining the request was not for commercial profit and aligned with the public interest "as it regards the public safety, welfare, and legal rights of the general public." Ex. 31. BPD and the Law Department failed to acknowledge each request and continued to put forth cost estimates for Dohony's records. Ex. 30, Ex. 31, Ex. 32, Ex. 16, Ex. 17. Rather than engaging the fee waiver request, the Law Department declined to acknowledge the request or quoted stock language stating that waivers are granted on a "case by case basis". Ex. 32, Ex. 9, Ex. 17.

68.    On April 7th 2020, months after OJB's initial fee waiver requests and following a series of subsequent requests, Kay Harding with the Law Department responded to OJB's latest fee waiver request by inviting OJB to submit a fee waiver request. Ex. 33 Harding's response indicated a lack of awareness regarding the multitude of prior fee waiver requests OJB made to no response. When OJB responded with a reiteration of their initial fee waiver request, Harding provided incomplete information regarding the fee waiver process for impoverished families and individuals – all of which was irrelevant to OJB. Ex. 24. OJB provided their reasoning for requesting a public interest fee waiver a final time, explaining again that "the transparency [. . .] granted would be in BPD's and the public's interest. BPD owes the community insight into its operations and accountability of its officers, as officers have caused disruption and harm throughout the City. The transparency would allow trust to grow." *Id.* Despite maintaining that "BPD is committed to transparency and dissemination of information to the public that restores trust in the police department," Harding informed OJB that their fee waiver request was simply denied on April 13th, 2020. *Id.*

**C. BPD and the Law Department repeatedly pressured OJB to narrow their request for Robert Dohony's records.**

69.    Kay Harding and Wayne Brooks with the Law Department suggested that OJB narrow the scope of their requests for Dorohony's records three separate times. Brooks' first

response to OJB's request expressed concern about the scope of records involved, having not actually read what was requested, and added, "[i]f you want to revise your request to something manageable . . . please let me know." Ex. 32. Harding suggested the same shortly afterwards, imploring OJB to "let me know if your client is willing to narrow their request." Ex. 17. OJB reminded Harding that they submitted multiple fee waiver requests. *See supra* Section IV.B. Harding avoided responding to OJB's actual fee waiver request, and in place of addressing the request presented by OJB redirected the matter and asked, "could you consider narrowing the scope of the requests to minimize the costs?" Exhibit C.

70.     OJB maintained their initial request since they sought Dohony's records to serve transparency and community accountability, and "the entirety of the request [was] necessary for this effect." *Id.* BPD and the Law Department were made well aware of the significance of receiving Dohony's files based on OJB's repeated requests for public-interest fee waivers. Ex. 30, Ex. 31, Ex. 32, Ex. 16, Ex. 17. BPD and the Law Department's persistent suggestions that OJB reduce their request to cut costs were in poor faith given OJB's fee waiver requests. Further, narrowing the request would have significantly undermined OJB's ultimate intent: providing community insight given the amount of harm BPD officers have perpetuated throughout the City and the fact that this particular officer was under criminal investigation, meaning the integrity of his own investigations warranted review. Ex. 24.

### D. BPD and the Law Department employed an overly broad use of exemptions to avoid granting OJB access to Robert Dohony's records.

71.     BPD and the Law Department denied OJB's Dohony records request based on incorrectly designating many records as exempt. Brooks claimed in his March 17th, 2020 denial response that Dohony's Special Investigation Response Team ("SIRT") investigations are personnel records and therefore not disclosable. Ex. 9. The letter stated that specific SIRT files could be requested, but would undergo review to determine appropriate segregation. *Id.* OJB responded by noting Brooks incorrectly conflated internal investigations with personnel records. Ex. 32. In fact, not all internal investigations are personnel records. *Id.* Brooks stood by his blanket denial of all internal investigation records on March 20th, 2020. Id. OJB responded once more, reiterating that "Criminal investigations [and investigatory records] by a law enforcement agency are separate from personnel records and are disclosable." Ex. 16. BPD and the Law

Department again failed to honor the distinction between the two record types, at which point OJB had to continue to press the matter and speak to Kay Harding on March 27th, 2020. Exhibit 17. After much pushing by OJB, Kay Harding with the Law Department eventually conceded that BPD was incorrect in applying the personnel exemption to all of OJB's requested records, beginning a cost evaluation and fee waiver denial process that would stretch on for a number of months. *Id.*

### VI. BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to officer James Deasel's records.

72.      After facing serious challenges accessing larger requests for misconduct records, in February 2022 OJB requested files pertaining to one officer, James Deasel. This request was submitted after BPD and the Law Department had approved a fee waiver for a prior request for a year of misconduct records due to their "overwhelming public interest". Ex. 12. BPD and the Law Department, however, also claimed that this prior request would require the assistance of an outside contractor, which would cost OJB over $600,000. So while BPD and the Law Department presented a clear contradiction on itself, accepting a public interest that warranted a waiver of fees and then not waiving fees, OJB felt smaller and simpler requests may be easier to navigate. These smaller requests ended up proving there was ongoing bad faith in BPD and the Law Department's original fee waiver scheme and in their responses to the new requests. BPD and the Law Department have refused to produce even a single officer's file, an amount of work that could be completed well before the Law Department hit its stated level for when it needed to outsource work.

73.      OJB submitted a request for just James Deasel's file and related records, understanding that BPD had already determined that the release of this type of file was in the public interest and approved for a fee waiver. BPD and the Law Department continued to ignore requests for fee waivers, urged OJB to narrow the scope of their already-narrowed request, and repeatedly transgressed MPIA timelines. OJB has not received any production related to James Deasel's personnel file or police records.

74.      On February 8th, 2022, OJB submitted two MPIA requests related to the BPD officer James Deasel. The first request was for the full extent of information available from

24

James Deasel's personnel file under Anton's Law. Ex. 34. The second was for thirty-five specified criminal incident reports written by James Deasel that aroused public suspicion. Ex. 35.

On February 9, OJB received an acknowledgement of the incident reports request from BPD. The acknowledgement also noted that while the request may take longer than ten-days to complete, it would be fulfilled within thirty. Ex. 36. BPD did not acknowledge the personnel file request. After OJB followed up on February 24th, the BPD representative said that the reply was accidentally overlooked, but that the department had started request fulfillment on February 8th. Ex. 34. Nothing to date has shown this to be true.

### A. BPD and the Law Department repeatedly ignored OJB's fee waiver request for James Deasel's records.

The original acknowledgement to both of these requests ignored OJB's public interest fee waiver requests and attempted to present cost barriers, asking OJB to significantly modify the original request. For example, on February 9th the Law Department informed OJB that because they submitted case numbers instead of incident report numbers, the request would push beyond the two free hours of labor and asked how OJB wanted to proceed. The email also required OJB to respond within ten days or the request would no longer be active, a practice which is nowhere found in the MPIA. The attempted use of this practice should be viewed as a way that the Law Department neglected their mandated duties under the MPIA. Ex. 37. OJB immediately responded that they provided the case numbers because those are the only numbers available to the public. OJB then asked the Law Department to proceed with the request and inquired as to whether the reference to cost was a denial of the public interest fee waiver. OJB followed up two more times about the status of the request on March 11th and March 31st, to no response. *Id.*

### B. BPD and the Law Department repeatedly suggested OJB narrow the scope of their request for James Deasel's records.

When the Law Department actually acknowledged receipt of the request for James Deasel's personnel file on February 24th, the Law Department asked if OJB would rather have a disciplinary history *summary* in lieu of the entirety of the personnel file, as originally requested, as this would lower the expenditure of resources and therefore the cost to OJB. The Law Department asked OJB to respond within ten days with how they would like to proceed, so that they could be provided with a cost estimate. Ex. 34. This offer to provide documents other than

those actually requested in order to avoid fees was an attempt to dissuade the public from requesting information that BPD and the Law Department has a legal duty to provide. This response also ignored OJB's original request for a public interest fee waiver, which had cited reasoning affirming the public interest of these files as previously accepted by BPD and the Law Department and as set out by the Court of Special Appeals in *Baltimore Action Legal Team v. Office of the State's Attorney.*, 253 Md. App 360 (2021); *Id.* OJB responded the same day to confirm they wanted the entirety of their original request, not a summary. OJB asked for a confirmation of fee waiver approval on February 25th, and followed up on the status of the request on March 11th and March 31st, all to no response. *Id.*

### C. BPD and the Law Department repeatedly transgressed MPIA deadlines for OJB's request for James Deasel's records.

As of March 31st, all communication concerning these two requests was merged and addressed to Stephen Salsbury, Chief of Staff with the Law Department. On April 8th, two full months after the original request, Stephen Salsbury informed OJB that they should receive production of James Deasel's personnel file "as early as today", while the incident reports were "nearly complete and set for production next week." Ex. 34.

Two weeks later on April 21st, the Law Department provided what they said was production of the personnel file request. However, the document the Law Department provided was only the summary of James Deasel's file, in direct contradiction and disregard of both OJB's original request and the parties' ongoing communications. After OJB pushed back on receiving only a summary, the Law Department responded on April 22nd that a request for the entirety of the personnel file was now put in with a review to determine if additional information could be released. Ex. 38, Ex. 39. OJB inquired as to why the original request was ignored and the actual file was only just now being requested and reviewed, more than a month after production was due and after OJB had very clearly in a back and forth conversation requested the whole file, not the summary. Stephen Salsbury repeatedly avoided this inquiry and failed to provide any meaningful response. Ex. 40.

OJB then followed up with the Law Department a month later on May 19th, asking for production of the request so as to avoid the need for litigation. Ex. 38. On May 24th, Stephen

Salsbury responded that the office was still reviewing James Deasel's personnel file and was preparing a cost letter for the incident reports. *Id.* This update contradicted earlier status updates, that work was underway, and OJB inquired as to why the request for incident reports was now just beginning and also being shielded behind a cost barrier when a month before the Law Department had informed OJB that the request was nearly ready for production. In response to this line of inquiry and subsequent follow-ups on May 25th, June 3rd, and June 15th, Stephen Salsbury ignored the questions and failed to provide any further information whatsoever. The Law Department refused to provide any information, and has yet to provide any of the requested records now over four months from the original request date. *Id.*

### VII. BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to a list of currently active BPD employees.

OJB made a request for public records to BPD on December 14th, 2020. Ex. 41. The records requested were a list of all active employees of BPD with corresponding suffix, ethnic group, sex, sequence number, employee ID number, age or year of birth, service date, rehire date, promotion date, job code, job title, supervisor ID, position number, grade, GL pay type, and locality. *Id.*

The request specified that OJB was not seeking the payroll data available on Open Baltimore because this data set does not contain all the information sought by OJB and is only updated once per year. OJB also requested an estimate of fees to be charged and notified BPD of the ten-day response timeline required by statute. *See* GP § 4-203(c).

The Law Department responded on December 17th, 2020 acknowledging receipt of the request and promising a response within thirty-days. Ex. 41. Nevertheless, BPD and the Law Department continued to transgress MPIA deadlines, asserted broad exemptions to deny any disclosure of public information, and was eventually found by the Circuit Court of Baltimore City to be in willful and knowing violation of the MPIA and failing to act in good faith.

### A. BPD and the Law Department repeatedly transgressed MPIA deadlines for OJB's records request for a list of currently active BPD employees.

75.     OJB contacted the Law Department on January 1st, 2021 requesting an update on the status of the request. Ex. 41. The Law Department responded on January 4th, 2021, stating

"[t]he process has been started to gather the information requested." *Id.* OJB reasonably relied on this statement and the expiration of the ten-day denial period to indicate that the records request had been granted. OJB contacted the Law Department on January 19th, 2021, thirty-three days after the initial request. *Id.* Ken Hurst responded on behalf of the Law Department stating he was "waiting for the information requested to be forwarded to me." *Id.*

76.     OJB contacted the Law Department on February 3rd, 2021 to which the Law Department responded the same day by apologizing for the delay. *Id.* The Law Department made no request to OJB for an extension. OJB followed up again on February 18th, 2021 to which the Law Department responded, "waiting on the review by the paralegal to approve for release after redactions have been done." *Id.* Yet again, OJB contacted BPD to follow up on the request on March 5th, 2021. *Id.* The same day the BPD responded, "[s]orry for the delay. I'm waiting on the paralegal to finish, we are a little behind." *Id.*

77.     OJB contacted the Law Department about the request on March 22nd, 2021. *Id.* On March 25th, 2021, the Law Department sent a response letter to OJB indicating that OJB's record request had been denied. *Id.* One hundred and one-days passed between the date of the initial records request and the date when the Law Department's response letter was sent. The response letter acknowledged that DCU was late in its response.

### B. BPD and the Law Department employed a broad use of exemptions to avoid allowing OJB access to BPD's list of currently active employees.

78.     The Law Department's initial denial letter stated, "BPD cannot provide a list with all sworn members because it will risk undercover officers being uncovered" and "[u]ndercover officer's names are protected under Maryland Law". The letter cited GP § 4-351 as the authority for this denial. GP § 4-351(a) provides in relevant part that "a custodian may deny inspection of: (1) records of investigations conducted by . . . a police department . . . ; (2) an investigatory file compiled for any other law enforcement . . . purpose; or (3) records that contain intelligence information or security procedures of . . . a police department." Ex. 41.

79.     The records requested by OJB did not include records of investigations, investigatory files, or records containing intelligence information or security procedures, by definition. Maryland has held the "well-established general principles governing the

interpretation and application of" the MPIA creates "a public policy and a general presumption in favor of disclosure of government or public documents." *Office of Governor v. Washington Post Co.*, 360 Md. 520, 544 (2000). Due to this "strong bias in favor of disclosure," an agency must not issue a blanket denial if "shielding of only a part of the file would suffice" to protect exempt information. *Blythe v. State*, 161 Md. App. 492, 519 (2005). The burden is on the custodian to justify non-disclosure and conduct a severability review. *Id.* at 522.

80.     OJB notified the Law Department of the relevant statute and case law in its response on April 8th, 2021. Ex. 41. OJB made a good faith effort to work with the Law Department by agreeing to accept an employee roster with undercover officer names redacted. *Id.* The Law Department responded with an indecipherable email. *Id.* On May 17th, 2021, OJB again requested the records. *Id.* On May 18th, 2021 the Law Department responded by disregarding OJB's objections and by referring OJB to Open Baltimore, all while acknowledging that "a more recent list might better reflect current additions or deletions to the department." *Id.* OJB responded, again objecting to the Law Department's disregard of its statutory obligations, suggesting redactions be made, and requesting that the records be promptly delivered. *Id.*

### C. BPD was found to be in violation of the MPIA regarding OJB's request for a list of currently active BPD members.

81.     As a result of the Law Department's continued refusal to communicate with OJB on disclosure of the requested roster, OJB was forced to file a court action on August 30th, 2021, Baltimore City Circuit Court case no. 24-C-21-003745.

82.     The Law Department provided the requested records on the last day BPD's answer was due to the Court, on November 24th, 2021. Ex. 5. The Law Department filed a motion to dismiss that relied on disclosure of the records on that same day. This shows that the Law Department knew they were going to be disclosing the records while preparing arguments, but still did not disclose the records until the last day possible. This also shows that the Law Department knew the arguments for withholding the records were without merit and the Law Department arbitrarily forced OJB to take them to court to force disclosure.

83.     That case proceeded to summary judgment on February 4th, 2022, before the Circuit Court for Baltimore City. In a bench opinion, the Court found that by denying the records, BPD, who was represented by the Law Department, willfully and knowingly violated the MPIA and did not act in good faith.

### VIII. BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to Civilian Review Board investigations.

84.     On February 21st, 2022, OJB made an MPIA request for all Civilian Review Board investigations closed in calendar year 2021, regardless of finding, as well as all IAD files provided to the CRB from BPD in calendar year 2021. Ex. 42. In addition to these files, OJB requested that the names of the officers being investigated in these files not be redacted, as recently made available under Anton's law, except where legally necessary. *Id.* A request was made for all communications between the CRB and BPD in efforts relating to the investigations. OJB requested a fee waiver based on the public interest of the records. *Id.* Dana Moore sent an acknowledgement email on February 21st, 2022. *Id.*

### A. BPD and the Law Department obstructed OJB's access to information that would help streamline their request for Civilian Review Board investigations.

85.     The Law Department delayed and obstructed this request for months by declining to provide information that would streamline the request. On February 25th, 2022, the Law Department asked OJB to identify which specific custodian's emails they would like to be searched, and provided a link to the entire Baltimore City employee directory. Understandably, a link to every single employee in Baltimore City served no point. Ex. 43. The Law Department also disregarded the request for a fee waiver, and stated a demand for prepayment before any work began on producing documents. Ex. 43. OJB responded on the same day, asking that work continue on the rest of the request for CRB police misconduct investigations while the issue of which parties' emails should be searched was resolved. Ex. 43. OJB provided recent case law declaring investigations into police misconduct to be in the public interest and to warrant a fee waiver. OJB then asked for assistance in determining who in the Office of Equity and Civil Rights would engage over email with BPD, as this is not information that could be gleaned from a directory or is publicly available. OJB also asked at this time for a confirmation of fee waiver approval status. Ex. 43.

86.     After two follow-up emails from OJB on March 8th and March 24th, the Law
Department responded on March 25th with a claim that the CRB is not the custodian of the
requested information. Ex. 43, Ex. 44. Furthermore, the Law Department refused to answer
OJB's request for assistance in determining whose emails to request, and again refused to
respond to the fee waiver request, relating to the investigatory files or the emails. Ex. 44. OJB
responded the same day, reiterating their requests for documents, a fee waiver, and assistance in
determining custodians of emails. The Law Department responded on March 29th that because
they could not determine whose emails to search, they would pull all email communications and
follow up with a fee estimate. Ex. 44. As the Law Department could only argue for so long about
not knowing relevant email identities without asking their client, the Law Department's ability to
uncover this information returned on April 14th. Ex. 44. The Law Department informed OJB that
they would be searching the emails of two named employees, at a cost of $637. *Id.* The Law
Department continued to ignore the numerous queries for a fee waiver.

### B. BPD and the Law Department delayed the approval of fee waivers and repeatedly transgressed MPIA deadlines for OJB's request for Civilian Review Board Investigations.

87.     In April 2022, two months after the original request, OJB expressed shock at the
imposition of fees after multiple requests for a fee waiver, without any response, and also asked
for clarification as to what documents would be produced after the demanded prepayment. Ex.
44. Two weeks later, the Law Department claimed on April 28th that they "did not understand
your prior email indicating your stance that fees should not be assessed for your records request
as a fee waiver request." Ex. 45. After requiring three more follow-up emails from OJB, the Law
Department delaying a month, on May 27th the Law Department finally accepted OJB's constant
effort that the CRB would provide responsive records on a rolling basis and would not impose
fees. Ex. 45. The Law Department has refused to respond to emails from OJB on March 31st and
June 14th asking for clarification of the anticipated timeline for the rolling disclosure of the CRB
files, such as when half the files will be provided and expected date of when all files will be
provided. *Id.* These questions are a genuine concern due to the Law Department's blatant
disregard of timelines generally and taking up to twenty-one months the only other known time
of file disclosure. OJB's questions are reasonable as disclosure of all records were to be made in
thirty-days, a deadline which passed months ago.

88.     On June 10th, 2022 the Law Department provided production of one CRB file to OJB. The only file provided to date lacks an officer's name. In other words, there is no identification of any officer being investigated.

### IX. BPD and the Law Department engaged in a pattern and practice of obstructing OJB's access to investigations into officers from the SAO list.

89.     The Court of Special Appeals of Maryland issued a ruling that the State's Attorney Office for Baltimore City must release a list of 307 police officers that it had determined to have issues of credibility. On May 26th, 2022, OJB submitted a new MPIA request to obtain full personnel files of 197 officers on the list known to be actively employed with BPD. OJB requested an accompanying fee waiver, as this request promotes the public interest of transparency around BPD investigative practices of officers with known integrity issues. Ex. 46. Stephen Salsbury of the Law Department responded that the office would review the request and proceed in accordance with the provisions of the  MPIA. *Id.* As over thirty days have elapsed since the request with no further communication, BPD is once again in violation of  MPIA guidelines.

### X. BPD and the Law Department have openly voiced their discontent over OJB's use of public records

90.     On September 23, 2021, Lisa Walden, Chief Counsel with the Office of Legal Affairs, the practice group in the Baltimore City Law Department that directly represents the Baltimore Police Department, contacted Plaintiff Open Justice Baltimore on behalf of BPD. Exhibit 47. Walden requested that OJB remove public information about BPD from a public web-based platform that OJB hosts. OJB hosts a public platform named BPDwatch.com that is available to the public and hosts profiles of BPD officers and employees and records known complaints of misconduct.

91.     Specifically, Walden wanted names of BPD employees removed from the public platform. Walden seeking removal of information about BPD's operating and staffing from OJB's website indicated a displeasure of OJB's use of public information about BPD. *Id.*  OJB responded that they would not remove public information.

### XI. Journalists Brandon Soderberg and Alissa Figueroa have faced similar obstruction tactics from BPD and the Law Department in response to their records requests.

92.     Two investigative journalists, Brandon Soderberg and Alissa Figueroa, have also been unable to access police records due to BPD's and the Law Department's obstruction. Like in the experience of OJB, both BPD and the Law Department follow a pattern and practice of obstruction that transcends mere delay and presents violations of constitutional rights. Soderberg and Figueroa requested access to BPD records as journalists seeking public transparency of BPD. BPD's and the Law Department's practice of obstructing access ultimately limits the scope of police accountability and public awareness. Soderberg and Figueroa's accounts demonstrate that BPD's and the Law Department's obstruction tactics are not limited to OJB, but impact a diverse array of public interest requestors city-wide.

*Brandon Soderberg's Struggle to Access Police Records*

**A. BPD and the Law Department repeatedly pressured Soderberg to narrow the scope of his requests away from full investigative files.**

93.     The Law Department entreated journalist Brandon Soderberg to accept summaries of the records he requested rather than the records themselves. Soderberg filed two requests for officer disciplinary records in Spring 2022, and the Law Department responded to both with a form email stating he will be contacted with the "possible costs associated with this request", and suggesting he accept "the disciplinary history summary for each BPD member identified in the request in lieu of a comprehensive response to the request." Ex. 48, Ex. 49. According to the Law Department, records production "often involves expenditure of substantial resources," but just taking the summary "can be produced at little or no cost to the requester". It is hard to not see this as being pressured away from an initial full request. This is particularly troublesome when a warranted fee waiver has been avoided and never received a response. The Law Department makes these suggestions while also indicating "we have not yet investigated the scope of your particular request." *Id.* Although Soderberg requested a cost estimate in his initial requests, the Law Department merely approximated costs as "substantial" when pressing that he accept summaries. *Id.*, Ex. 50, Ex. 51.

94.     Between the Law Department's use of identical form letters, failure to consider the substance of requests before responding, and failure to approximate costs, the Law Department's offer of summaries in lieu of records is a clear attempt to avoid making records available. Soderberg is an investigative journalist and author focusing on Baltimore Police

33

Department corruption, and report *summaries* are insufficient for his investigative purposes. Soderberg declined the summaries for his second request on June 8th, 2022. Ex. 51. The MPIA deadline for denying Soderberg's second request will pass on July 13th, 2022. Ex. 52. Soderberg has received no further response to date.

**B. BPD and the Law Department required Soderberg to comply with arbitrary response deadlines.**

95.     BPD and the Law Department simultaneously attempt to redirect requests with the pressure of costs while attempting to evade their responsibility under the MPIA altogether. The Law Department avoids responding to fee waiver requests and also attempts to discard requests entirely.

96.     Both of the Law Department's responses to Soderberg's requests stated: "respond to this email within 10 business days indicating whether you wish to receive disciplinary history summaries in lieu of your request as originally stated…no further action will be taken by DCU until we receive your response." Ex. 48, Ex. 49. Engaging with the Law Department's offer of summaries is thus required in order to proceed with a records request. Further, requesters must respond within 10 days. Neither restriction has a basis in the MPIA rules, and the additional steps simply serve to present unnecessary roadblocks in the requests process while the Law Department attempts to avoid making records available.

*Alissa Figueroa's Struggle to Access Ten Police Misconduct Files.*

**A. BPD and the Law Department obstructed Figueroa's access to police misconduct files by refusing to waive fees, even though they acknowledged a public interest in the requested files.**

97.     On October 1st, 2021, Alissa Figueroa and her team requested all records relating to misconduct investigations for ten Baltimore police officers. Ex. 53. A fee waiver was requested with this request. *Id.*

98.     Over thirty-days later, the Law Department responded on November 3rd, 2021, granting the request but citing enormous fees. Ex. 53.  While drawing heaving questions, the Law Department stated that it would cost BPD a total of $5,177.00, outside counsel a total of $61,332.50, and the Baltimore City Law Department a total of $52,743.00. *Id.* The Law Department stated that it had reviewed the request and that it was cognizant of the public interest

in reviewing the files and that the intent was to make this information public. *Id.* However, BPD stated that it would be unable to waive all costs. *Id.* It would only be able to waive BPD and the Law Department's fees. *Id.* Since BPD had "to pay outside counsel, a cost that BPD is incurring only because of your request," it would be unable to waive these fees. *Id.* The Law Department calculated that given the uncertainty of some costs with audio and video files, the full payment due before production began was $44,981.50. *Id.* This amount would cover the contract attorney fee of $25,000.00, the managing attorney fee of $7,644.00, a three and a half month hosting charge of $3,150.00, and a three and a half month LSPM charge of $9,187.50 totaling $44,981.50. *Id.* The Law Department informed Figueroa that due to COVID, there would be a delay in the production of the files and that this fee was only an estimate.*Id.* Figueroa may be required to pay more or be granted a refund, if she were to be required to pay more, it would have to be paid before the work continued. *Id.*

99.    As a freelance journalist, Alissa Figueroa did not have the funds to pay this amount of money. Figueroa works with a researcher, Laura Juncadella, and has a monthly budget and without the full grant of the fee waiver, it became impossible for her to access the records she had requested.

**B. BPD pressured Figueroa to agree to drop her initial requests and settle for a summary of the disciplinary history of officers, obstructing her access to the full public records.**

Figueroa responded to the extraordinary costs by reducing her request for ten officers' files to a request for two officers' files and asked for the cost. The Law Department provided a response, but did not address Figueroa's actual question and instead redirected Figueroa on why she should not seek the full files of the two officers she just asked about.

100.    The Law Department responded to Figueroa, by email, that "[i]n lieu of providing you with a new cost estimate, we would like to offer you the option to receive the disciplinary history summary for each BPD member identified in the request in lieu of a comprehensive response to the request. These summaries . . . can be prepared more quickly than a full disciplinary file, and can be produced **at little or no costs to the requestor.**" Ex. 53 (emphasis in original). This email was sent to Figueroa on January 11th, 2022, 102 days after her initial October 1, 2021, request. *Id.*

35

101.    After being presented with insurmountable fees for records and abusive violations of the MPIA deadlines for response, Figueroa was presented with the option of taking summaries or no records at all. Ex. 53. In other words, BPD and the Law Department provided a facetious response to Figueroa's fee waiver request that denied the waiver of costs and presented exorbitant fees, and then when Figueroa reduced her request, the Law Department avoided having to address the issue of full disclosure and pressured the requester to only take summaries. The Law Department then, after already delaying the MPIA process significantly, stated that if you do not want to pay high fees and another unknown amount of time, you must accept summaries. *Id.* On January 13th, 2022, Laura Juncadella, responded to the Law Department's email confirming that Figueroa would accept the disciplinary history summary for each BPD member identified in the request in lieu of a comprehensive response to the request. *Id.* Juncadella, asked for confirmation of receipt of the email; none was given. *Id.*

## C. BPD took active and passive steps to obstruct Figueroa's access to the files she requested.

102.    Figueroa's researcher, Juncadella, followed up fourteen days later on January 27th, 2022. There was no response. Ex. 53. Then four days later, on January 31st, 2022, she followed up again to confirm that the request had been received; there was no response. *Id*. Forty days after requesting the summaries, on February 22nd, 2022, Juncadella asked for a status request; there was no response. *Id.* Forty-eight days after requesting the summaries, on March 2nd, 2022, she followed up again; there was no response. *Id.* Sixty-one days after requesting the summaries, on March 15th, 2022, she followed up.*Id.* Between this time and April 1st, 2022, there was a phone call between the parties and Juncadella was informed that there would be a status update on April 1st, 2022. *Id.* On April 1st, 2022, seventy-eight days after requesting the summaries, and 180 days after the initial requests, Juncadella, followed-up to ask for a status update. *Id.* BPD responded that day with the summaries. *Id.*

103.    It took BPD 180 days, or half of a year, and more than nine follow-up emails or phone calls to produce a reduced version of Figueroa's initial request. Ex. 53. As a freelance journalist, paying her team by the day, Figueroa used a great amount of her minimum resources to receive what already belongs to the public under Anton's law. The Law Department took active and passive steps to obstruct Figueroa's access to disciplinary records that she requested.

D.  **BPD withheld relevant and important information from the delayed summaries that they provided to Figueroa.**

104.    Figueroa had known about at least one internal affairs investigation for all ten of the officers that she had requested records. These officers had previously been involved in the loss of life in the community. *Id.* Civil litigation has been brought due to death at the hands of these officers. Civil litigation publicly discussed internal affairs investigations conducted into some of these officers. *Id.* Similarly, investigations about these officers has been discussed in public media. *Id.*

105.    Upon Figueroa's review of the summaries the Law Department provided, she discovered that no information nor acknowledgement about these internal affairs investigations were included in these summaries. *Id.* These investigations are public knowledge yet the Law Department has obstructed access to Figueroa by not acknowledging them in the summaries of each of the officers.

106.    Failure to even produce these summaries is a pattern and practice which BPD and the Law Department rely on to keep relevant and important disciplinary records hidden from the public in violation of the MPIA.

## CLAIMS

### COUNT I

**Defendants violated Plaintiff's due process rights under the 14th Amendment of the Constitution of the United States, through 42 U.S.C. § 1983, and under Article 24 of the Maryland Declaration of Rights, by maintaining a pattern and practice of obstructing the disclosure of public records**

107.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

108.    Defendants' repeated improper responses to lawful and proper Maryland Public Information Act requests acted to obstruct Plaintiffs' access to Plaintiffs' property interests. Defendants taken action such as ignored requests, transgressed deadlines, misled Plaintiffs on the ongoing production of records, ignored fee waiver requests, deceitfully approached fee waiver requests, urged a narrowing of requests through intimidation of cost, employed an overly broad

use of exemptions to avoid producing documents, and provided minimal records instead of full records of actually requested government operations.

109.    Defendants failed to properly assist in MPIA requests, and/or to work with the requester to make the MPIA request available and financially attainable, in violation of the MPIA.

110.    Defendants evaded answering specific questions from Plaintiffs and further delayed disclosure of records resulting in a constructive denial of the requested records.

111.    Supervisory roles as well as line attorneys in the Baltimore City Law Department both oversaw and participated in this obstruction. The same obstruction was conducted by front line response staff of the Baltimore Police Department and higher supervision, such as the chief of staff. For the foregoing reasons, Defendants have a policy or practice that obstructs access to public records made available under Anton's Law and the MPIA.

112.    By Defendants' refusal to provide timely compliance with the MPIA, by Defendants' reliance on any inapplicable and fictitious exemptions and privileges, by Defendants not assisting in requests, by Defendants' refusal to acknowledge fee waiver requests, and by Defendants' willful refusal to provide any and all records responsive Plaintiffs' MPIA requests, and Defendants' other herein described actions to obstruct disclosure of records of police misconduct, Defendants have violated Plaintiffs' rights to procedural due process of law as proscribed to be applied under the Maryland Public Information Act, and thereby caused Plaintiff to utilize legal counsel to obtain the desired relief.

## COUNT II

**Defendants violated Plaintiff's right to free speech under the 1st Amendment of the Constitution of the United States, through 42 U.S.C. § 1983, and Article 40 of the Maryland Declaration of Rights, by maintaining viewpoint discrimination when restricting access to public records**

113.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

114.    Defendants' have repeatedly responded to lawful and proper Maryland Public Information Act requests by taking action such as ignoring requests outright, transgressed deadlines, misled Plaintiffs on the ongoing production of records, ignored fee waiver requests, deceitfully approached fee waiver requests, urged a narrowing of requests through intimidation of cost, employed an overly broad use of exemptions to avoid producing documents, and provided minimal records instead of full records of actually requested government operations. In light of the facts that Defendants have explicitly communicated disapproval for how Plaintiffs are using requested information to shed light on the practices of Defendants, and Defendants' intention and history of concealing abuse, it is evident that Defendants have taken actions to suppress Plaintiffs' protected speech in order to protect themselves from further liability. Defendants have engaged in viewpoint discrimination towards Plaintiffs because of contempt for the content of their speech.

115.    Defendants impermissibly suppressed access to public records to silence Plaintiffs' use of those records and point of view, and thereby caused Plaintiffs to utilize legal counsel to obtain the desired relief.

116.    Defendants also bring a parallel state constitutional claim pursuant to article 40 of Maryland's state constitution which guarantees the right of "every citizen to speak, write, and publish his sentiments on all subjects." By engaging in viewpoint discrimination, Defendants have also violated Plaintiffs' rights protected under the Maryland State Constitution.

### COUNT III

**Defendants violated Plaintiff's right to free speech under the 1st Amendment of the Constitution of the United States, through 42 U.S.C. § 1983, and Article 40 of the Maryland Declaration of Rights, through retaliation in restricting access to public records**

117.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

118.    Defendants have retaliated against Plaintiffs by placing restraints on their protected speech for previously publishing information in which Defendants did not approve. These restraints have included action such as Defendants' ignoring requests outright, transgressed deadlines, misled Plaintiffs on the ongoing production of records, ignored fee waiver requests, deceitfully approached fee waiver requests, urged a narrowing of requests

through intimidation of cost, employed an overly broad use of exemptions to avoid producing documents, and provided minimal records instead of full records of actually requested government operations. These restraints amount to an attempt on behalf of the Defendants to obstruct Plaintiffs from obtaining the information they need in order to continue their work in providing the community with transparency around the police misconduct. This retaliation has adversely affected Plaintiffs' constitutionally protected speech in that Plaintiffs are now halted from continuing the development of their databases designed to promote transparency, and journalism.

119.    Defendants impermissibly retaliated against Plaintiffs' protected speech by placing numerous restraints on Plaintiffs' access to public records and therefore on Plaintiffs' ability to continue the work of providing the community with public information concerning the police misconduct, and thereby caused Plaintiffs to utilize legal counsel to obtain the desired relief.

120.    Defendants also bring a parallel state constitutional claim pursuant to article 40 of Maryland's state constitution which guarantees the right of "every citizen to speak, write, and publish his sentiments on all subjects." By retaliating against Plaintiffs' protected speech, Defendants have also violated Plaintiffs' rights protected under the Maryland State Constitution.

## COUNT IV

**Defendants violated Plaintiffs' constitutional rights under the 1st and 14th Amendments of the Constitution of the United States, through 42 U.S.C. § 1983, and Articles 24 and 40 of the Maryland Declaration of Rights, by maintaining a conspiracy between agencies and individuals in the ongoing unlawful denial and obstruction of disclosure of public records**

121.    The allegations set forth in the foregoing paragraphs are incorporated herein by reference.

122.    Defendants, being two or more people and agencies, have partnered to accomplish an unlawful act, the violation of Plaintiffs' rights. Defendants' have repeatedly responded to lawful and proper Maryland Public Information Act requests by making unlawful responses such as ignoring requests outright, transgressed deadlines, misled Plaintiffs on the ongoing production of records, ignored fee waiver requests, deceitfully approached fee waiver requests, urged a narrowing of requests through intimidation of cost, employed an overly broad use of exemptions

to avoid producing documents, and provided minimal records instead of full records of actually requested government operations. The Defendants, including the Law Department and BPD, work with a mutual understanding and plan, for instance: when misconduct happens at the hands of BPD, the Law Department fights any liability and exposure of the incident and ultimately fights disclosure of the public records; the Law Department makes bad faith arguments to deny records and to deny fee waivers for the records and plans with BPD to support these bad faith arguments; when BPD makes a bad faith decision to deny a fee waiver, the Law Department relays and maintains that bad faith; and, when the Circuit Court for Baltimore City has found that BPD, through its counsel and custodian the Law Department, knowingly and willfully has violated the MPIA and did not act in good faith, neither party has taken any action to correct their chosen misconduct and instead continues to represent themselves in the same manner.

123.    The nature of Defendants' obstruction of disclosure of public records, as well as the mutual and collective interest to contain liability contained in the release of the public records, culminates in a common design and therein constitutes conspiracy. This conspiracy to violate Plaintiffs' due process and First Amendment rights has caused Plaintiffs to utilize legal counsel to obtain the desired relief.

## PRAYER FOR RELIEF

The Plaintiffs respectfully request that the court:

A. Order Defendants to provide all records meeting the description of each herein named Maryland Public Information Act records request, not claimed in a prior action, to Plaintiffs within ten days.

B. Order Defendants must waive all fees associated with Plaintiffs' records requests involved in this action and not claimed in a prior action.

C. Enter a declaratory judgment that Defendants may only charge for actual prorated costs expensed to Defendants for PIA reproduction, after reproduction is complete and once all actual costs are known, including all specific accounting with a narrative for all fees charged to the requester, in any case where there is no genuine public interest.

D. Enter a declaratory judgment that Defendants violated Plaintiffs' First Amendment rights.

E. Enter a declaratory judgment that Defendants violated Plaintiffs' procedural due process rights as applied under Article 24 of the Maryland Declaration of Rights and the 14th Amendment of the Constitution of the United States.

41

F.  Order a permanent injunction against Defendants that all same and similar record requests made by Plaintiffs be provided by Defendants at no cost within ten days of the request.

G.  Order that Defendants allocate long-term staffing to public record disclosure units to more adequately respond to public records requests, to allow all proper record requests to be granted within the statutory timeframe, and for this proper staffing to be presented to this court for review and approval.

H.  Order that Defendants be sanctioned and found in contempt of court if a Plaintiff files a motion to reopen this case upon evidence of a Defendants' continued pattern and practice described in this complaint.

I.  Enter judgment in Plaintiffs' favor for monetary damages for each of Plaintiffs' constitutional claims.

J.  Order Defendants to pay the fees and cost of Plaintiffs' counsel in this matter, valued at $400 an hour, for the time involved in Plaintiffs' records requests and litigation.

K.  Order Defendants to pay court costs.

L.  Order any additional relief the court deems equitable and proper.


Dated: June 30, 2022

Respectfully submitted,


Matthew Zernhelt, Esq.
Baltimore Action Legal Team
1014 West 36th Street #135
Baltimore, MD 21211
Ph.: (443) 690-0870
mzernhelt@baltimoreactionlegal.org

42

| | | |
|---|---|---|
| OPEN JUSTICE BALTIMORE, ET. AL. | * | IN THE |
| | * | |
| Plaintiffs, | * | CIRCUIT COURT |
| | * | |
| v. | * | FOR |
| | * | |
| BALTIMORE CITY DEPARTMENT OF | * | BALTIMORE CITY |
| LAW, ET. AL. | * | |
| | * | |
| | * | Case No.: |
| | * | |
| Defendants, | * | |
| * * * * * * * * * * * * * * * | * | |

* * * * * * * * * * * * * * *

### Plaintiffs' Demand for a Jury Trial

Plaintiffs elect a trial by jury under Rule 2-325. This demand is valid because:

(1)   It is filed within the time required by Md. Rule 2-325(b).

(2)   This case involves costs improperly and unreasonably assessed to Plaintiffs by Defendants for public records, amounting to over $15,000.00 (exclusive of attorney's fees and damages). This allows for a jury trial pursuant to the Maryland Rules. Md. Code, Cts. & Jud. Proc. § 4-402(e)(1).

    (a)   Defendants placed a value of $44,981.50 on Plaintiff Alissa Figueroa's record request for ten officers' files. Defendants used these costs to coerce Plaintiff to reduce Plaintiff's records request and this remains a primary issue in this case.

    (b)   Defendants have refused to comply with the law and provide timely response to other records requested in this case. Therefore, due to Defendants' violation of the law it is impossible to know the exact cost of records, as Defendants have refused to provide them. However, as Defendants demanded $44,981.50 for ten officer files, Plaintiffs have used this amount to average the cost of single files, resulting in an amount of $4,498.15 per officer file.

        a.   Plaintiff Brandon Soderberg requested two officer files, for Melvin Hill and Luke Shelley, to which a response from Defendants is now in violation. Plaintiff estimates these files to be valued at $8,996.30.

        b.   Plaintiff OJB requested an officer file, for James Deasel, to which a response from Defendants is now long in violation. Plaintiff estimates the fee of this file to be valued at $4,498.15.

43

     c.  Plaintiff OJB similarly requested one-hundred and ninety-seven officer files for all of the officers on the State's Attorney for Baltimore City's "no call list." Defendants are now in violation and overdue in their response to this request. Therefore, OJB is unable to name the exact cost of this request but can estimate one-hundred and ninety-seven officer files by $4,498.15 to equal $886,135.55.

(c) Plaintiff Open Justice Baltimore has requested six months of closed citizen and administrative complaint records, closed between July 1, 2021 and December 31, 2021. Defendants are in violation of their duty to respond to this request. However, Open Justice Baltimore had previously made a request for the full year of records preceding this period, a request twice the size of this request. Defendants stated the value of the full year request was $1.3 million dollars. Therefore, Open Justice Baltimore estimates that the cost of the request for six months of records would be $650,000. While the costs of the records is what is important, it is also important to note Defendants charged Open Justice Baltimore and charged Open Justice Baltimore $603,870 for a full year of records, so it is estimated that Open Justice Baltimore will likely be charged $301,935 for six months of records.

(d) As this case presents a pattern and practice of obstructing disclosure of public records, this case presents the likelihood that the pattern and practice will continue into the future. Defendants have obstructed every single request made by Plaintiffs, and will likely obstruct every request made in the future. Therefore there is a certainty, or at least a high likelihood, that the value of future records are at issue in this case. The value of a single record is reasonably estimated at $4,498.15, therefore the jurisdictional amount will be reached within the time it takes to request four files, which in this case has repeatedly happened at once or within a several month span.

(e) This case requests reimbursement of attorney's fees valued at an excess of $15,000.00, awardable by statute under 42 U.S.C. § 1983.

(3)    Plaintiff has not waived the right to a jury trial.


Dated: June 30, 2022


                       Respectfully submitted,


                       Matthew Zernhelt, Esq.
                       Baltimore Action Legal Team
                       1014 West 36th Street #135

Baltimore, MD 21211
Ph.: (443) 690-0870
mzernhelt@baltimoreactionlegal.org

IN THE CIRCUIT COURT FOR Baltimore City

(City or County)

## CIVIL - NON-DOMESTIC CASE INFORMATION REPORT

### DIRECTIONS

*Plaintiff*: This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant*: You must file an Information Report as required by Rule 2-323(h).

*THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING*

FORM FILED BY: ☒PLAINTIFF ☐DEFENDANT    CASE NUMBER
_____ (Clerk to insert)

CASE NAME: OPEN JUSTICE BALTIMORE vs. The Baltimore City Law Department, Et .
_____
Plaintiff                                                    Defendant

PARTY'S NAME: Open Justice Baltimore, Et. At.    PHONE: 443-690-0870

PARTY'S ADDRESS: 1014 West 36th Street #135, Baltimore, MD 21211

PARTY'S E-MAIL: MZernhelt@baltimoreactionlegal.org

**If represented by an attorney:**

PARTY'S ATTORNEY'S NAME: Matthew Zernhelt, Esq.    PHONE: 443-690-0870

PARTY'S ATTORNEY'S ADDRESS: 1014 West 36th Street #135, Baltimore, MD 21211

PARTY'S ATTORNEY'S E-MAIL: MZernhelt@baltimoreactionlegal.org

JURY DEMAND? ☒Yes ☐No

RELATED CASE PENDING? ☐Yes ☒No  If yes, Case #(s), if known: _____

ANTICIPATED LENGTH OF TRIAL?: _____ hours _____ days

### PLEADING TYPE

New Case: ☒Original  ☐Administrative Appeal  ☐Appeal

Existing Case: ☐Post-Judgment  ☐Amendment

*If filing in an existing case*, skip Case Category/ Subcategory section - go to Relief section.

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.*)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint - DOB of Youngest Plt:
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☒ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Workers' Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. - Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

CC-DCM-002 (Rev. 04/2017)        Page 1 of 3

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

☐ Abatement
☐ Administrative Action
☐ Appointment of Receiver
☐ Arbitration
☐ Asset Determination
☐ Attachment b/f Judgment
☐ Cease & Desist Order
☐ Condemn Bldg
☐ Contempt
☒ Court Costs/Fees
☐ Damages-Compensatory
☒ Damages-Punitive

☐ Earnings Withholding
☐ Enrollment
☐ Expungement
☒ Findings of Fact
☐ Foreclosure
☒ Injunction
☐ Judgment-Affidavit
☒ Judgment-Attorney Fees
☐ Judgment-Confessed
☐ Judgment-Consent
☒ Judgment-Declaratory
☐ Judgment-Default

☐ Judgment-Interest
☒ Judgment-Summary
☐ Liability
☐ Oral Examination
☒ Order
☐ Ownership of Property
☐ Partition of Property
☐ Peace Order
☐ Possession
☒ Production of Records
☐ Quarantine/Isolation Order
☐ Reinstatement of Employment

☐ Return of Property
☐ Sale of Property
☐ Specific Performance
☐ Writ-Error Coram Nobis
☐ Writ-Execution
☐ Writ-Garnish Property
☐ Writ-Garnish Wages
☐ Writ-Habeas Corpus
☐ Writ-Mandamus
☐ Writ-Possession

*If you indicated **Liability** above*, mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐Liability is conceded.  ☐Liability is not conceded, but is not seriously in dispute. ☐Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000     ☐ $10,000 - $30,000     ☐ $30,000 - $100,000     ☐ Over $100,000

☐ Medical Bills $_____     ☐ Wage Loss $_____     ☐ Property Damages $_____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

| | | | | | | |
|---|---|---|---|---|---|---|
| A. Mediation | ☐Yes | ☒No | | C. Settlement Conference | ☐Yes | ☒No |
| B. Arbitration | ☐Yes | ☒No | | D. Neutral Evaluation | ☐Yes | ☒No |

## SPECIAL REQUIREMENTS

☐ If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐ If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated **LENGTH OF TRIAL**.*          ***(Case will be tracked accordingly)***

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time          ☐ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

***For all jurisdictions**, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited**- Trial within 7 months of          ☐ **Standard** - Trial within 18 months of
Defendant's response                                          Defendant's response

EMERGENCY RELIEF REQUESTED

| COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR) |
|---|

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

❏ **Expedited** - Trial within 7 months of Defendant's response     ❏ **Standard** - Trial within 18 months of Defendant's response

**IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY, OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.**

## CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | | |
|---|---|---|
| ❏ | Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☒ | Civil-Short | Trial 210 days from first answer. |
| ❏ | Civil-Standard | Trial 360 days from first answer. |
| ❏ | Custom | Scheduling order entered by individual judge. |
| ❏ | Asbestos | Special scheduling order. |
| ❏ | Lead Paint | Fill in: Birth Date of youngest plaintiff ............................ . |
| ❏ | Tax Sale Foreclosures | Special scheduling order. |
| ❏ | Mortgage Foreclosures | No scheduling order. |

## CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ❏ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ❏ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ❏ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ❏ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

6/30/22
................................................
Date
1014 West 36th Street #135
................................................
Address
Baltimore          MD       21211
................................................
City          State     Zip Code

*Signature of Counsel / Party*
Matthew Zernhelt
................................................
Printed Name