IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OPEN JUSTICE BALTIMORE, *et al*.

    *Plaintiffs*,

    v.

BALTIMORE    CITY    LAW
DEPARTMENT, *et al.*

    *Defendants*.

Civil Action No. ELH-22-1901

**MEMORANDUM OPINION**

This case concerns numerous attempts by a community organization, a journalist, and a journalist/author to obtain records from the Baltimore Police Department ("BPD") pertaining largely to police misconduct. Plaintiffs allege that defendants have violated, *inter alia*, the First Amendment to the Constitution and the Maryland Public Information Act by their "deficient response[s]." ECF 14, ¶ 23.

Unhappy with the defendants' failure to provide the requested records, plaintiffs Open Justice Baltimore ("OJB"), Alissa Figueroa, and Brandon Soderberg filed suit in the Circuit Court for Baltimore City against defendants BPD and BPD Police Commissioner Michael Harrison (collectively, the "BPD Defendants"), as well as the Baltimore City Law Department; City Solicitor James Shea; Stephen Salsbury, Chief of Staff to the City Solicitor; Lisa Walden, Chief Legal Counsel; and the Mayor and City Council of Baltimore (the "City") (collectively, the "City

Defendants").  ECF 3.[1]  Defendants removed the case to federal court.[2]  Thereafter, on October 24, 2022, plaintiffs filed an Amended Complaint.  ECF 14.[3]

Pursuant to 42 U.S.C. § 1983, the Amended Complaint alleges violations of the First Amendment to the Constitution.  It also asserts a parallel claim under Article 40 of the Maryland Declaration of Rights, which is Maryland's counterpart to the First Amendment.  In addition, plaintiffs assert violations of the Maryland Public Information Act ("MPIA"), Md. Code (2019 Repl. Vol., 2022 Supp.), §§ 4-101 *et seq.* of the General Provisions Article ("G.P."), as amended by the Maryland Police Accountability Act ("MPAA" or "Anton's Law"), G.P § 4-351(a)(4), (c), (d), (e).  *See* ECF 14 at 31-36.  Notably, each individual defendant is sued only in his or her official capacity.  *Id.* ¶ 1.[4]  The Amended Complaint is supported by one submission that actually consists of 44 separate exhibits.  *See* ECF 14-1.[5]

---

[1] To my knowledge, Harrison, Shea, Salsbury, and Walden have left their respective positions.

[2] The case was timely removed to federal court on August 2, 2022, pursuant to 28 U.S.C. § 1441(a).  ECF 1 ("Notice of Removal"), ¶ 5.  Removal apparently was based on federal question jurisdiction, because defendants asserted that the case "contain[s] claims under 42 U.S.C. § 1983, *et seq.*, over which this Court has original jurisdiction."  ECF 1, ¶ 6.  However, defendants do not cite 28 U.S.C. § 1331 in their Notice of Removal.

[3] Curiously, the Amended Complaint is titled "Complaint."  *See* ECF 14.

[4] In a later filing, plaintiffs also refer to "Eric Meloncon" as a defendant, in his "official capacity."  *See* ECF 27 at 23.  However, Meloncon is not named as a party in the Amended Complaint.  *See* ECF 14.  Nor is there any indication that he was served with the suit.  *See* Docket.

[5] The original Complaint (ECF 3) was supported by 55 exhibits, each with its own ECF number.  So, if an exhibit was mentioned, it could be easily located.  In contrast, ECF 14-1 consists of 44 separate exhibits, docketed collectively and in random order, totaling 238 pages.  Although plaintiffs provided a courtesy copy of ECF 14-1, it does not contain tabs to separate the exhibits.  Simply put, it was a challenge to wade through the 238 pages in search of particular exhibits.

Plaintiffs seek injunctive relief, attorney's fees, and "other proper relief." ECF 14, ¶ 4. In their "Prayer For Relief," plaintiffs also seek a declaratory judgment and unspecified monetary damages. *Id.* at 35-37.

The BPD Defendants and the City Defendants have each moved to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b). ECF 15 (the "BPD Motion"); ECF 16 (the "City Motion"). Plaintiffs responded collectively to these motions (ECF 27, the "Opposition"), and resubmitted the 44 exhibits collectively. ECF 27-1. The BPD Defendants and the City Defendants replied. ECF 30; ECF 31.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant defendants' motions to dismiss as to the individual defendants, who were sued only in their official capacities, and as to the Baltimore City Law Department. I shall also dismiss plaintiffs' federal law claims. As to the State law claims, I decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3). Therefore, I shall remand the State law claims to the Circuit Court for Baltimore City.

## I. Background

### A. Procedural Summary

Plaintiffs commenced this action on June 30, 2022, by filing suit in the Circuit Court for Baltimore City. ECF 3. The Complaint alleged violations of the First and Fourteenth Amendments to the Constitution as well as Articles 24 and 40 of the Maryland Declaration of Rights.[6]

---

[6] Although the Complaint referenced the MPIA and Anton's Law, the Complaint did not contain a count based on those statutes.

"Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States." *Hawkins v. Leggett*, 955 F. Supp. 2d 474 (D. Md. 2013) (quotation marks omitted). Article 24 "has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution,' so that 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities.'" *Frey v.*

Defendants removed the case to this Court on August 2, 2022, asserting federal question jurisdiction. *See* ECF 1. Thereafter, defendants moved to dismiss the Complaint for failure to state a claim. ECF 12 (BPD Defendants); ECF 13 (City Defendants).

Plaintiffs subsequently filed the Amended Complaint. ECF 14. It did not include due process claims under the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. But, plaintiffs added claims under the MPIA and MPAA. *Id.* ¶¶ 127–65.[7]

Counts I, II, and III assert federal and State free speech claims against all defendants under the First Amendment and its State counterpart, Article 40 of the Maryland Declaration of Rights. In particular, Count I alleges viewpoint discrimination; Count II alleges content-based discrimination; and Count III alleges retaliation in restricting access to public records. *See id.* ¶¶ 127–47.

Counts IV, V, and VI contain State law claims against all defendants brought under the MPIA and the MPAA. *Id.* ¶¶ 148–65. Count IV alleges that defendants violated the MPIA and the MPAA by failing to provide requested police misconduct records to plaintiffs. *Id.* ¶¶ 148–53. Count V alleges that defendants failed to abide by the time provisions of the MPIA. *Id.* ¶¶ 154–

---

*Comptroller of Treasury*, 422 Md. 111, 176, 29 A.3d 475, 513 (2011) (quoting *Attorney Gen. of Maryland v. Waldron*, 289 Md. 683, 704, 426 A.2d 929, 941 (1981)).

Article 40 of the Maryland Declaration of Rights is Maryland's counterpart to the provisions for freedom of speech and freedom of the press contained in the First Amendment. Courts ordinarily "need not consider Article 40 and the First Amendment separately as Article 40 is read generally *in pari materia* with the First Amendment." *Nefedro v. Montgomery County*, 414 Md. 585, 593 n. 5, 996 A.2d 850, 855 n. 5 (2010).

[7] The Amended Complaint (ECF 14) supersedes the original Complaint. *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021); *Young v. City of Mt. Ranier*, 238 F.3d 567, 573 (4th Cir. 2001). Because ECF 12 and ECF 13 are directed to the original Complaint, I shall deny ECF 12 and ECF 13 as moot.

58.  And, Count VI alleges that defendants violated the MPIA and the MPAA by failing to waive fees and costs for plaintiffs.  ECF 14, ¶¶ 160–65.

## B.  The MPIA and The MPAA

The MPIA, enacted in 1970, is Maryland's analog to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  The Maryland General Assembly enacted the MPIA in order to "foster transparency in the operation of our State government" and to "'provide the public the right to inspect the records of the State government or of a political subdivision within the State.'"  *Glenn v. Maryland Dep't of Health and Mental Hygiene*, 446 Md. 378, 380, 384, 132 A.3d 245, 247, 249 (2016) (quoting *Haigley v. Dep't of Health and Mental Hygiene*, 128 Md. App. 194, 207, 736 A.2d 1185, 1191 (1999) (Hollander, J.) (cleaned up).[8]  The provisions of the statute are "'liberally construed . . . in order to effectuate [the statute's] broad remedial purpose.'"  *Kirwan v. The Diamondback*, 352 Md. 74, 81, 721 A.2d 196, 199 (1998) (citation omitted).

The MPIA codifies the ideal of open government that "[a]ll persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees."  G.P. § 4-103.  To that end, the MPIA states that, "[e]xcept as otherwise provided by law, a custodian shall allow a person or governmental unit to inspect any public record at any reasonable time," *id*. § 4-201(a)(1), and that "[i]nspection or copying of a public record may be denied only to the extent provided" by the MPIA.  *Id*. § 4-201(a)(2); *see also Certain Underwriters at Lloyd's, London v. Cohen*, 785 F.3d 886, 893 (4th Cir. 2015); *Waterkeeper Alliance, Inc. v. Md. Dep't of Agric*., 439 Md. 262, 268, 96 A.3d 105, 108 (2014).

---

[8] The MPIA was previously codified in §§ 10-611 to 10-628 of the State Government ("S.G") Article of the Maryland Code.

There are many exceptions and limitations to the general entitlement to public access.  *See* G.P. §§ 4-301, 4-304 to 4-341, 4-434 to 4-356.  Of relevance here, the investigatory records provision of the MPIA, set forth in G.P. § 4–351, is titled "Investigation; intelligence information; security procedures."  It was amended, effective October 1, 2021, by Anton's Law.  It added, *inter alia*, G.P. § 4-351(a)(4).  GP § 4-351 provides (italics in original):

(a) Subject to subsections (b), (c), and (d) of this section, a custodian may deny inspection of:

    (1) records of investigations conducted by the Attorney General, a State's Attorney, a municipal or county attorney, a police department, or a sheriff;

    (2) an investigatory file compiled for any other law enforcement, judicial, correctional, or prosecution purpose; or

    (3) records that contain intelligence information or security procedures of the Attorney General, a State's Attorney, a municipal or county attorney, a police department, a State or local correctional facility, or a sheriff.

    (4) records, other than a record of a technical infraction, relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, and records relating to a disciplinary decision.

(b) A custodian may deny inspection by a person in interest only to the extent that the inspection would:

    (1) interfere with a valid and proper law enforcement proceeding;
    (2) deprive another person of a right to a fair trial or an impartial adjudication;
    (3) constitute an unwarranted invasion of personal privacy;
    (4) disclose the identity of a confidential source;
    (5) disclose an investigative technique or procedure;
    (6) prejudice an investigation; or
    (7) endanger the life or physical safety of an individual.

                    ***

(d) Except as provided in subsection (c) of this section [which concerns disclosures to law enforcement], a custodian:

    (1) shall redact the portions of a record described in subsection (a)(4) of this section to the extent that the record reflects:

        (i) medical information of the person in interest;
        (ii) personal contact information of the person in interest or a
        witness; or
        (iii) information relating to the family of the person in interest; and
    (2) may redact the portion of a record described in subsection (a)(4) of this
    section to the extent that the record reflects witness information other than
    personal contact information.

"Applicant" is defined as a person or governmental unit that asks to inspect a public

record. G.P. § 4-101(b). And, "person in interest" means, *id*. § 4-101(g):

    (1)   a person or governmental unit that is the subject of a public record or
    a designee of the person or governmental unit;
    (2)   if the person has a legal disability, the parent or legal representative of
    the person; or
    (3)   as to requests for correction of certificates of death under § 5–310(d)(2)
    of the Health – General Article, the spouse, adult child, parent, adult sibling,
    grandparent, or guardian of the person of the deceased at the time of the
    deceased's death.

An agency is generally permitted to charge an applicant for costs and fees for "the search

for, preparation of, and reproduction of a public record prepared, on request of the applicant, in a

customized format; and the actual costs of the search for, preparation of, and reproduction of a

public record in standard format, including media and mechanical processing costs." G.P. § 4-

206(b)(i)-(ii). "The fee assessed to the requestor must bear a reasonable relationship 'to the

recovery of actual costs incurred by a governmental unit' for the search, preparation, and

reproduction of requested public records." *Glass v. Anne Arundel Cty.*, 453 Md. 201, 212, 160

A.3d 658, 664 (2017) (quoting former S.G. § 4–206); *see also Action Comm. for Transit, Inc. v.*

*Town of Chevy Chase*, 229 Md. App. 540, 542-44, 145 A.3d 640, 642 (2017) ("The [MPIA] . . .

permits government agencies to charge a reasonable fee for expenses incurred in the course of

responding to a request to inspect public records.").

    However, the agency may waive this fee if "the applicant asks for a waiver," G.P. § 4-

206(e)(1), and if, "after consideration of the ability of the applicant to pay the fee and other relevant

factors, the official custodian determines that the waiver would be in the public interest." *Id.* § 4-206(e)(2)(ii). But, a custodian need not convey to an applicant the reasons underlying that denial. *Action Comm. for Transit, Inc.*, 229 Md. App. at 561, 145 A.3d at 652.

In order for a reviewing court properly to affirm an agency's denial of a fee waiver request the record must, however, contain "sufficient information . . . to satisfy [the court] that the custodian's decision was not arbitrary or capricious." *Id.* When conducting such a review, the court's consideration is not limited to the record before the agency. Rather, it extends to "facts generated 'by pleadings, affidavit, deposition, answers to interrogatories, admission of facts, stipulations and concessions.'" *Id.* at 449 (quoting *Prince George's Cnty. v. Wash. Post Co.*, 149 Md. App. 289, 304, 815 A.2d 859, 868 (2003)).

Although the MPIA governs all aspects of record production, disputes may arise. Contemplating such disputes, the MPIA provides a comprehensive framework for resolving them. *See* G.P. § 4-1A-01 *et seq.* (State Public Information Act Compliance Board); § 4-1B-01 *et seq.* (Public Access Ombudsman); § 4-362 (Judicial Review). If a requestor believes that the agency failed to produce or allow inspection of a document, the requestor may file a complaint with the Office of the Public Access Ombudsman, the State Public Information Act Compliance Board, and/or seek judicial review in the Maryland circuit courts. *Id.*

### C. The Requests

The Amended Complaint concerns eighteen MPIA requests, most of which are quite extensive in scope. ECF 14, ¶¶ 26–35, 41–47. OJB, a § 501(c)(3) community organization in

Baltimore (ECF 14, ¶ 8), made fourteen of the eighteen MPIA requests. *Id*. ¶¶ 26–35.[9]  Soderberg and Figueroa each made two requests. *Id*. ¶¶ 41–47.

The various requests made by each plaintiff are discussed chronologically.[10]  However, it is somewhat difficult to summarize the content of the various requests.  The adage that a picture is worth a thousand words is apt.  Therefore, I begin by including a copy of an OJB request (ECF 14-1 at 2-5), because it serves to illustrate the scope and the complexity of many of the requests.

---

[9] The BPD Defendants assert that sixteen of the requests pertain to them.  ECF 15-1 at 4. And, they assert that OJB made twelve of the requests.  *Id*.  But, they state: "The February 8, 2020 [sic] requests appear to have been made on behalf of Baltimore Action Legal Team, which is the lawyer for OJB, but not a party to this lawsuit."  *Id*. at 4 n. 2.  OJB's counsel, Matthew Zernhelt, Legal Director for the Baltimore Action Legal Team ("BALT"), made all of the requests, on behalf of OJB, not BALT.

[10] The chronological order does not always correspond to the presentation in the Amended Complaint.



December 20, 2019

**Via: Electronic Mail**
**Baltimore Police Department**
   c/o Office of Legal Affairs, Dana Abdul Saboor or MPIA Representative
242 W. 29ᵗʰ Street
Baltimore, MD 21211

        Re: Maryland Public Information Act Request

Dear Public Information Act Representative,

Pursuant to the Maryland Public Information Act, MD CODE, Gen. Prov., T. 4, we hereby request on the behalf of Open Justice Baltimore the following records pertaining to investigations of citizen and administrative complaints against officers of the Baltimore Police Department. Open Justice Baltimore is a Baltimore-based organization interested in policy and handling of police misconduct.

Open Justice Baltimore specifically requests:

1. Records relating to all citizen complaints filed in any manner or form to any member or affiliate of the Baltimore Police Department, about the Baltimore Police Department, with any subsequent investigations and conclusions, that the Baltimore Police Department closed during the period of January 1, 2019 through and including December 19, 2019. Please include the entire file and all related documents as further described below. Please redact the name of the officer of the instant file and interchange with traceable, but not identifiable to the officer, number.

2. Records relating to all administrative complaints filed in any manner or form to any member or affiliate of the Baltimore Police Department, about the Baltimore Police Department, with any subsequent investigations and conclusions, that the Baltimore Police Department closed during the period of January 1, 2019 through and including December 19, 2019. Please include the entire file and all related documents as further described below. Please redact the name of the officer of the instant file and interchange with traceable, but not identifiable to the officer, number.

Please redact the officer's name and badge number in which a complaint is directed. Please replace the officer's name with a number that does not identify the officer's identity. However, maintain consistency so that an officer's assigned number appears repeatedly if they have multiple citizen and/or administrative complaints.

The nature of this request seeks all complaints filed, all records collected or created during the investigation of each complaint, and all records reflecting the conclusion, recommendation, and outcome of each investigation.



"Citizen and administrative complaints" means all complaints made in any form to any member or affiliate of the Baltimore Police Department. This includes complaints made against any of the Department's officers, or any of its units or configurations.

Documents may include, but are not limited to: Complaint forms, Written Notifications, Documentation from any Accelerated Disposition Programs, Disciplinary Review Committee Documents, Final Dispositions, Casebooks, Disciplinary/Failure to Appear and Traffic Matrixes, Disciplinary Recommendations, Acceptance of Disciplinary Action, Charging Documents, Written Summaries, Verdict Sheets, Exhibits, Form 155s, Certification of Completion of Disciplinary Action, Statements, Interviews, Administrative Reports, Form 95s, Use of Force Review documents, Use of Force Preliminary Review Checklist for Supervisors, Use of Force and Reportable Force Documents, Force Reports, Form 96s, Public Safety Statements, Form 97s, Notification of Internal Investigations, Form 98s, 24-Hour Reports, Critical incident debriefing materials, Blue Team Entries, Crime scene logs, Firearm/weapon ballistic reports and diagnostics and photographs, Other photographs and any other evidence collected, Re-classification documents, Analysis supporting changes in classification, Chain of Custody documents, Written requests for extensions, Force Extension Request Forms, Approval and disapproval forms, Documentation of incomplete review, Documentation or errors, Documentation of all communication, Completed assessments, Corrective Recommendations, Unapproved delay Notifications, Use of Force Assessment Form, Use of Force Review Submission Tables, Use of Force Coordinator Files, Additional reviews, Additional assessments, and any Final Reports. Please include documentation of any aid rendered to an injured person. Please provide documents of resulting administrative leave.

Please include all documentation regarding recommendations disciplinary action, counseling, training referrals, and other steps taken. Please also include any criminal referrals made, and documents further created, sent, and received in relation to that referral.

Please include all audio and visual records. This may include but is not limited to: CCTV footage, Private or public surveillance, Cell phone video footage, KGA and 911 recordings, Body worn camera recordings, "dash cam" footage, any other video, and any other evidence collected.

Please include all related documents in IAPro or other record keeping systems. Please also include any documents received from the Civilian Review Board that are maintained with files related to this investigation.

Please also include records of phone, email, and other communications regarding this incident. This may include but is not limited to records of communication with the victim or the victim's family, and critical incident debriefing materials. Please provide any records related to media about an incident. This includes policy statements regarding statements allowed and disallowed, and coordination of public comment or interviews.

Please also provide any relevant training and equipment provided to any involved officers. This includes trainings made available to all those involved in the incident and trainings taken by



those involved in the incident. Training records shall include at a minimum the name of the trainer, type of training conducted, and date the training was completed.

Please include subject matter experts that were consulted, if such occurred, and the exact content in which they assisted, whether it be statements, writings, depictions, audio, video, or other, as well as any recordings of cost for their services and records of transaction for payment of their services.

This record request extends to all parts of the agency, including but not limited to the Department's Special Investigations Response Team ("SIRT") investigations. This includes SIRT investigations done by, in collaboration with, in conjunction with, or parallel to an investigation of Homicide, Crash Team, W.A.T.F., Arson Unit, etc.

Provide these records from all department personnel, including but not limited to: First-Line Permanent-Rank Supervisors, Lieutenants, Executive Officer/Captains, Commanding Officers, Police Commissioner, Trainers, Investigators, etc.

We would prefer the request be filled electronically in a searchable and analyzable electronic format, by e-mail attachment if available, or CD-ROM if not. They can be sent to mzernhelt@baltimoreactionlegal.org. If there is a concern with sending them via email, please contact me at that email address as soon as possible. Please acknowledge which, if any, of the above records the Baltimore Police Department does not keep in a searchable and analyzable electronic format, and provide those records in the fullest and most accessible format you maintain.

As you know, the Act requires that you make available for inspection and copying all public records, except certain exempt records, within thirty days of receipt of a request.

It is our position that all of the requested information is clearly public and non-exempt under the Act.

In the event that some of the information requested is deemed to fall under an exception to the Act, we expect, as the Act requires, that you will notify me within ten days and redact the material which you believe is exempt and send the remaining non-exempt material within thirty days. Please identify with specificity the information that is deemed not to fall within the Act and please list the specific exemption(s) under the Act on which you rely to withhold the records. We do not object if you redact any: social security numbers; the home address and phone of witnesses or complainants; medical records; or identifying information of the complainant or civilian third-party witness.

We are prepared to pay reasonable copying costs for reproducing the requested materials but request that you waive any such fees under the GP § 4-206(e), which authorizes you to waive copying fees when doing so would be "in the public interest." Being a program of a non-profit organization the requestor has been deemed a public interest organization, classified tax-exempt, not generating any beneficiary income.  Additionally, the requestor seeks the information for a public purpose and concern, as it regards official actions and the agency's performance of its

1601 Guilford Avenue 2 South Baltimore, MD 21202                                    3



public duty. As it regards the public safety, welfare, and legal rights of the general public, and because it bears implications on the interests of Maryland taxpayers, the request further aligns with the public interest. Furthermore, this request is not for commercial benefit as it is not made by news media.

In the event that there are fees, please inform BALT of the total charges in advance of fulfilling this request.

Thank you for your time, prompt attention to, and cooperation in this matter.

Sincerely,

Matt Zernhelt, Esq.

On December 19, 2019, OJB, through counsel, submitted a request to the BPD, over three pages in length. *Id.* at 1-5 ("Request 1" or "Exhibit 1").[11] OJB requested "the entire file and all related documents" pertaining to administrative and civilian complaints against members of the BPD that BPD had closed between January 1, 2019, and December 19, 2019. *Id.* at 2; *see also* ECF 14, ¶ 26. OJB invited BPD to redact and replace names and badge numbers with traceable but non-identifiable numerical designations, "so that an officer's assigned number appears repeatedly if they have multiple citizen and/or administrative complaints." ECF 14-1 at 2.

Request 1 devotes more than a page to the definition of the term "documents." And, the request also seeks records of phone and email communications and training records, as well as information as to any experts consulted by the BPD. *Id.* at 3, 4. Moreover, the request "extends to all parts of the agency and all BPD personnel. *Id.* at 4.

---

[11] Although plaintiffs allege in the suit that the request was made on December 19, 2019, the request is dated December 20, 2019. *See* ECF 14-1 at 2.

Plaintiffs allege: "Defendants declared that disclosure of their internal accountability records was not in the public interest so no fees would be waived."  ECF 14, ¶ 26.  And, as of the filing of the Amended Complaint, they assert that "[n]o records have been disclosed" in response to this request.  *Id.*

OJB submitted a request to the BPD on December 20, 2019, again over three pages in length.  ECF 14-1 at 59-63 ("Request 2" or "Exhibit 10"); *see* ECF 14, ¶ 30.  Request 2 sought all files related to investigations of the Special Investigation Response Team ("SIRT") that were closed between July 1, 2018, and December 19, 2019.  ECF 14-1 at 60.

On January 10, 2020, OJB sought records pertaining to citizen and administrative complaints against BPD officers that have been "open for over twelve months."  ECF 14-1 at 6-10 ("Request 3" or "Exhibit 2") (underlining in original).  And, by separate letter on January 10, 2020, OJB asked BPD for all files related to SIRT investigations open for more than twelve months.  ECF 14-1 at 64-68 ("Request 4" or "Exhibit 11");[12] *see* ECF 14, ¶ 30.  Requests 3 and 4 are each almost four pages in length.

In all four requests, which are comparable in detail, OJB asked BPD to waive any costs and fees related to reproducing the requested records, writing ECF 14-1 at 4-5, 9-10, 63, 68:

> We are prepared to pay reasonable copying costs for reproducing the requested materials but request that you waive any such fees under the GP § 4–206(e), which authorizes you to waive copying fees when doing so would be "in the public interest." Being a program of a non-profit organization the requestor has been deemed a public interest organization, classified tax-exempt, not generating any beneficiary income. Additionally, the requestor seeks the information for a public purpose and concern, as it regards official actions and the agency's performance of its public duty. As it regards the public safety, welfare, and legal rights of the general public, and because it bears implications on the interests of Maryland taxpayers, the request further aligns with the public interest. Furthermore, this request is not for commercial benefit as it is not made by for-profit news media.

---

[12] Plaintiffs seem to refer to Exhibit 12, rather than Exhibit 11.  *See* ECF 14, ¶ 30, line 2. But, Exhibit 12 is a request of February 3, 2020, and it does not pertain to SIRT.

In response to these requests, plaintiffs allege that "BPD and the Law Department declared it was not in the public interest to publicly disclose records of how it handles violence and its misconduct." ECF 14, ¶ 30.  Moreover, they assert that "BPD and the Law Department obstructed access to these public records by delaying responses to requests, employing a broad use of exemptions to disclosure, urging OJB to narrow the requests, using deceitful fee waiver practices, and repeatedly transgressing MPIA deadlines." *Id.*  According to plaintiffs, "OJB only received the first [SIRT] request after an improper demand for payment, and only after production was delayed by twenty-one months, undermining the information's relevance." *Id.*

The BPD Defendants note that OJB's requests dated December 19, 2019 (Request 1), December 20, 2019 (Request 2), and January 10, 2019 (Requests 3 and 4) are the subject of litigation in the Maryland judicial system.  ECF 15-1 at 5.  They refer to the case of *Open Justice Baltimore v. Baltimore Police Department, et al*., filed in the Circuit Court for Baltimore City on March 2, 2020, Case 24-C-20-001269.  It is now pending before the Supreme Court of Maryland, based upon a writ of certiorari granted on or about September 30, 2022.  *See Baltimore Police Department v. OJB,* 482 Md. 7, 282 A.3d 1106 (2022). [13]  Argument was held on January 6, 2023. [14]

_____

[13] In Maryland's general election of November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland.  And, the voters also approved changing the name of the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022.  *See* Press Release, Maryland Courts, Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland (Dec. 14, 2022), https://www.courts.state.md.us/media/news/2022/pr20221214#:~:text=Effective% 20immediately % 2C% 20the% 20Court% 20of,the% 20Appellate% 20Court% 20of% 20Maryland.

[14] Four MPIA applications are at issue in the case.  In an unpublished opinion issued on February 7, 2022, the Maryland Court of Special Appeals upheld the decision of the Circuit Court, denying production of records for open internal investigations.  But, the State's intermediate appellate court reversed as to the denial of the fee waiver requests.  *See Open Justice Baltimore v. Baltimore City Police Department*, No. 122, Sept. Term, 2021, 2022 WL 354486 (Feb. 7, 2022).

In a four-and-a-half-page submission on February 3, 2020, OJB requested records of investigations of potential or alleged criminal conduct of Officer Robert Dohony since at least March 28, 2017. ECF 14-1 at 69-74 ("Request 5" or "Exhibit 12"); *see* ECF 14, ¶ 31. Request 5 also sought a fee waiver. ECF 14-1 at 73.

Plaintiffs allege: "BPD and the Law Department repeatedly attempted to thwart OJB's access to the records through a variety of methods: transgressing the MPIA deadline for responding to Dohony's records request, repeatedly and egregiously ignoring OJB's fee waiver requests, suggesting OJB narrow their [sic] request for Dohony's records, and employing an overly broad use of exemptions to avoid granting OJB access to Dohony's records." ECF 14, ¶ 31. Additionally, they allege that, as of the filing of the Amended Complaint, "no records have been provided." *Id*. In response, BPD Defendants state that "OJB requested misconduct records of Robert Dohony prior to the passage of Anton's Law, when such records were not disclosable." ECF 15-1 at 6.

OJB requested a list of all active employees of the BPD on December 14, 2020. ECF 14-1 at 113-115 ("Request 6" or "Exhibit 21"); *see* ECF 14, ¶ 33. As to these employees, OJB sought information as to ethnicity, gender, date of birth, service dates, job titles, as well as other work information. ECF 14-1 at 114-115. Ken Hurst, Contract Specialist and Document Compliance Coordinator in BPD's Office of Legal Affairs, acknowledged the request three days later. *Id*. at 116. And, on February 18, 2021, Hurst notified OJB that he had "received the information requested" but was "waiting on the review by the paralegal to approve for release after redactions have been done." *Id* at 121. On March 5, 2021, Hurst wrote: "Sorry for the delay. I'm waiting on

---

A related appellate case, decided on December 17, 2021, is titled *Baltimore Action Legal Team v. Office of State's Attorney of Balt.*, 253 Md. App. 360, 265 A.3d 1187.

the para legal [sic] to finish, we are a little behind."  ECF 14-1 at 122.  Then, on March 25, 2021,

Hurst "sent an official response letter indicating that OJB's request had been denied based on [what

OJB regards as] inapplicable exemptions."  ECF 14, ¶ 33; *see* ECF 14-1 at 123.[15]  According to

the BPD, "OJB's December 14, 2020 request [(Request 6)] was the subject of *Open Justice*

*Baltimore v. The City of Baltimore, et al*., filed on August 30, 2021, in the Circuit Court for

Baltimore City, Case 24-C-21-003745.  ECF 15-1 at 5.

Plaintiffs allege that "OJB submitted another request on October 1, 2021, seeking all officer

misconduct complaints closed between July 1, 2020, and June 30, 2021."  ECF 14, ¶ 26 ("Request

7").[16]  In a letter to OJB dated October 12, 2021 (ECF 14-1 at 17-22), Hurst addressed OBJ's

requests for closed citizen complaints for the period July 1, 2020 through June 30, 2021; closed

administrative complaints for the same period; as well as citizen and administrative complaints

open for more than a year.  He stated: "BPD will provide [OJB] with the responsive records

regarding closed citizen and administrative complaints."  *Id*.  But, Hurst advised that the requests

were denied for "open citizen complaints and open administrative complaints" because disclosure

"would prejudice" ongoing investigations.  *Id*.

Hurst's letter continued, *id*. at 20:

> BPD is certainly cognizant of the overwhelming public interest in the review of
> these files.  BPD also understands that [OJB] intend[s] to make this information
> public.  For these reasons, BPD is granting a complete waiver of all of BPD's fees.
> The only cost passed on to [OJB] will be that of the outside counsel, a cost that
> BPD is incurring only because of [OJB's] request.

---

[15] The Court was not provided with a copy of the letter.

[16] Plaintiffs cite to Exhibit 2 for this request.  ECF 14, ¶ 26, line 4.  But, Exhibit 2, discussed
earlier, is a request made on January 10, 2020.  *See* ECF 14-1 at 6-10.  I was unable to locate the
particular exhibit in ECF 14-1.

BPD valued the fee waiver at more than $770,000.  ECF 14-1 at 20.  The letter details the anticipated time and expense for outside counsel as well as the Baltimore City Law Department. *Id.* at 19-20.  BPD also noted that it cannot estimate the cost of video and/or video recordings, which "vary from file to file."  *Id.* at 21.  And, Hurst stated that OJB would have to submit a "prepayment" of $603,870.00 "before any work can commence."  *Id.*  According to plaintiffs, this "constituted a fee waiver denial."  ECF 14, ¶ 27.

In a follow-up email to OJB regarding this request, dated August 11, 2022 (ECF 14-1 at 37), Salsbury stated that "it was determined that there were in fact fewer cases that fit the perimeters [sic] of [OJB's] original request."  *Id.*  When OJB asked later that day how the change would affect the fees for the request (*see id.* at 40), Salsbury stated: "[W]e do anticipate a change in the fee estimate based on the lower number of files."  *Id.*  He added: "We are currently working with our outside vendor to prepare the estimate."  *Id.*

In their motion to dismiss, the BPD Defendants assert that "OJB's MPIA request made on October 1, 2021 [(Request 7)] is the subject of *Open Justice Baltimore v. Baltimore Police Department, et al*. (Circuit Court for Baltimore City, case no. 24- C-21-005650, filed December 15, 2021[]]" ", ECF 15-1 at 5, pending before the Circuit Court for Baltimore City.  *Id.* at 5-6.  But, they also assert that the Circuit Court "rejected OJB's arguments and granted BPD's Motion to Dismiss with respect to violations of the First Amendment on August 15, 2022."  *Id.* at 5 n. 4. Further, they claim that the case is proceeding under the MPIA's "dispute resolution framework." *Id.*

In an email to the BPD dated February 8, 2022, OJB requested the "entirety of disclosable material in Det. Jame [sic] Deasel's personnel file, everything available including all investigations

and conclusions." ECF 14-1 at 24 ("Request 8" or "Exhibit 5"); *see* ECF 14, ¶ 32. OJB also requested "a fee waiver for this material." ECF 14-1 at 24.

That same day, OJB submitted "a new PIA request" for "[a]ll police reports" concerning "arrests involving BPD Det. James Deasel." *Id*. at 76 ("Request 9" or "Exhibit 13"). Plaintiffs allege that the second email "was for thirty-five specified criminal incident reports written by James Deasel that aroused public suspicion." ECF 14, ¶ 32. OJB also asked defendants to "[f]ulfill this request at no cost." ECF 14-1 at 76. Plaintiffs assert that "OJB hoped smaller and simpler requests would be easier for BPD and the Law Department to navigate," but defendants still "refused to fulfill OJB's request for even a single officer's file." ECF 14, ¶ 32.

According to plaintiffs, on April 21, 2022, "the Law Department provided what they described as James Deasel's personnel file." *Id*.; *see* ECF 14-1 at 93-94. However, plaintiffs allege that "the attached document was only a summary of James Deasel's file, in direct contradiction and disregard of both OJB's original request and the parties' ongoing communications." ECF 14, ¶ 32.

Specifically, in an email to Hurst and Salsbury dated April 25, 2022 (ECF 14-1 at 96, Exhibit 16), OJB stated, in part, *id*. (brackets added):

> [OJB] asked for the full file on 2/8. You responded with an offer to provide a summary on 2/24 to which [OJB] clearly stated [OJB] wanted the entirety of his personnel file on 2/24. [OJB] then followed up to this directly on at least 2/25, 3/11, and 3/31. You then only sent the summary.

On October 4, 2022, Hurst wrote to OJB. ECF 14-1 at 102-06 (Exhibit 18). He said, in part, *id*. at 103 (underlining in original):

> Upon reviewing your request, BPD will provide you with the responsive closed disciplinary files of Det. James Deasel. A response to your fee waiver request and a detailed cost estimate is provided below. However, your request "for Det. James Deasel's personnel file, everything available including all investigations

and conclusions" is denied for all <u>open</u> disciplinary actions as such disclosure would prejudice pending administrative and/or criminal investigations.

According to plaintiffs, on October 21, 2022, Hurst sent OJB "25 of the requested criminal incident reports" related to Detective Deasel.  ECF 14, ¶ 32; *see* ECF 14-1 at 111-12.  However, plaintiffs allege that "[t]he Law Department has yet to disclose the personnel file requested in February."  ECF 14, ¶ 32.  In their Motion, the BPD Defendants claim that "BPD has not produced the misconduct records of James Deasel because the requestor has not paid the nonwaived portion of the productions."  ECF 15-1 at 6.

On February 14, 2022, OJB requested the names of officers matching each case number on a list of BPD's 2019 misconduct investigations.  ECF 14, ¶ 28 ("Request 10").[17]  In an email to OJB dated May 29, 2022, Julie Hallam, Esquire, of the Baltimore City Law Department, provided the list in PDF format.  ECF 14-1 at 46.  And, upon requests from OJB on May 21, 2022, and June 2, 2022 (*see id*. at 47), Hallam provided the spreadsheet in "Native format" on June 6, 2022.  *Id*.

On February 21, 2022, in an email to Dana Moore, the Chief Equity Officer for Baltimore City, OJB requested all Civilian Review Board ("CRB") investigations "closed in calendar year 2021, regardless of finding."  ECF 14-1 at 133 ("Request 11" or "Exhibit 22"); *see* ECF 14, ¶ 34. Additionally, OJB requested "all [Internal Affairs Division] files provided to the CRB from BPD in calendar year 2021."  ECF 14-1 at 133.  Based on the recent passage of Anton's Law, OJB also requested minimal redactions of officers' names.  *Id*.  And, OJB asked "for all communications to and from BPD in efforts relating to the investigations, as well."  ECF 14-1 at 133.  Further, OJB "request[ed] a fee waiver in the public interest."  *Id*.

---

[17] The Court was not provided a copy of this request.

In the months that followed, OJB and Assistant City Solicitor D'ereka Bolden exchanged several emails. *See id.* at 135-44 (Exhibit 23). Notably, on May 27, 2022, Bolden wrote to OJB stating, in part: "In consideration of your fee waiver request, the CRB has decided to provide all responsive records to you on a rolling basis at no charge." *Id.* at 145. However, plaintiffs allege that, as of the filing of the Amended Complaint, "Defendants produced only one CRB file, which lacks any officer's name." ECF 14, ¶ 34.

On March 14, 2022, OJB requested all officer misconduct complaints closed between July 2021 and December 2021. ECF 14-1 at 11-15 ("Request 12" or "Exhibit 3"); *see* ECF 14, ¶ 26. OJB also included a fee-waiver request, "in the public interest." ECF 14-1 at 14. According to plaintiffs, "[n]o requested records have been disclosed to date." ECF 14, ¶ 26.

Then, on March 31, 2022, OJB requested a list of names of officers associated with misconduct investigations from 2020 and 2021. ECF 14, ¶ 29 ("Request 13"); ECF 14-1 at 58.[18] According to plaintiffs, "[t]he Law Department took two months before responding to this request." ECF 14, ¶ 29. And, plaintiffs claim that the "list has still not been produced." *Id.*

The last MPIA request made by OJB, dated May 26, 2022, sought the full personnel files of 197 officers "that [sic] are on the State's Attorney for Baltimore City's list of police officers with issues of integrity[.]" ECF 14-1 at 147 ("Request 14" or "Exhibit 24"); *see* ECF 14, ¶ 35. That same day, Salsbury responded to the request, stating: "We'll review and get back to you in accordance with the provisions of the MPIA." ECF 14-1 at 148. Plaintiffs allege that, as of the date of filing the Amended Complaint, defendants "have failed to provide any further response, let alone records." ECF 14, ¶ 35.

---

[18] Plaintiffs cite "Ex. 9." *See* ECF 14, ¶ 29. Exhibit 9 appears at ECF 14-1 at 49-58. The exhibit consists of correspondence that begins on January 4, 2022. *Id.* at 50. ECF 14-1 at 58 contains a reference to a request made on March 31, 2022.

In their motion to dismiss, BPD Defendants contend that "only OJB's requests dated March 14, 2022, March 31, 2022, and May 26, 2022 (Requests 12 to 14) remain either pending or not the subject of state court litigation."  ECF 15-1 at 6.

As noted, the two individual plaintiffs also submitted MPIA requests.  They allege that on "April 30, 2021, Alissa Figueroa through her assistant Laura Juncadella requested BPD's investigatory files and related records regarding the in-custody death of Tyrone West, which occurred on or around July 18, 2013."  *Id.* ¶ 43; *see* ECF 14-1 at 194-96 ("Request 15" or "Exhibit 33").  Juncadella stated that she is "a member of the news media and this request is for news gathering purposes."  ECF 14-1 at 196.  She also claimed that "disclosure of the requested information is in the public interest."  *Id.*  Therefore, she requested "a waiver of all fees . . . ."  *Id.*  According to plaintiffs, "Figueroa was charged about $400 and the records were not released to her until on or around November 4, 2021."  ECF 14, ¶ 43.[19]

In an Affidavit of Figueroa dated June 29, 2022, (ECF 14-1 at 198-199), Figueroa details another MPIA request she made.  *See* ECF 14, ¶ 44 ("Request 16").  The Affidavit states, ECF 14-1 at 198-199 (emphasis in original):

  • On October 1, 2021, my team and I requested all records relating to misconduct investigations for ten police officers.

  • Over thirty days later, the Baltimore City Law Department (Law Department) responded on November 3, 2021, granting the request but cited enormous fees. The Law Department estimated that it would cost BPD a total of $5,177.00, outside counsel a total of $61,332.50, and the Baltimore City Law Department a total of $52,743.00.

  • Although the Law Department stated it was cognizant of the public interest and the intent to make this information public, the Law Department stated that it would

---

[19] Tyrone West died on July 18, 2013, in the aftermath of a traffic stop.  His death spawned fierce litigation in this Court in which West's family alleged the use of excessive force.  The case culminated in a settlement.  *See Jones v. Chapman*, Case ELH-14-2627.

be unable to waive all costs and would only waive BPD and the Law Department's fees.

• Since the Law Department had "to pay outside counsel," they said I would still be responsible for $44,981.50, with that full amount being due before production began. This amount would allegedly cover the contract attorney fee of $25,000.00, the managing attorney fee of $7,644.00, a three and a half month hosting charge of $3,150.00, and a three and a half month LSPM charge of $9,187.50. The Law Department also informed me that due to COVID, there would be a delay in the production of the files and that this fee was only an estimate.

• As an independent journalist, I did not have the funds to pay this amount of money. Without the full grant of the fee waiver, it was impossible for me to access the records I had requested.

• I responded to the Law Department's presentation of costs asking for an estimate of fees for just two officers' files out of the list of ten.

• The Law Department followed-up with an email, redirecting away from disclosure of actual files, stating "[i]n lieu of providing you with a new cost estimate, we would like to offer you the option to receive the disciplinary history summary for each BPD member identified in the request in lieu of a comprehensive response to the request. These summaries . . . can be prepared more quickly than a full disciplinary file, and can be produced **at little or no costs to the requestor.**" I received this email on January 11, 2022, 102 days after my initial October 1, 2021 request.

• After being presented with an insurmountable fee for actual files and abusive delay in response times, I was presented with taking summaries or obtaining no records at all. Laura Juncadella, my research assistant, responded to the Law Department's email confirming that I would accept the disciplinary history summary for each BPD member identified in the request in lieu of a comprehensive response to the request. Juncadella, asked for confirmation of receipt of the email; none was given.

• Juncadella followed up fourteen days later on January 27, 2022 but received no response. Four days later, on January 31, 2022, she followed up again to confirm that the request had been received but again there was no response. Forty days after requesting the summaries, on February 22, 2022, she asked for a status request; there was no response. Sixty-one days after requesting the summaries, on March 15, 2022, she followed up again.

• Between this time and April 1, 2022, there was a phone call between the parties and Juncadella was informed that there would be a status update on April 1, 2022. On April 1, 2022, seventy-eight days after requesting the summaries, and 180 days after the initial requests, Juncadella followed up to ask for a status update.

23

• The Law Department finally responded with the summaries. It took the law department 180 days, or half of a year, and more than nine follow-up emails or phone calls to produce a reduced version of my initial request. As a freelance journalist paying my team by the day, I used a great amount of my minimal resources to receive what already belongs to the public under Anton's law.  The Law Department took active and passive steps to obstruct my access to disciplinary records that I requested.

• I have known about at least one previous internal affairs investigation for all ten officers.  These officers had previously been involved in the loss of life. Civil litigation has been brought due to death at the hands of these officers.  Civil litigation publicly discussed internal affairs investigations conducted into some of the officers.  Similarly, investigations about these officers have been discussed in public media.  Upon review of the summaries the Law Department provided, I discovered that no information nor acknowledgement about these internal affairs investigations were included in these summaries.

Soderberg "filed two requests for officer disciplinary records in Spring 2022, and the Law Department responded to both with a form email stating he would be contacted with the 'possible costs associated with this request,' and suggesting he accept 'the disciplinary history summary for each BPD member identified in the request in lieu of a comprehensive response to the request.'" ECF 14, ¶ 41 (citing ECF 14-1 at 189-90 ("Request 17" or "Exhibit 31") & 191-92 ("Request 18" or "Exhibit 32")).  According to the BPD Defendants, "Soderberg did not communicate any issues with BPD or utilize any of the MPIA dispute resolution mechanisms prior to this lawsuit."  ECF 15-1 at 6 (citing ECF 14, ¶¶ 41, 53).

In sum, plaintiffs allege that the BPD and the Baltimore City Law Department "have violated the law in their responses to every single request."  ECF 14, ¶ 2.  They contend that "the repeated and protracted fight over each records request cumulatively display [sic] a true pattern and practice of obstructing disclosure as required by the [MPIA]."  *Id*.  Further, they contend that all defendants "have taken actions to prevent the disclosure of police misconduct records . . . ." ECF 14, ¶ 3.

## II. Standard of Review

The BPD Defendants and the City Defendants have each moved to dismiss under Fed. R. Civ. P. 12(b)(6).  ECF 15; ECF 16.  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at

25

555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the

factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). But, "[m]ere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included

allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).   In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

29

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Under the principles outlined above, I may consider ECF 14-1, consisting of 44 exhibits, because plaintiffs appended the exhibits to their Amended Complaint.  The exhibits are also integral to the Amended Complaint.  *See* ECF 14.  Moreover, the authenticity of the exhibits is not disputed, nor do defendants take issue with them.[20]

And, as noted, defendants point out that OJB has lodged related MPIA lawsuits against the BPD and other defendants in State court.  They cite *Open Justice Baltimore v. Baltimore Police Department, et al*., Circuit Court for Baltimore City, Case 24-C-20-001269, filed March 2, 2020; *Open Justice Baltimore v. The City of Baltimore, et al*., Circuit Court for Baltimore City, Case 24-C-21-003745, filed August 30, 2021; and *Open Justice Baltimore v. Baltimore Police Department, et al*., Circuit Court for Baltimore City, Case 24-C-21-005650, filed December 15, 2021.  In the context of a motion to dismiss, "[a] court may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug.

---

[20] ECF 27-1 appears to be identical to ECF 14-1.  I will cite only to ECF 14-1.

20, 2015), *aff'd*, 639 F. App'x. 200 (4th Cir. 2016); *see also Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990) (holding that a district court may "properly take judicial notice of its own records").  Therefore, I may take judicial notice of the complaints filed in each of State court cases.

### III. Discussion

### A. Claims and Parties

### 1.

Plaintiffs filed suit against four individual defendants, only in their official capacities.  ECF 14 at 2.  They also sued the BPD, the Baltimore City Law Department, and the City for the exact same conduct and claims.

As an initial matter, when a plaintiff sues an individual in his or her official capacity, and also sues a municipality or agency for the same conduct, the claims against the individual are duplicative.  *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against [the defendant] in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative."); *Cottman v. Baltimore Police Department*, SAG-21-00837, 2022 WL 137735, at *5 (D. Md. Jan. 13, 2022) (dismissing a claim against the BPD Commissioner "as it is duplicative of [the plaintiff's] *Monell* claim against the BPD.")  This is because "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Huggins v. Prince George's County*, 683 F.3d 525, 532 (4th Cir. 2012)); *see also Griffin v. Salisbury Police Dep't*, RDB-20-2511, 2020 WL 6135148 at *4 (D. Md. Oct. 19, 2020) ("[A] claim against a state official in his

31

official capacity is analogous to asserting a claim against the entity of which the official is an agent.").

Again, all of the individual defendants were sued only in their official capacities. On this basis, the claims against Commissioner Harrison are duplicative of the claims against the BPD. And, the claims against City Solicitor James Shea; Stephen Salsbury, Chief of Staff to the City Solicitor; and Lisa Walden, Chief Legal Counsel are duplicative of the claims against the Mayor and City Council of Baltimore. Therefore, the claims against the individual defendants are subject to dismissal.

In addition, the Amended Complaint is woefully deficient in failing to allege any facts related to actionable conduct on the part of Harrison and Shea. As mentioned, the federal constitutional claims are lodged pursuant to 42 U.S.C. § 1983. I discuss § 1983 in detail, *infra*. But, I note here that there is no respondeat superior liability under § 1983. Rather, liability under 42 U.S.C. § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983).

To be sure, supervisor may be liable "for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013). However, liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020). Thus, supervisory liability under § 1983 must be predicated on facts that, if proven, would establish that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in

32

conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014).

To qualify as "pervasive," a plaintiff must demonstrate that the challenged conduct "is widespread, or at least has been used on several different occasions." *Shaw*, 13 F.3d at 799. Therefore, it is insufficient to point "to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence . . . nor can he reasonably be expected to guard against the deliberate [unlawful] acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan*, 737 F.2d at 373) (alteration inserted).  On the other hand, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799.

The Amended Complaint is devoid of reference to any conduct on the part of Harrison and Shea that would amount to supervisory liability.  Plaintiffs have not set forth any allegations that Harrison or Shea were personally involved in the events at issue, nor have they alleged facts indicating supervisory liability.

In sum, the Amended Complaint fails to state a claim as to any of the individual defendants. *See* ECF 14.  Therefore, I shall dismiss the suit as to these defendants.

**2.**

The Baltimore City Charter provides that "[t]he inhabitants of the City of Baltimore are a corporation, by the name of the 'Mayor and City Council of Baltimore,' and by that name ... may sue and be sued." BALTIMORE CITY CHARTER art. 1, § 1.  The Baltimore City Law Department is not an entity that has an independent legal identity separate from the Mayor and City Council of Baltimore.  Nor does it have the capacity to sue or be sued.  Rather, it is an executive agency of City government.

In my view, the Baltimore City Law Department is not a proper defendant.  *Cf. Weathersbee v. Baltimore City Fire Dept.*, 970 F. Supp. 2d 418, 425 (D. Md. 2013) (concluding that no claims were viable against the Baltimore City Fire Department because it is not an entity that can sue or be sued); *Jenkins v. Balt. City Fire Dep't*, 862 F. Supp. 2d 427, 442 (D. Md. 2012) ("The Court finds no merit in plaintiffs' argument that [the Baltimore City Fire Department] is an agent of the City and agents can be sued . . . ."), *aff'd on other grounds*, 519 F. App'x 192 (4th Cir. 2013); *Upman v. Howard County Police Dep't*, RDB-09-1547, 2010 WL 1007844, at *2 (D. Md. Mar. 17, 2010) ("Maryland law is not unique as federal courts have traditionally recognized that individual government departments lack the capacity to be sued.").  In other words, naming both the Baltimore City Law Department, along with the Mayor and City Council of Baltimore, is superfluous.

Accordingly, I shall dismiss the suit as to the Baltimore City Law Department.

**3.**

The BPD Defendants argue that "the Court should dismiss any claims related to the [previously filed] state court suits."  ECF 15-1 at 22.  Plaintiffs do not dispute this contention.  *See* ECF 27.

Litigants are generally not permitted to pursue simultaneously or successively the same claim in two cases. "The rule against claim splitting 'prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action.'" *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 635 (4th Cir. 2015) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. Appx. 256, 265 (4th Cir. 2008)). "In a claim splitting case, as with the traditional res judicata analysis, the second suit will be barred if the claim involves the same parties or their privies and 'arises out of the same transaction or series of transactions' as the first claim." *Sensormatic*, 452 F. Supp. 2d 621, 626 (D. Md. 2006), *aff'd*, 273 Fed. Appx. 256 (4th Cir. 2008) (citing *Trustmark Insur. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1269–70 (11th Cir. 2002)).

The prohibition on claim splitting fosters judicial economy and protects parties from "the vexation of concurrent litigation over the same subject matter." *Alston v. Experian Info. Sols., Inc.*, TDC-14-3957, 2016 WL 901249, at *3 (D. Md. Mar. 3, 2016), *aff'd*, 680 F. App'x 243 (4th Cir. 2017). The doctrine is intended in part "to prohibit plaintiffs from 'circumventing' a court's earlier ruling." *Chihota v. Fulton, Friedman & Gullace, LLP*, WDQ-12-0975, 2012 WL 6086860, at *3 (D. Md. Dec. 5, 2012). In determining the appropriate recourse for a claim splitting violation, courts must also be mindful to "protect[ ] litigants against gamesmanship." *Airframe Systems, Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010); *see also Chihota*, 2012 WL 6086860, at *2 n.18.

As noted, OJB lodged three related MPIA lawsuits against the BPD and other defendants in State court. These suits allegedly concern Requests 1 through 4, 6, and 7. In particular, *Open Justice Baltimore v. Baltimore Police Department, et al*., Circuit Court for Baltimore City, Case 24-C-20-001269, filed March 2, 2020, pertains to Requests 1, 2, 3, and 4. *Open Justice Baltimore v. The City of Baltimore, et al*., Circuit Court for Baltimore City, Case 24-C-21-003745, filed August 30, 2021, concerns Request 6. And, *Open Justice Baltimore v. Baltimore Police*

*Department, et al.*, Circuit Court for Baltimore City, Case 24-C-21-005650, filed December 15, 2021, pertains to Request 7.

The Court was not provided with any documents or filings related to the State court cases. But, as discussed earlier, the Court may take judicial notice of the complaints filed in the state cases. And, those suits concern Requests 1 through 4, 6, and 7 of the instant case. Therefore, as to these six requests, plaintiffs are not entitled to relief, because these requests are or were the subject of litigation in State court.

**4.**

The BPD Defendants also argue that, "[t]o the extent that OJB attempts to sue Defendants under the MPIA for violations that occurred more than two years prior to the filing of the Amended Complaint, those claims are barred by the statute of limitations and must be dismissed with prejudice and without leave to amend." ECF 15-1 at 22 (citing *Rounds v. Maryland-Nat. Capital Park and Planning Com'n*, 441 Md. 621, 656 (2015)). Plaintiffs do not dispute this contention, either. *See* ECF 27.

Request 5, in which OJB requested misconduct records of Officer Robert Dohony, was made on February 3, 2020. *See* ECF 14, ¶ 31; *see also* ECF 14-1 at 70-74. As noted, plaintiffs commenced this action on June 30, 2022, by filing a Complaint in the Circuit Court for Baltimore City. ECF 3. In general, an action to enforce must be brought within two years from the date on which the claim arises. *See* Md. Code (2020 Repl. Vol.), § 5-110 of the Courts and Judicial Proceedings Article ("C.J."). However, the statute carves out an exception, not addressed by the parties. C.J. § 5-110 requires an enforcement action to be filed within two years, "except that if the defendant has materially and willfully misrepresented any information required under those sections to be disclosed to a person and the information so misrepresented is material to the

36

establishment of liability . . . the action may be brought . . . within two years after discovery by the person of the misrepresentation."

In regard to Request 5, plaintiffs allege that defendants "repeatedly attempted to thwart OJB's access to the records through a variety of methods: transgressing the MPIA deadline for responding to Dohony's records request, repeatedly and egregiously ignoring OJB's fee waiver requests, suggesting OJB narrow their request for Dohony's records, and employing an overly broad use of exemptions to avoid granting OJB access to Dohony's records." ECF 14, ¶ 31. Moreover, the crux of the Amended Complaint alleges that defendants engaged in "deceitful" practices" in responding to plaintiffs' requests. *See* ECF 14, ¶¶ 30, 64, 81, 94, 130, 138.

Limitations is an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1) (in responding to a pleading, "a party must affirmatively state any . . . affirmative defense, including . . . statute of limitations . . . ."). As noted, courts ordinarily do not determine the applicability of a defense in connection with Rule 12(b)(6). *See King*, 825 F.3d at 214. Therefore, I cannot conclude on the face of the Amended Complaint that Request 5 is barred by limitations.

### B. Federal Law Claims

#### 1. Section 1983

Counts I, II, and III are based on the First Amendment, and lodged pursuant to 42 U.S.C. § 1983.

Under § 1983, a plaintiff may file suit against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Nieves v. Bartlett*, ___ U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377 (2012); *Owens v. Balt. City State's*

*Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).  "The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'"  *Davison*, 912 F.3d at 679 (quoting *Philips*, 572 F.3d at 180); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *Polk Cnty. v. Dodson*, 454 U.S. 312, 317–18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326, (1941)); *see also Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted) ("[P]rivate activity will generally not be deemed

state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.").

In the seminal case of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court determined that a local governmental body may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government, resulting in a violation of the plaintiff's rights. *Id.* at 690-91. A viable *Monell* claim consists of two components: 1) an unconstitutional policy or custom of the municipality; 2) and the unconstitutional policy or custom caused a violation of the plaintiff's rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Washington v. Housing Authority of the City of Columbia*, 58 F.4th 170, 177 (4th Cir. 2023); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

As the *Monell* Court explained, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *See Love-Lane*, 355 F.3d at 782. But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

Generally, § 1983 suits against a State for money damages are barred by the sovereign immunity embodied in the Eleventh Amendment. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979). And, since 1867, the BPD has been regarded as a State agency under Maryland law, at least for some purposes. *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128

(2008); *Beca v. City of Baltimore*, 279 Md. 177, 180-81, 367 A.2d 478, 480 (1977).  To that end, PUB. LOCAL LAWS OF MD. ("PLL"), Art. 4, § 16-2(a) (2021) states: "The Police Department of Baltimore City is hereby constituted and established as an agency and instrumentality of the State of Maryland."

In *Clark*, for example, the Maryland high court said, 404 Md. at 28, 944 A.2d at 1131: "[N]otwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency."  *See also Ashton v. Brown,* 339 Md. 70, 104 n. 18, 660 A.2d 447, 464 n. 18 (1995) (stating that "the Baltimore City Police Department, for purposes of Maryland law, is a state agency"); *Clea v. Mayor & City Council of Balt.,* 312 Md. 662, 668, 541 A.2d 1303, 1306 (1988) ("Unlike other municipal or county police departments which are agencies of the municipality or county . . . the Baltimore City Police Department is a state agency.") (citations omitted).[21]

---

[21] On November 8, 2022, "82% of Baltimore [City] voters approved a ballot measure to bring the police department back under local control." *Baltimore Police Being Placed Under City Control After Functioning as State Agency*, POLICE MAG. (Nov. 14, 2022), https://www.policemag.com/649878/baltimore-police-being-placed-under-city-control-after-functioning-as-state-agen.

In a report published in 2019 by the Abell Foundation, George A. Nilson, Esquire, a former City Solicitor, stated, *The Abell Report*, ABELL FOUND. (Mar. 2019), at 6:

> The most significant impact of a change from State Agency status to City Agency status relates to the legal immunities that currently offer some protection to the Police Department and Baltimore City when citizens claim to have been mistreated by police officers.  Currently, the Police Department is protected by State sovereign immunity that provides a greater level of protection than local immunity.  If the Police Department becomes a City Agency, it would lose the protection of State sovereign immunity and be exposed to significantly higher damages awards in civil lawsuits.

The parties have not supplemented their submissions to address the import, if any, of the recent change in BPD's status.

Nevertheless, the weight of authority in this District generally holds that, for purposes of §
1983, the BPD is a municipal entity, not protected by sovereign immunity. *See, e.g.*, *Earl v. Taylor*,
CCB-20-1355, 2021 WL 4458930, at *3 (D. Md. Sept. 29, 2021); *Washington v. Baltimore Police
Dep't*, 457 F. Supp. 3d 520, 532 (D. Md. 2020); *Johnson v. Baltimore Police Dep't*, 452 F. Supp.
3d 283, 299 (D. Md. 2020); *Hill v. CBAC Gaming LLC*, DKC-19-0695, 2019 WL 6729392, at *4-
5 (D. Md. Dec. 11, 2019); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept.
25, 2019); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28,
2019); *Fish v. Mayor and City of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10,
2018); *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003); *Alderman v. Balt. Police
Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997); *see also Est. of Bryant v. Baltimore Police Dep't*,
ELH-19-384, 2020 WL 673571, at *33 (D. Md. Feb. 10, 2020); *Grim v. Baltimore* Police Dep't,
ELH-18-3864, 2019 WL 5865561, at *14-15 (D. Md. Nov. 8, 2019); *Jones v. Chapman*, ELH-14-
2627, 2015 WL 4509871, at *10 (D. Md. July 24, 2015); *Humbert v. O'Malley*, WDQ-11-0440,
2011 WL 6019689, at *5 n.6 (D. Md. Nov. 29, 2011).

Therefore, as a municipal entity, the BPD is subject to suit under § 1983. In *Connick v.
Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if
> the governmental body itself "subjects" a person to a deprivation of rights or
> "causes" a person "to be subjected" to such deprivation. *See Monell v. New York
> City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local
> governments are responsible only for "their *own* illegal acts." *Pembaur v.
> Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They
> are not vicariously liable under § 1983 for their employees' actions. *See id.*, at
> 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S.
> 397, 403 (1997) (collecting cases).

However, neither an individual nor a municipality can be held liable in a § 1983 action
under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94; *Love-Lane*, 355 F.3d at 782.

Moreover, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___U.S.___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). However, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Of relevance, beyond "formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at

691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 F. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim based on custom and practice, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as

a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

Of relevance, "not all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (1995) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). A constitutional violation requires more than mere negligence. *See Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Indeed, "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999), *cert. denied*, 529 U.S. 1067 (2000).

### 2. Viewpoint & Content-Based Discrimination (Counts I, II)

Count I asserts a First Amendment claim of viewpoint discrimination, in which plaintiffs allege that defendants unlawfully restricted their access to public records based on opinions or perspectives of the plaintiffs. ECF 14, ¶¶ 127-34. Count II alleges a First Amendment claim of content-based discrimination. ECF 14, ¶¶ 135-42.[22] And, plaintiffs assert their claims under *Monell*, 436 U.S. 658, alleging "'practices so persistent and widespread as to practically have the force of the law.'" ECF 27 at 22 (citing *Connick*, 563 U.S. at 61).

In essence, plaintiffs assert that defendants violated the MPIA with respect to plaintiffs' requests because defendants disapprove of how plaintiffs will use the information. ECF 14, ¶¶ 62-93. For instance, Count I of the Amended Complaint alleges, *id*. ¶ 131:

> Defendants have engaged in viewpoint discrimination towards Plaintiffs because of viewpoints expressed in their speech. Defendants have explicitly communicated disapproval for how Plaintiffs are using requested information: to shed light on Defendants' practice and history of concealing abuse, violence, corruption,

---

[22] Plaintiffs do not distinguish "viewpoint" and "content-based" discrimination. In fact, plaintiffs seem to have "copied and pasted" the allegations from both counts, at times forgetting to replace the word "viewpoint" with the word "content-based." *Compare* ECF 14, ¶¶ 61-76 *with* ¶¶ 77-93.

misconduct, etc.   Consequently, Defendants have taken actions to suppress Plaintiffs' protected speech in order to protect themselves from further liability.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."   And, it "is applicable to the States through the Due Process Clause of the Fourteenth Amendment." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc.*, 425 U.S. 748, 749 n.1 (1976); *see Lovell v. Griffin*, 303 U.S. 444, 450 (1983).

Under the First Amendment, the "government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Assoc. of Political Consultants, Inc.*, ___ U.S. ___, 140 S. Ct. 2335, 2346 (2020) (quotation marks and citation omitted).   A "core postulate of free speech law" is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, ___ U.S. ___, 139 S. Ct. 2294, 2299 (2019).   "'Premised on mistrust of governmental power" the First Amendment "stands against attempts to disfavor certain subjects or viewpoints.'" *Am. Civil Liberties Union of N. Carolina v. Tata*, 742 F.3d 563, 565-66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 340 (2010)).

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).   The Supreme Court has said: "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (quoting *Abrams v. United States,* 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).   As a general matter, "imposing financial burdens based on the content

of the speech or viewpoint of the speaker runs afoul of the First Amendment." *Wang v. City of Rockville*, GJH-17-2131, 2018 WL 801526, at *3 (D. Md. Feb. 7, 2018) (citing *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995)).

"Viewpoint-based discrimination occurs when a government official 'targets not subject matter, but particular views taken by speakers on a subject.'" *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting *Rosenberger*, 515 U.S. at 829). Viewpoint-based restrictions are a subset of content-based restrictions. *See Barr*, 140 S. Ct. at 2346; *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) ("Government discrimination among viewpoints . . . is a 'more blatant' and 'egregious form of content discrimination'[.]") (quoting *Rosenberger*, 15 U.S. at 829); *Rosenberger*, 515 U.S. at 829 ("Viewpoint discrimination is thus an egregious form of content discrimination"); *McCullen v. Coakley*, 573 U.S. 464, 484-85 (2014) (noting than an exemption for a group on only one side of the abortion debate would constitute a clear form of viewpoint discrimination); *Davison*, 912 F.3d at 687 (stating that viewpoint discrimination "'targets'" a speaker's view on a subject and concluding that public official's conduct in banning a constituent from the public official's Facebook page constituted viewpoint discrimination) (citation omitted); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 623 (4th Cir. 2002) ("Viewpoint discrimination is a kind of content discrimination, but is not always easily distinguishable.").   Further, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject' the violation of the First Amendment is all the more blatant . . . . *Rosenberger*, 515 U.S. at 829.

Plaintiffs posit that defendants are aware of plaintiffs' viewpoints and the content they publish due to previous lawsuits filed by them, and because of plaintiffs' professional interests and

accomplishments.  ECF 14, ¶¶ 62, 63, 66, 67, 70, 71, 74, 78-80, 84, 87, 88, 91.  Additionally, it appears that plaintiffs' requests for records related to police misconduct would be used to criticize the BPD.  *See Robinson v. City of Mount Rainer*, GJH-20-2246, 2021 WL 1222900, at *8 (D. Md. Mar. 31, 2021) ("It can be inferred from these facts, as well as the content of [plaintiff's] public information requests—seeking information such as arrest statistics, stop-and-frisk reports, and information related to the Ethics Commission's selection process—that Plaintiff was seeking information she would use to criticize the City [of Mount Rainier]."  However, the Amended Complaint contains no allegations that, if proven, would establish that defendants considered plaintiffs' viewpoints or content when responding to the requests.  In essence, plaintiffs baldly assert that, by the very nature of who they are, any violation of the MPIA must necessarily be the result of a discriminatory animus.  *See* ECF 14, ¶¶ 63, 67, 70, 71, 74.

Regardless, even assuming that defendants have delayed or denied plaintiffs access to public records on the basis of viewpoint or content-based discrimination, plaintiffs' alleged constitutional violations by defendants extend only to plaintiffs.  As noted, the Fourth Circuit has instructed that a "meager history of isolated incidents" does not approach the "widespread and permanent practice necessary to establish [a] custom."  *Carter*, 164 F.3d at 220; *see Owens*, 767 F.3d at 403.  Instead, a plaintiff must allege "'numerous particular instances' of unconstitutional conduct . . . ."  *Lytle*, 326 F.3d at 473 (quoting *Kopf v. Wing*, 942 F.2d 265, 269 (4th Cir. 1991)).  Plaintiffs cannot rely upon "scattershot accusations of unrelated constitutional violations" to establish liability under *Monell*.  *Carter*, 164 F.3d at 218.  And, even those kinds of allegations are absent.

The case of *Robinson*, 2021 WL 1222900, is instructive.  There, the plaintiff alleged that the City of Mount Rainier denied the nine MPIA requests she made for information and four

requests for fee waivers, and that the City did so because of her viewpoint, in violation of the First

Amendment.  *Id*. at *17.  The allegation was based upon a city attorney's explicit reference to the

plaintiff's viewpoint when processing her MPIA requests, as well as an open letter published by

the City Council of Mount Rainer that criticized the plaintiff.  *Id*. at *5, 8.

     Of import here, the *Robinson* Court said, *id*. at *17 (alteration added):

> [Plaintiff's conclusory statement] is insufficient where it is supported by factual
> allegations involving the Plaintiff alone – she does not point to any other instances
> of the City's discriminatory conduct or otherwise allege that its discrimination
> extends beyond herself.  'Sporadic or isolated violations of rights will not give rise
> to *Monell* liability; only widespread or flagrant violations will.'  *See Owens v.
> Baltimore City State's Att'ys Off*., 767 F.3d 379, 403 (4th Cir. 2014) (quoting *Spell
> v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)) (finding the plaintiff's *Monell*
> claim—based on a policy or custom of withholding exculpatory evidence from
> criminal defendants—survived where he alleged that "reported and unreported
> cases" from before and during the events at issue, as well as "numerous 'successful
> motions'" in other criminal cases, showed similar conduct by officers and that the
> department ignored this conduct); *see also Weeden v. Prince George's Cty*., No.
> GJH-17-2013, 2018 WL 2694441, at *4 (D. Md. June 4, 2018) (dismissing *Monell*
> claim where the plaintiff offered broad, general allegations of a widespread practice
> but identified only one specific instance of unconstitutional conduct). Because
> Plaintiff has not alleged the existence of a widespread unconstitutional practice that
> constitutes a custom with the force of law, and thus has not alleged the City
> maintained an official policy or custom that caused the violation of her
> constitutional rights, she has failed to state a *Monell* claim against the City.

Accordingly, the court granted the defendant's motion to dismiss with respect to the *Monell* claim.

*Id*.

     OJB has sued BPD in State court for similar claims of violations of the MPIA.  But,

plaintiffs cite no other instances involving others whose requests were denied.  Nor do plaintiffs

point to any other instances in which BPD allegedly stonewalled the production of records or was

found to have violated the First Amendment in processing MPIA requests.

     Nevertheless, it would seem that a municipality could be found to have a custom or

practice, even if there is only one entity or person subject to it.  *See Oyenik v. Corizon Health*

*Incorporated*, 696 Fed. App'x 792, 794 (9th Cir. 2017) ("There is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual . . . ."). For example, if only one person submits multiple MPIA requests, over a period of time, and they are always rejected, it is possible that there is a custom or policy as to such requests, even though others are not affected.

But, the allegations and exhibits here reveal that BPD was aware of its obligations under the MPIA. However, over a relatively short period of time, three requestors made extensive record requests to the BPD, and at a time when the law was evolving and the BPD had to consider the statutory change. Specifically, the MPIA was amended by Anton's Law, effective October 1, 2021.

To be sure, many of the requests preceded that date, and the last MPIA request is dated May 26, 2022. But, the MPIA permits redaction of records under certain circumstances. And, production is not a simple matter of locating and then handing over documents. After the records are located, the BPD has a right (and obligation) to review them to determine whether they fall within a statutory exception; whether redactions are warranted; and, if so, to make them. This can be a labor-intensive and time-consuming process, particularly when the requests are substantial.

In terms of BPD's alleged policy, it is noteworthy that at least some of the requests are impacted by Anton's Law. Given the recent passage of Anton's Law in relation to some of the requests, BPD hardly had time to formulate a "widespread and permanent practice necessary to establish [a] custom." *Carter*, 164 F.3d at 220. And, the allegations, even if proven, do not establish a custom or policy "with the force of law." *Robinson*, 2021 WL 122900, at *17.

Furthermore, BPD's decision-making process with regard to OJB's fee waiver requests is currently pending before Maryland's highest court. *See Baltimore Police Department,* 482 Md. at

7, 282 A.3d at 1106.  These factors, along with the unique scope and complexity of the requests, are at odds with the conclusory assertions of a custom or practice that is tantamount to a policy.

In addition, plaintiffs have failed to allege that a policymaker had actual or constructive knowledge of any constitutional violations, or that a policymaker failed to correct the improper conduct due to deliberate indifference.  As discussed earlier, a municipal entity could be liable if it "fail[s] 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'"  *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389).  A *Monell* claim survives if the plaintiff alleges facts to support that the defendant "was aware of ongoing constitutional violations" and "did nothing to stop or correct those actions."  *Smith v. Aita*, CCB-14-3487, 2016 WL 3693713 at *4 (D. Md. July 12, 2016); *see Garcia v. Montgomery Cnty.*, JFM-12-3592, 2013 WL 4539394 at *5 (D. Md. Aug. 23, 2013) (denying motion to dismiss on the basis that the plaintiff alleged that the defendant "was aware of the ongoing constitutional violations" by police officers and that "the county's failure to supervise and discipline its officers allowed a pattern and/or practice of unconstitutional actions to develop"); *McDowell v. Grimes*, GLR-17-3200, 2018 WL 3756727, at *5 (D. Md. Aug. 7, 2018) (denying motion to dismiss because the plaintiff alleged sufficient facts that, if proven, would establish that the defendant "had knowledge of, and was deliberately indifferent to, officers' practice of unconstitutional conduct"); *Jones v. Jordan,* GLR-16-2662, 2017 WL 4122795, at *11 (D. Md. Sept. 18, 2017) (denying motion to dismiss on the basis that the facts were sufficient to plead that the defendant was aware of police officers' ongoing violations).

To assert a plausible *Monell* claim on this basis, a plaintiff must allege "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it

due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391).   Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct."   *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391).   However, only "'widespread or flagrant'" misconduct is sufficient.   *Owens*, 767 F.3d at 403 (quoting Spell, 824 F.2d at 1387).   In contrast, "[s]poradic or isolated" misconduct is not.   *Owens*, 767 F.3d at 403.

In *Corbitt v. Baltimore City Police Department*, RDB-20-3431, 2021 WL 3510579, at *7 (D. Md. Aug 10, 2021), Judge Bennett granted a defendant's motion to dismiss a *Monell* claim because the plaintiff asserted "absolutely no facts to support his contention that the BPD . . . condoned the activity of BPD Officers."   In addition, the court reasoned that there were no allegations as to whether there had been similar incidents or whether the BPD was aware of the alleged improper conduct.   *Id.*

Here, in a conclusory fashion, plaintiffs assert that "[t]he individual agents of the agencies did not only have an actual or constructive knowledge of the misconduct perpetrated by the agencies, but they themselves ensured its continuance."   ECF 14, ¶ 25.   Yet, put simply, the Amended Complaint contains no facts — just bald assertions — that the BPD and the City employees considered viewpoint and content when processing the MPIA requests at issue.

Certainly, *Monell* does not impose heightened pleading requirements, beyond the basic "short and plain statement" requirement of Fed. R. Civ. P. 8(a).   *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993).   But, it still requires plaintiffs to plead adequately "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights," *Jordan by Jordan*, 15 F.3d at 338; *see also Grim* , 2020 WL 1063091, at *5 ("[A] viable § 1983 *Monell* claim consists

of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights.").

Accordingly, plaintiffs fail to state First Amendment claims based on viewpoint and content-based discrimination.  These claims are subject to dismissal.

### 3. Retaliation (Count III)

In Count III, plaintiffs allege: "All Defendants violated all Plaintiffs' right to free speech under the First Amendment of the Constitution of the United States, through 42 U.S.C. § 1983, . . . through retaliation in restricting access to public records."  ECF 14 at 34.   In particular, plaintiffs assert: "Defendants' retaliation based on Plaintiffs' filing of this lawsuit has adversely affected Plaintiffs' ability to engage in constitutionally protected speech and fulfill its [sic] intended purpose of increasing public awareness of government corruption."  *Id*. ¶ 146.

The right to free speech under the First Amendment includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right.  *See ACLU v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993).  In order to prevail on a claim of retaliation, plaintiffs "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right."  *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994).

The Fourth Circuit has said, ACLU, 999 F.2d at 785: "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights."  (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); *see also Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968) (noting that retaliatory acts can be "a potent means of inhibiting speech").   "[B]y engaging in retaliatory acts, public officials place informal restraints on speech allow[ing] the government to produce a result which

[it] could not command directly.  Such interference with constitutional rights is impermissible."
*Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000) (quoting *Perry*, 408 U.S. at
597 (1972)) (internal citations and quotation marks omitted).

A plaintiff who brings a § 1983 First Amendment retaliation claim must allege facts that,
if proven, would show: (1) that the plaintiff's speech was protected; (2) that "the defendant's
alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech"; and
(3) "a causal relationship exists between the plaintiff's speech and the defendant's retaliatory
action." *Suarez*, 202 F.3d at 685–86.  "'A complaint which alleges retaliation in wholly conclusory
terms may safely be dismissed on the pleading alone.'"  *Gill v. Mooney*, 824 F.2d 192, 194 (2d
Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *Pierce v. King*, 918 F.
Supp. 932, 945 (E.D.N.C. 1996) (noting that conclusory allegations of retaliation are insufficient
to state claim).

In *Raub v. Campbell*, 785 F.3d 876 (4th Cir. 2015), the Fourth Circuit reviewed the
elements of a First Amendment claim and said, *id*. at 885:

> Of note, our causal requirement is "rigorous."  *Huang v. Bd. of Governors of the
> Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir.1990).  "[I]t is not enough that the
> protected expression played a role or was a motivating factor in the retaliation;
> claimant must show that 'but for' the protected expression the [state actor] would
> not have taken the alleged retaliatory action."  *Id*.

As noted, the alleged retaliation is "based on Plaintiffs' filing of this lawsuit."  *Id*. ¶ 146.
However, in Count III of the Amended Complaint plaintiffs fail to allege which specific actions,
if any, were taken by defendants after the filing of this suit on June 30, 2022.  *See* ECF 3.  For
instance, plaintiffs assert only that "Defendants impermissibly retaliated against Plaintiffs'
protected speech by placing numerous restraints on Plaintiffs' access to public records."  ECF 14,
¶ 147.  But, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice" to state a constitutional violation. *Iqbal*, 556 U.S. at 681, 685.

Thus, Count III fails to state a claim under the First Amendment based on a theory of retaliation.

## B. State Law Claims

Based on my analysis, the federal claims are not viable. Therefore, the suit no longer presents a federal question. Plaintiffs' remaining claims are predicated on State law.

In their motions to dismiss, defendants claim that "state courts have exclusive jurisdiction over Plaintiffs' MPIA claims" (ECF 15-1 at 20), and that "MPIA matters are within the sole province of the State Circuit Court." ECF 16-1. Ironically, it was defendants who removed this case to federal court in the first place. *See* ECF 1. Nevertheless, defendants now contend that the Court should decline to exercise supplemental jurisdiction because the "First Amendment claims are not viable, the MPIA claims predominate over the First Amendment claims, and the Amended Complaint involves issues of novel state law." ECF 30 at 14. Conversely, in their Opposition, plaintiffs claim that "[s]upplemental jurisdiction for the state law claims is proper under 28 U.S.C. § 1367(a), as the constitutional issues are predominate and this petition raises no novel or complex issue of state law." ECF 27 at 33-34.

Under 28 U.S.C. § 1367(a), a federal court may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

"[T]he doctrine of supplemental jurisdiction . . . 'is a doctrine of flexibility, designed to allow courts to deal with cases involving pendent claims in a manner that most sensibly accommodates a range of concerns and values.'" *Jordahl v. Democratic Party of Va.*, 122 F.3d

192, 203 (4th Cir. 1997) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 106 (4th Cir. 1995)).  In *ESAB*

*Group, Inc. v. Zurich Insurance PLC*, 685 F.3d 376, 394 (4th Cir. 2012), the Fourth Circuit

described the traditional approach to supplemental jurisdiction (previously known as "pendent"

jurisdiction).  It said, *id*. at 394 (internal citation omitted):

> [S]o long as one claim in an action presented a federal question on the face of the
> well-pleaded complaint, a court could exercise jurisdiction over the entire
> constitutional case or controversy. It does not follow, however, that the federal
> court had original jurisdiction over the entire case; rather, it had original jurisdiction
> over at least one claim, allowing the exercise of supplemental/pendent jurisdiction
> over the remaining claims. And the Supreme Court subsequently recognized that,
> when the exercise of pendent jurisdiction over these claims became
> "inappropriate," district courts had inherent authority to remand them to state
> courts.

However, pursuant to § 1367(c)(3), a district court "may decline to exercise supplemental

jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has

original jurisdiction."  In *Shanaghan v. Cahill*, 58 F.3d at 110, the Fourth Circuit recognized that

under § 1367(c)(3), "trial courts enjoy wide latitude in determining whether or not to retain

jurisdiction over state claims when federal claims have been extinguished."  *See also ESAB*, 685

F.3d at 394 ("Section 1367(c) recognizes courts' authority to decline to exercise supplemental

jurisdiction in limited circumstances, including . . . where the court dismisses the claims over

which it has original jurisdiction."); *Hinson v. Northwest Fin. S. Carolina, Inc.*, 239 F.3d 611, 616

(4th Cir. 2001) (stating that, "under the authority of 28 U.S.C. § 1367(c), authorizing a federal

court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss

the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental

jurisdiction have been met"); *see, e.g.*, *Ramsay v. Sawyer Property Management of Maryland*,

LLC, 948 F.Supp.2d 525, 537 (D. Md. 2013) (declining to exercise supplemental jurisdiction over

plaintiff's state law claims after dismissing federal law claims); *Int'l Ass'n of Machinists &*

*Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 500 (D. Md. 2005) ("Because the court will dismiss the claims over which it has original jurisdiction, the court will decline to exercise supplemental jurisdiction over the remaining state law claims.").

The Court may exercise this discretion by dismissing a case or by remanding the case if it is a removed action. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353-57 (1988). "In *Carnegie–Mellon*, the [Supreme] Court found federal courts to have an *inherent* power to remand removed State claims when the federal claims drop out of the case." *Hinson*, 239 F.3d at 616 (emphasis in original). "Even though *Carnegie–Mellon* was decided before the doctrine of pendent jurisdiction was codified in 28 U.S.C. § 1367," the Fourth Circuit has said that it "continues to inform the proper interpretation of § 1367(c)." *Id.* And, the 30-day deadline specified in 28 U.S.C. § 1447(c) for motions to remand on the basis of defects other than subject matter jurisdiction does not apply to motions to remand arguing that the Court should decline to exercise supplemental jurisdiction. This is because such motions do not arise under § 1447(c). *See Hinson*, 239 F.3d at 616.

When exercising this discretion, the Supreme Court has instructed federal courts to "consider and weigh . . . the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over . . . pendent state-law claims." *Carnegie-Mellon*, 484 U.S. at 350. In particular, "a remand may best promote [these] values" by permitting a case to be resolved in State court without the needless expense of filing a new case. *Id.* at 353. The Supreme Court has also said: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966).

These factors plainly favor remand to the Circuit Court for Baltimore City.[23]  First, each count in the Amended Complaint is rooted in State law: the MPIA and MPAA.  And, as noted, BPD's decision-making process with regard to OJB's fee waiver request is currently pending before Maryland's highest court.

In particular, *Open Justice Baltimore v. Baltimore Police Department, et al.*, Circuit Court for Baltimore City, Case 24-C-20-001269, filed March 2, 2020, involves BPD's interpretation of the MPIA's fee waiver provision.  This is an issue that permeates the Amended Complaint.  And, the Supreme Court of Maryland heard oral arguments in the State case on January 6, 2023.

Furthermore, the MPIA explicitly contemplates that if a requestor is denied inspection of a public record, a complaint "shall be filed with the circuit court for the county where: (i) the complainant resides or has a principle place of business; or (ii) the public record is located."  G.P. § 4-362; *see also Sowe v. Maryland*, WDQ-09-0621, 2009 WL 2730284, at *2 "([The MPIA] requires suit to be filed in a state circuit court.") (citations omitted).  As discussed, OJB has filed several suits in State court.

Regrettably, the motions have been ripe for some time.  Nevertheless, the case has not progressed beyond preliminary motion practice.  *Cf. Carnegie-Mellon*, 484 U.S. at 350 n.7 ("[I]n

---

[23] The BPD Defendants also note that "Plaintiffs' attempt to bring MPIA claims in federal court become even more problematic" because "BPD is a state agency that has not consented to this lawsuit, nor has any federal statute abrogated BPD's sovereign immunity in federal court." ECF 30 at 13.  To be sure, "State sovereign immunity is applicable to state agencies and instrumentalities."  *Mealey v. Baltimore City Policy Department*, JRR-21-2332, 2023 WL 2023262, at *18 (D. Md. Feb. 15, 2023) (citing *Corbitt*, 2021 WL 3510579 at *7).  And, as noted, until a recent election, the BPD has been regarded as a State agency under Maryland law.

However, the parties do not provide any briefing regarding the implications of this recent change, nor do they provide a discussion on any potential retroactivity that may apply to the BPD in this instance.  Regardless, because I have decided to remand the suit back to the Circuit Court for Baltimore City, this Court need not reach the issue of State sovereign immunity.

the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").

As I see it, remand is appropriate. *See, e.g., Medina v. L & M Const., Inc.*, RWT–14–00329, 2014 WL 1658874, at *2 (D. Md. Apr. 23, 2014) ("Finally, as a matter of comity, this Court will remand Medina's state law claims back to state court, as '[n]eedless decisions of state law [by federal courts] should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'") (alteration in *Medina*) (quoting *Gibbs*, 383 U.S. at 726).

### IV. Conclusion

For the reasons stated herein, I shall dismiss the suit as to the individual defendants, as they were sued only in their official capacities, and thus the claims as to them are duplicative. Moreover, as to Harrison and Shea, there are no allegations to support a claim for supervisory liability. I shall also dismiss the case as to the Baltimore City Law Department, because it is not a proper defendant. And, I shall grant defendants' motions to dismiss as to the First Amendment claims in Counts I through III.

As a result, there is no viable claim that establishes federal question jurisdiction. And, I decline to exercise supplemental jurisdiction over the remaining State law claims, contained in Counts I through VI. Accordingly, I shall remand the State law claims in Counts I through VI to the Circuit Court for Baltimore City.[24]

---

[24] This Court expresses no opinion on the merits of any State law claims.

An Order follows, consistent with this Memorandum Opinion.

Date: August 10, 2023                              _____/s/_____

                                                  Ellen L.  Hollander
                                                  United States District Judge