IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

OPEN JUSTICE BALTIMORE, *et al*.

    *Plaintiffs*,

v.

BALTIMORE CITY LAW
DEPARTMENT, *et al.*

    *Defendants*.

Civil Action No. ELH-22-1901

**MEMORANDUM OPINION**

This case arises from efforts by the plaintiffs to obtain records from the Baltimore City

Police Department ("BPD") that generally concern police misconduct.

Plaintiffs Open Justice Baltimore ("OJB"), a community organization; Brandon Soderberg,

a journalist and author; and Alissa Figueroa, a journalist, filed suit in the Circuit Court for

Baltimore City against the BPD; the Baltimore City Law Department ("Law Department"); the

Mayor and City Council of Baltimore (the "City"); as well as several individuals in their official

capacities: City Solicitor James Shea; Stephen Salsbury, Chief of Staff to the City Solicitor; Chief

Legal Counsel Lisa Walden; and Police Commissioner Michael Harrison. ECF 3.[1] Plaintiffs

alleged, *inter alia*, that defendants' incomplete and untimely responses to plaintiffs' requests for

public records concerning police misconduct violated the First Amendment. *Id.*

Defendants removed the case to federal court on the basis of federal question jurisdiction.

ECF 1. Thereafter, plaintiffs filed an Amended Complaint (ECF 14), supported by 238 pages of

exhibits. Plaintiffs again alleged, *inter alia*, violations of the First Amendment in connection with

---

[1] Harrison is no longer the Police Commissioner; Shea no longer serves as City Solicitor; and Salsbury is now Deputy City Solicitor.

their requests for public records pertaining to police misconduct.   ECF 14 ("Amended Complaint"), ¶¶ 1–4, 127–134.

By Memorandum Opinion and Order entered August 10, 2023, I dismissed plaintiffs' First Amendment claims.  ECF 32; ECF 33.  I also declined to exercise supplemental jurisdiction with respect to plaintiffs' remaining State law claims.  Instead, I remanded the case to the Circuit Court for Baltimore City.  ECF 32 at 58; ECF 33.

On September 4, 2023, pursuant to Fed. R. Civ. P. 59, plaintiffs moved to alter or amend the Court's judgment.  ECF 35 ("Motion").  They primarily argue that the Court failed to consider factual allegations that support their claim that defendants committed viewpoint discrimination in violation of the First Amendment.  The BPD and Commissioner Harrison responded to the Motion on October 16, 2023.  *See* ECF 42, 42-1.  In a separate filing on the same date, the Law Department, Shea, Salsbury, Walden, and the Mayor and City Council of Baltimore also responded.  ECF 43, 43-1–3.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.    Background

In my Memorandum Opinion of August 10, 2023, I described in detail the procedural history of the case and plaintiffs' factual allegations.  ECF 32 at 3–24.  Therefore, I shall assume familiarity with this material and incorporate it here by reference.  Nevertheless, a brief review of certain relevant details is helpful.

The Amended Complaint contains six counts, all related to defendants' alleged failure to respond adequately to public records requests made by plaintiffs pursuant to the Maryland Public Information Act ("MPIA"), Md. Code (2019 Repl. Vol., 2022 Supp.), §§ 4-101 *et seq.* of the

General Provisions Article ("G.P."), as amended by the Maryland Police Accountability Act ("MPAA" or "Anton's Law"), G.P. § 4-351(a)(4), (c), (d), (e).   Counts I, II, and III allege viewpoint discrimination, content-based discrimination, and retaliation, respectively, in violation of the First Amendment and its Maryland counterpart, Article 40 of the Maryland Declaration of Rights. *Id.* ¶¶ 127–47.[2]   Counts IV, V, and VI allege that defendants violated the MPIA, as amended by Anton's Law, by "failing to provide the requested records," *id.* ¶¶ 148–53 (Count IV), by "fail[ing] to abide by the time provisions of the" MPIA, *id.* ¶¶ 154–58 (Count V), and by "failing to waive fees."   *Id.* ¶¶ 160–65 (Count VI).

The MPIA, enacted in 1970, is Maryland's analog to the Freedom of Information Act, 5 U.S.C § 552.   It declares generally: "All persons are entitled to have access to information about the affairs of government and the official acts of public officials and employees."   G.P. § 4-103(a). To that end, the MPIA provides that, "[e]xcept as otherwise provided by law, a custodian shall allow a person or governmental unit to inspect any public record at any reasonable time," *id.* § 4-201(a)(1), and that "[i]nspection or copying of a public record may be denied only to the extent provided" by the MPIA.   *Id.* § 4-201(a)(2).   Under the provisions relevant here, "a custodian may

---

[2] The First Amendment to the Constitution provides, in part: "Congress shall make no law . . . abridging the freedom of speech."   It is made applicable to the states through the Fourteenth Amendment.   *Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940); *see also Manhattan Cnty. Access Corp. v. Halleck*, 587 U.S. ___, 139 S. Ct. 1921, 1928 (2019).

Article 40 of the Maryland Declaration of Rights provides that "every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects."   Article 40 is the State of Maryland's constitutional counterpart to the First Amendment.   It is ordinarily interpreted *in pari materia* with its federal analog.   *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 684 F.3d 462, 468 n.3 (4th Cir. 2012) ("Article 40 is 'co-extensive' with the First Amendment, and is construed *in pari materia* with it.") (quoting *Newell v. Runnels*, 407 Md. 578, 967 A.2d 729, 743 n.11 (2009)); *Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 556–57 (D. Md. 2016), *aff'd*, 874 F.3d 187 (4th Cir. 2017); *Nefedro v. Montgomery Cnty.*, 414 Md. 585, 593 n.5, 996 A.2d 850, 855 n.5 (2010).

deny inspection of . . . records, other than a record of a technical infraction, relating to an administrative or criminal investigation of misconduct by a police officer," *id.* § 4-351(a)(4), "only to the extent that the inspection would . . . (1) interfere with a valid and proper law enforcement proceeding; (2) deprive another person of a right to a fair trial or an impartial adjudication; (3) constitute an unwarranted invasion of personal privacy; (4) disclose the identity of a confidential source; (5) disclose an investigative technique or procedure; (6) prejudice an investigation; or (7) endanger the life or physical safety of an individual." *Id.* § 4-351(b)(1)–(7).

In general, an agency may charge for costs and fees incurred in "the search for, preparation of, and reproduction of a public record prepared, on request of the applicant, in a customized format; and the actual costs of the search for, preparation for, and reproduction of a public record in standard format, including media and mechanical processing costs." G.P. § 4-206(b)(i)–(ii). However, an agency may waive the fee if "the applicant asks for a waiver, G.P. § 4-206(e)(1), and if, "after consideration of the ability of the applicant to pay the fee and other relevant factors, the official custodian determines that the waiver would be in the public interest." *Id.*

In their Amended Complaint, plaintiffs allege that, in the three years preceding the filing of their lawsuit, they "made eighteen requests [to defendants] for public records . . . regarding the police and police misconduct." ECF 14, ¶ 2. According to plaintiffs, none of these requests has been fulfilled. *Id.* ¶ 26.

As plaintiffs' exhibits reflect, many of these requests were extremely broad in scope. *See*, *e.g.*, ECF 32 at 10–13. For example, by letter dated December 20, 2019, OJB requested "[r]ecords relating to all citizen [or administrative] complaints filed in any manner or form to any member or affiliate of the [BPD], about the [BPD], with any subsequent investigations and conclusions, that the [BPD] closed during the period of January 1, 2019 through and including December 19, 2019."

ECF 14-1 at 1–5.  The letter provided a 19-line definition of "Documents."  *Id.* at 3.  Additional letter requests submitted by OJB on January 10, 2020, and March 14, 2022, were similarly broad. *See id.* at 7 (requesting records relating to all citizen or administrative complaints that the BPD "has not closed and has had open for over twelve months"); *id.* at 12 (requesting records relating to all citizen or administrative complaints "that the [BPD] closed during the period of July 1, 2021 through and including December 31, 2021").

Plaintiffs also submitted several other more limited requests for records relating to individual officers.  *See id.* ¶¶ 31–32, 53.  For example, on February 3, 2020, OJB requested the "misconduct records of Robert Dohony, a single officer."  *Id.* ¶ 31.  According to plaintiffs, the "BPD and the Law Department repeatedly attempted to thwart OJB's access to the [Dohony] records through a variety of methods," such as by "repeatedly and egregiously ignoring OJB's fee waiver requests."  *Id.*

In addition, on February 8, 2022, OJB requested "the full extent of information available from James Deasel's personnel file under Anton's Law" and "thirty-five specified criminal incident reports written by . . . Deasel that aroused public suspicion."  *Id.* ¶ 32.  According to plaintiffs, "the Law Department provided 25 of the requested criminal incident reports" but otherwise failed to fulfill plaintiffs' requests.  *Id.*

Further, plaintiffs allege that Soderberg "requested the personnel file for Officer Melvin Hill on May 5, 2022" and "records for Officer Luke Shelley . . . on June 6, 2022."  *Id.* ¶ 53. Soderberg's request for Officer Hill's records was fulfilled on September 29, 2022, but his request for Officer Shelley's records was "left unanswered."  *Id.*  A discussion of plaintiffs' other requests can be found in the Court's Memorandum Opinion of August 10, 2023.  *See* ECF 32 at 8–24.

Of relevance here, plaintiffs allege that BPD and the Law Department have shown "preferential treatment towards different requesters."  ECF 14, ¶ 48.  They also assert that defendants "clearly release to requesters of favorable files over requesters of unfavorable files."  *Id.* ¶ 52.  In plaintiffs' view, defendants' failure to respond adequately to their MPIA requests is evidence of disparate treatment in favor of requesters less likely to publicize information showing police misconduct.  *Id.* ¶¶ 48–53.[3]

In particular, plaintiffs suggest that defendants readily granted "MPIA [request] 21-2452" because it concerned officers with "very minimal complaint histories," *id.* ¶ 50, and was made by "an associate at the Ponds Law Firm," which, according to plaintiffs, had "limited ability for dissemination or sharing of disclosed records."  *Id.* ¶ 51.  In contrast, plaintiffs assert that their requests were left mostly unfulfilled because they concerned "notorious officers on the [police] force, with known histories of violence and complaints," *id.* ¶ 50, and because plaintiffs, unlike the law firm responsible for request 21-2452, planned to publicize the information they received.  *Id.* ¶ 51.

In addition, plaintiffs allege that "Defendants . . . show[ed] preferential treatment when disclosing summaries of full files," by delaying the disclosure to Soderberg of a summary of Officer Hill's personnel file for five months, even though a similar or identical summary had been provided to other requesters several months earlier.  *Id.* ¶ 53.  Moreover, plaintiffs allege that disparate treatment is evident in records maintained by defendants recording "the dates in which requesters make requests, the category of the requester, what is requested, and the date information was released."  *Id.* ¶ 54.  According to plaintiffs, these records show, *inter alia*, that "it takes about

---

[3] Plaintiffs have not lodged an Equal Protection claim.

eight times as long for media requesters to receive a response [than] it does for states' attorneys and law enforcement." *Id.*

In my Memorandum Opinion of August 10, 2023, I concluded that plaintiffs had not sufficiently alleged First Amendment claims based on viewpoint discrimination, content-based discrimination, or retaliation. ECF 32 at 44–54. With respect to plaintiffs' claim of viewpoint or content-based discrimination, I acknowledged that, according to plaintiffs, defendants were "aware of plaintiffs' viewpoints and the content they publish due to lawsuits filed by them." *Id.* at 46. In addition, I noted that "it appear[ed] [from the allegations] that plaintiffs' requests for records related to police misconduct would be used to criticize the BPD." *Id.* at 47. Nonetheless, I determined that the "Amended Complaint contains no allegations that, if proven, would establish that defendants considered plaintiffs' viewpoints or content when responding to requests." *Id.* "In essence," I explained, "plaintiffs baldly assert that, by the very nature of who they are, any violation of the MPIA must necessarily be the result of discriminatory animus." *Id.* I concluded that such an assertion did not suffice to plead viewpoint discrimination. *Id.* at 52.

I also concluded that, even if plaintiffs had successfully pleaded viewpoint or content-based discrimination, they had not adequately alleged that this discrimination was the result of a municipal policy or practice, as is required to establish municipal liability under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), and its progeny. In particular, I determined that plaintiffs failed to allege that any City policymaker knew of, but exercised deliberate indifference to, a persistent and widespread unconstitutional practice. ECF 32 at 50–51.

I also dismissed plaintiffs' claim of retaliation in violation of the First Amendment. *Id.* at 54. In my view, "plaintiffs fail[ed] to allege which specific actions, if any, were taken by

defendants [in alleged retaliation for] the filing of this suit" on June 30, 2022.  *Id.* at 53 (citing ECF 3; ECF 14, ¶ 146).

## II.   Standard of Review

Plaintiffs' Motion is filed "pursuant to Rule 59" of the Federal Rules of Civil Procedure.  ECF 35 at 1.[4]  Fed. R. Civ.  Proc. 59(e) is captioned "Motion to Alter or Amend a Judgment."  It provides: "A motion to alter or amend a judgment must be filed no later than 28 days after the entry of judgment."  Plaintiffs filed the Motion on September 4, 2023 (ECF 35), twenty-five days after the Court entered judgment on August 10, 2023.  ECF 33.  Therefore, the Motion was timely filed.

The purpose of Rule 59(e) is to "give[] a district court the chance to rectify its own mistakes in the period immediately following its decision."  *Banister v. Davis*, 590 U.S. ___, 140 S. Ct. 1698, 1703 (2020) (citation and internal quotation marks omitted); *see Zinkand v. Brown*, 478 F.3d 634, 637 (4th Cir. 2007); *Pac. Ins. Co. v. American Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).  Allowing the district court this opportunity helps to "spar[e] the parties and the appellate courts the burden of unnecessary appellate proceedings."  *Pac. Ins. Co.*, 148 F.3d at 403.  Nonetheless, "'reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly."  *Id.* (quoting 11 Wright et al., Federal Practice and Procedure § 2810.1 at 124 (2d ed. 1995) ("Wright and Miller 1995").  Indeed, "because of the narrow purposes for which they are intended, Rule 59(e) motions typically are denied."  11 Wright et al., Federal Practice and Procedure § 2810.1 at 171 (3d ed. 2012).

---

[4] Plaintiffs do not specify the portion of "Rule 59" on which they rely.  Nor do they cite any authority interpreting this Rule.  Because the Motion is styled as a "Motion to Alter or Amend Judgment," the Court believes that plaintiffs mean to invoke Fed. R. Civ. Proc. 59(e).

Rule 59(e) does not provide a standard by which to evaluate a motion to alter or amend a judgment.  However, Fourth Circuit "case law makes clear [] that Rule 59(e) motions can be successful in only three situations: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Zinkand*, 478 F.3d at 637 (citation and internal quotation marks omitted); *see Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 197 (4th Cir. 2006); *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002), *cert. denied*, 538 U.S. 1012 (2003); *EEOC v. Lockheed Martin Corp.*, 116 F.3d 110, 112 (4th Cir. 1997).

The Fourth Circuit has cautioned that other uses of Rule 59(e) are inappropriate.  For example, a party may not use a Rule 59(e) motion to "raise arguments [that] could have been raised prior to the issuance of the judgment" or to "argue a case under a novel legal theory that the party had the ability to address in the first instance." *Pac. Ins. Co.*, 148 F.3d at 403; *see also Matter of Reese*, 91 F.3d 37, 39 (7th Cir. 1996) ("A motion under Rule 59(e) is not authorized to enable a party to complete presenting his case after the court has ruled against him.") (citation and internal quotation marks omitted).  Nor may a party use a Rule 59(e) motion to "'relitigate old matters.'" *Pac. Ins. Co.*, 148 F.3d at 403 (quoting Wright and Miller 1995 § 2810.1 at 127–28).

The decision whether to alter or amend a judgment is firmly within a court's discretion. *See, e.g., Bogart v. Chapell*, 396 F.3d 548, 555 (4th Cir. 2005).  However, "[t]o justify reconsideration on th[e] basis" that a court committed a clear error of law, it is not enough for a plaintiff to show that the court's judgment was "'just maybe or probably wrong.'" *Fontell v. Hassett*, 891 F. Supp. 2d 739, 741 (D. Md. 2012) (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)).  Instead, the error identified by the plaintiff "must strike [the court] as wrong

with the force of a five-week-old, unrefrigerated dead fish.  It must be dead wrong." *U.S. Tobacco*

*Coop. Inc. v. Big South Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018).

In other words, "[m]ere disagreement" with a court's ruling is not a proper basis for a Rule

59(e) motion.  *Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir. 1993).  Without these

"restraint[s]," "there would be no conclusion to motions practice, each motion becoming nothing

more than the latest installment in a potentially endless serial that would exhaust the resources of

the parties and the court—not to mention its patience." *Pinney v. Nokia*, 402 F.3d 430, 452–53

(4th Cir. 2005); *see also Jackson v. Sprint/United Mgmt. Co.*, 633 F. Supp. 3d 741, 746 (D. Md.

2022).

### III.  Discussion

### A.

In their Motion, plaintiffs acknowledge that "[t]he Court's Memorandum Opinion provides

an in-depth analysis of the matters before the Court."  ECF 35, ¶ 3.  However, they complain that

the Court "does not mention critical facts that Plaintiffs brought that contest the Court's findings"

with respect to viewpoint discrimination and First Amendment retaliation.  *Id.*  As far as the Court

can discern, plaintiffs identify three "critical facts" pertinent to their claim of viewpoint

discrimination.  *See id.* ¶¶ 4–13.

First, plaintiffs claim that they "have faced a pattern of unwavering obstruction and [have]

been unable to get even the simplest document disclosed without a struggle"; yet, "a requester with

less critical views was provided agency records with much less condemning content with much

more ease." *Id.* ¶ 6.  Plaintiffs identify the "requester with less critical views" as "Michael Fortini,

an associate at the Ponds Law Firm," who made MPIA request number "21-2452," which

concerned officers with "minimal complaint histories." *Id.* ¶¶ 6, 7.  Second, plaintiffs allege that

defendants delayed providing or withheld from Soderberg records pertaining to officers Melvin Hill and Luke Shelley, even though similar or identical records had already been produced to different requesters. *Id.* ¶ 9. Third, plaintiffs assert that "internal record-keeping used [by defendants] to track MPIA requests . . . indicate[s] that for requests of single officers, it takes about eight times longer for media requesters to receive a response [than] it does for states' attorneys and law enforcement to receive a response." *Id.* ¶ 10 (citing ECF 27-1 at 239–41).

Plaintiffs also argue that the Court failed to consider allegations suggesting that defendants retaliated against plaintiffs for the filing of this lawsuit and other activity protected by the First Amendment. ECF 35, ¶¶ 14–21. In particular, plaintiffs assert that the Court failed to consider defendants' alleged revocation of a fee waiver after the suit was filed, *id.* ¶ 15; defendants' failure to cooperate with Soderberg after he published a book examining the BPD's notorious Gun Trace Task Force, *id.* ¶ 16; and defendants' attempts to charge Figueroa for certain records "[a]fter [they] learned of Figueroa's position as media and the nature of the contents of her MPIA requests which related to police misconduct." *Id.* ¶¶ 17–18.

Citing *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017), plaintiffs state that a "plaintiff suffers a retaliatory action if the alleged retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* ¶ 19. According to plaintiffs, defendants' unjustified imposition of significant fees, "pressure to accept incomplete information, and delays in . . . releas[ing] . . . information would likely deter an independent journalist of ordinary firmness from requesting more records," and therefore constitutes First Amendment retaliation. *Id.* ¶ 20. In addition, plaintiffs claim that their allegations of "eighteen instances of abuse" are sufficient to plead municipal liability. *Id.*

In response, the BPD argues: "At bottom, Plaintiffs urge this Court to reconsider its ruling because they disagree with it."   ECF 42-1 at 5.   According to the BPD, "Plaintiffs' Motion is virtually an unmodified regurgitation of their Opposition to Defendants' Motion to Dismiss . . . and [the] Amended Complaint, all of which this Court considered when rendering its Opinion."   *Id.*   In support, the BPD provides a table purporting to show that "nearly every substantive paragraph in Plaintiffs' Motion can be found, oftentimes verbatim, in their Opposition, their Amended Complaint, or both."   *Id.* at 5–6.   In urging the Court to deny the Motion, the BPD claims: "Plaintiffs [have] advance[d] no intervening change in controlling law, no new evidence, and no clear error of law or manifest injustice."   *Id.* at 7.

The other defendants make similar assertions in their opposition.   ECF 43-1.   They contend that plaintiffs have "'merely reiterate[d] arguments' . . . already . . . rejected by the Court" and have failed to "'point to any controlling case law or evidence that was unavailable' at the time" the Court dismissed plaintiffs' First Amendment claims.   *Id.* at 3 (quoting *Amy v. Sebelius*, 749 F. Supp. 2d 315, 340 (D. Md. 2010)).

**B.**

"Motions under Rule 59 are not to be made lightly," *Aiken Cnty. v. Bodman*, RBH-05-2737, 2009 WL 10710596, at *2 (D. S.C. June 19, 2009), and they are subject to a "stringent standard" of review.   *J & J Sports Prods., Inc. v. Intipuqueno, LLC*, DKC-15-1325, 2016 WL 4141010, at *2 (D. Md. Aug. 4, 2016).   This stringent standard is important because it requires a party requesting the "extraordinary" remedy of an amended judgment to justify its demand on limited judicial resources.   *Pac. Ins. Co.*, 148 F.3d at 403.   Yet, plaintiffs' Motion fails to describe the standard of review applicable to motions brought under Rule 59(e), let alone explain how this "stringent standard" is met in this case.   This is a noteworthy omission.

Another important precept pertaining to Rule 59(e) is that a motion under the Rule is not to be used to "relitigate old matters." *Pac. Ins. Co.*, 148 F.3d at 403 (citation and internal quotation marks omitted). Yet, plaintiffs' Motion does little more than restate in slightly different terms certain allegations made in the Amended Complaint. In this respect, the Motion is inconsistent with the purpose for which the Rule 59(e) procedural device is intended.

In particular, paragraphs 5–8 of the Motion simply repeat, with some changes in wording, the allegations made in paragraphs 48–52 of the Amended Complaint. *Compare* ECF 35, ¶¶ 5–8 *with* ECF 14, ¶¶ 48–52. And, both series of allegations conclude with nearly identical statements.

To illustrate, paragraph 8 of the Motion states: "Defendants' only known release of a full personnel file, at no cost, demonstrates Defendants' preference for releasing favorable files over unfavorable files[,] and disclosure to private entities rather than to entities with criticism of BPD and a public reach like [OJB]." ECF 35, ¶ 8. And, the Amended Complaint states, ECF 14, ¶ 52: "From Defendants [sic] only known release of a full personnel file, at no cost, we can see Defendants clearly release favorable files over unfavorable files; Defendants clearly release to requesters of favorable files over requesters of unfavorable files."

The Motion's other assertions regarding viewpoint discrimination are also repetitive of allegations in the Amended Complaint. *Compare* ECF 35, ¶¶ 9–12 *with* ECF 14, ¶¶ 53–56. For example, in paragraph nine of the Motion, plaintiffs state: "Even when Plaintiffs have acquiesced to accepting *summaries* of misconduct records in place of full files, Defendants do not just break the law, but also ensure a difficult process for obtaining these records" (emphasis in Motion). That statement is nearly identical to the following allegation in the Amended Complaint, ECF 14, ¶ 53: "Even where Plaintiffs have acquiesced to accepting summaries of misconduct records, Defendants do not just break the law, but also ensure a difficult process for obtaining the records."

In addition, plaintiffs' statement in paragraph ten of the Motion that "Defendants' own records demonstrate an even more concrete preferential treatment of requesters," ECF 35, ¶ 10, is repetitive of their assertion in the Amended Complaint that defendants' "[p]referential treatment to different requesters can be made even more concrete" by examining "[d]efendants' own records." ECF 14, ¶ 54.  And, plaintiffs' statement in the Motion that "state's attorneys receive records within the statutory timeframe, proving timely disclosure is not an impossibility," ECF 35, ¶ 11, is substantially identical to their allegation in the Amended Complaint that "states [sic] attorneys are shown to receive records within the statutory timeframe, proving it is not an impossibility."  ECF 14, ¶ 55.

Furthermore, plaintiffs' assertions in the Motion concerning defendants' alleged retaliation in violation of the First Amendment, and *Monell* liability, are duplicative of allegations in the Amended Complaint.  Indeed, to substantiate their statements in the Motion concerning retaliation and *Monell* liability, plaintiffs simply refer the Court to allegations already advanced in the Amended Complaint.  *See* ECF 35, ¶¶ 14–18.

Thus, much of the Motion reiterates allegations presented in the Amended Complaint.  However, plaintiffs observe that the Court did "not mention" in its Memorandum Opinion of August 10, 2023, certain "critical" factual allegations in the Amended Complaint relating to plaintiffs' First Amendment claims—in particular, paragraphs 48 to 57 of the Amended Complaint.  *Id.* ¶¶ 3–4.[5]  Because the Memorandum Opinion did not mention paragraphs 48 to 57 of the Amended Complaint, plaintiffs posit that their renewed allegations of viewpoint

---

[5] Plaintiffs' citations to the Amended Complaint provide page numbers rather than paragraph numbers.

discrimination and retaliation do not, in fact, concern "old matters" in the typical sense. *Id.* ¶ 3; *see Pac. Ins. Co.*, 148 F.3d at 403.

It is true that, in my Memorandum Opinion, I did not mention every factual allegation contained in the Amended Complaint. But, I certainly considered and rejected plaintiffs' claims of viewpoint discrimination and retaliation under the First Amendment, ECF 32 at 44–54, as well as plaintiffs' contention as to liability under *Monell*, 436 U.S. 658.

For example, citing portions of the Amended Complaint captioned, *inter alia*, "*Defendants' viewpoint discrimination against OJB*," "*Defendants' viewpoint discrimination against Plaintiff Soderberg*," and "*Defendants' viewpoint discrimination against Plaintiff Figueroa*," I stated: "In essence, plaintiffs assert that defendants violated the MPIA with respect to plaintiffs' requests because defendants disapprove of how plaintiffs will use the information." ECF 32 at 44 (citing ECF 14, ¶¶ 62–93) (italics in Amended Complaint). Citing paragraphs of the Amended Complaint setting forth plaintiffs' claim of viewpoint discrimination, I observed: "Plaintiffs posit that defendants are aware of plaintiffs' viewpoints and the content they publish due to previous lawsuits filed by them, and because of plaintiffs' professional interests and accomplishments." ECF 32 at 46–47 (citing ECF 14, ¶¶ 62, 63, 66, 67, 70, 71, 74, 78–80, 84, 87, 88, 91). And, again citing paragraphs setting forth plaintiffs' claim of viewpoint discrimination, I concluded that plaintiffs' allegations would not, if proven, "establish that defendants considered plaintiffs' viewpoints or content when responding to the requests." ECF 32 at 47 (citing ECF 14, ¶¶ 63, 67, 70, 71, 74).

To be sure, a court must consider all nonconclusory factual allegations when determining whether a complaint "states a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But, the law does not require a court to "mention" every nonconclusory factual allegation when it summarizes the facts or sets forth the reasons for its decision. This is especially so when,

as here, a plaintiff has submitted an Amended Complaint that, with its 44 exhibits, totals 277 pages. The fact that a court granting a motion to dismiss has not mentioned every factual allegation included in a lawsuit is, by itself, not grounds for relief under Rule 59(e)'s demanding standard. *See U.S. Tobacco Coop. Inc.*, 899 F.3d at 258 (requiring that the error identified by the plaintiff must "strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish.").

Indeed, the Fourth Circuit recently observed that, "when there isn't a federal rule requiring the district court to make its reasoning known," in general, "a district court's lack of explanation doesn't amount to error." *Frazier v. Prince George's Cnty.*, ___ F.4th ___ , 2023 WL 7563846, at *4 (4th Cir. Nov. 15, 2023). Moreover, even when there *is* a rule requiring the district court to explain its reasoning, such as Federal Rule of Civil Procedure 52(a)(2), the "burden" of explanation borne by the district court "is not Herculean." *Id.* For example, Rule 52(a)(2), which provides that a court must "state the findings and conclusions that support" its decision to grant or deny an interlocutory injunction, "does not require a tome that memorializes all factual minutiae or responds to every legal assertion." *Id.*

Here, the Memorandum Opinion of August 10, 2023, did "respond[] to every legal assertion," because it addressed each of plaintiffs' constitutional claims. *Id.* And, the Memorandum Opinion did "make [the Court's] reasoning known." *Id.*

"District courts are busy places." *United States v. Amin*, ___ F.4th ___ , 2023 WL 7118917, at *4 (4th Cir. Oct. 30, 2023). Some judges write lengthy opinions; others do not. The measure of a sound judicial opinion is certainly not the number of allegations the Court chooses to mention.

## C.

In any event, even if I were to reevaluate plaintiffs' First Amendment claims *de novo*, I would still conclude that they must be dismissed for failure to state a claim.

16

As discussed in the Memorandum Opinion of August 10, 2023, ECF 32 at 45, the prohibition against viewpoint discrimination is "a core postulate of free speech law:   The government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. ___, 139 S.Ct. 2294, 2299 (2019).   In other words, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citing *Perry Ed. Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 46 (1983)).

Viewpoint discrimination is prohibited in any forum. *See Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 (4th Cir. 2006) ("The ban on viewpoint discrimination is a constant.   Beyond this, speakers' rights depend upon how widely the government has opened its property and its purposes in doing so.")

"[T]he 'principal inquiry' in assessing a claim of viewpoint discrimination 'is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786, 795 (4th Cir. 2004) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).   However, direct proof of viewpoint discrimination is hard to come by, because "the government rarely flatly admits it is engaging in viewpoint discrimination." *Ridley v. Mass. Bay Trans. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), *partially abrogated on other grounds by Matal v. Tam*, 582 U.S. 218 (2017).   Therefore, courts have recognized that several types of indirect evidence can be probative of viewpoint discrimination. *See Ridley*, 390 F.3d at 86; *Am. Freedom Defense Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365–66 (D.C. Cir. 2018); *see also Wang v. City of Rockville*, GJH-17-2131, 2019 WL 1331400, at *2.

For example, in *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 297–98 (3d Cir. 2011), the Third Circuit recognized that a plaintiff can establish viewpoint discrimination with a "comparator analysis," that is, a showing that the government's treatment of the plaintiff was less favorable than its treatment of other, similarly-situated speakers with different viewpoints.  Likewise, in *Ridley*, 390 F.3d at 86, the First Circuit acknowledged that, "where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted," a "suspicion [arises] that the stated neutral ground for action is meant to shield an impermissible motive."  The *Ridley* court also observed that "suspicion [of viewpoint discrimination] arises where the viewpoint-neutral ground" advanced by the government "is not actually served very well by the specific governmental action at issue; where, in other words, the fit between the means and ends is loose or nonexistent."  *Id.*

The D.C. Circuit has likened a court's inquiry into viewpoint discrimination to "the test the Supreme Court has used to unearth tacit discrimination on the basis of race."  *See Am. Freedom Defense Initiative*, 901 F.3d at 366.  According to the D.C. Circuit, "'[t]he historical background of the decision' is relevant; if the Government has repeatedly been found to have engaged in viewpoint discrimination, especially against the plaintiff, then courts should look skeptically at its seemingly viewpoint-neutral rationale."  *Id.* (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)).  Moreover, "'[t]he specific sequence of events leading up to the challenged decision,' such as '[d]epartures from the normal procedural sequence' and '[s]ubstantive departures' from 'the factors usually considered important' may also be relevant."  *Am. Freedom Defense Initiative*, 901 F.3d at 366 (quoting *Arlington Heights*, 429 U.S. at 267)).

Of course, the Court's task here is to evaluate the sufficiency of plaintiffs' allegations, not to determine whether plaintiffs have proved their case. Nonetheless, the Court's understanding of what evidence would be probative of viewpoint discrimination necessarily informs its assessment of whether plaintiffs have included allegations that, if proved, would allow a factfinder to conclude that defendants committed viewpoint discrimination.

Plaintiffs' claim of viewpoint discrimination rests on a "comparator analysis," *see Pittsburgh League*, 653 F.3d at 297–98: that is, allegations that defendants were less accommodating of plaintiffs' requests than they were of requests made by other similarly-situated requesters with viewpoints that were supposedly less critical of the BPD. ECF 14, ¶¶ 48–57. In my view, these allegations fail to move plaintiffs' claim of viewpoint discrimination "'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 680 (2007)).

The first of plaintiffs' allegations of disparate treatment concerns defendants' response to "MPIA [request] 21-2452," which was "made by Michael Fortini, an associate at the Ponds Law Firm." ECF 14, ¶ 51. According to plaintiffs, the defendants' response was "more favorabl[e]" than defendants' responses to the requests made by plaintiffs, because request 21-2452 concerned "officers [with] very minimal complaint histories" that could be "provided on one page." *Id.* ¶ 50. In contrast, plaintiffs' requests concerned "notorious officers on the force, with known histories of violence and complaints," including James Deasel, whose "summary was provided in over 80 pages." *Id.* In addition, plaintiffs assert that defendants responded more favorably to request 21-2452 because the requester, the "Ponds Law Firm," had "a limited ability for dissemination or sharing of disclosed records" and had offered to "dismiss an existing complaint in federal court if

the files were disclosed in full." *Id.* ¶ 51.  Plaintiffs conclude that defendants' treatment of request 21-2452 shows that they "clearly release favorable files over unfavorable files." *Id.* ¶ 52.

The second of plaintiffs' allegations of establish viewpoint discrimination is that defendants delayed providing or entirely withheld from Soderberg certain files that defendants had already provided in some form to other requesters. *Id.* ¶ 53.  For example, plaintiffs assert that even though defendants provided the file for Officer Hill to other requesters in April 2022, they did not fulfill a request by Soderberg relating to Officer Hill until September 29, 2022. *Id.*

Plaintiffs' third allegation in support of their claim of viewpoint discrimination is that defendants' own records, documenting, *inter alia*, the date a request was made, by whom, and when the request was fulfilled, show that defendants responded more slowly to requests by the media than to requests by attorneys, law enforcement, and inmates. *Id.* ¶¶ 54–55.

Again, my assessment of these allegations is governed by the pleading standard articulated by the Supreme Court in *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662.  As the Court explained in *Iqbal*, 556 U.S. at 678, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 at 570).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 at 556).  In particular, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 at 557) (some internal quotation marks omitted).

In *Twombly*, the plaintiffs claimed that the defendants violated the Sherman Act, 15 U.S.C. § 1, which prohibits restraints of trade that are "effected by a contract, combination, or conspiracy."

550 U.S. at 551, 553 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984)). In support of their claim, the plaintiffs "flatly pleaded" the existence of an illegal contract or conspiracy, and "also alleged that the defendants' 'parallel course of conduct . . . to prevent competition' and inflate prices was indicative of the unlawful agreement alleged." *Iqbal*, 556 U.S. at 679–80 (quoting *Twombly*, 550 U.S. at 551).

The Supreme Court concluded that these allegations failed to state a plausible claim for relief. *Twombly*, 550 U.S. at 570. "In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a 'legal conclusion' and, as such, was not entitled to the assumption of truth." *Iqbal*, 556 U.S. 680 (quoting *Twombly*, 550 U.S. at 555). The Court then considered whether plaintiffs' "well-pleaded, nonconclusory factual allegation of parallel behavior . . . gave rise to a 'plausible suggestion of conspiracy.'" *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 566). The Court "acknowledg[ed] that parallel conduct was *consistent with* an unlawful agreement," but "nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed *was more likely explained by*, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 567) (emphasis added). "Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570).

In *Iqbal*, 556 U.S. at 666, the plaintiff, a Muslim citizen of Pakistan, claimed that John Ashcroft, the former Attorney General of the United States, and Robert Mueller, the former Director of the Federal Bureau of Investigation ("FBI"), "adopted an unconstitutional policy that subjected [the plaintiff] to harsh conditions of confinement on account of his race, religion, or national origin." In support of this claim, the plaintiff alleged that Ashcroft and Mueller

"'maliciously agreed to subject' him to harsh conditions of confinement 'as a matter of policy, solely on account of'" his protected characteristics. *Id.* at 680 (quoting complaint). Further, the plaintiff alleged that "Ashcroft was the 'principal architect' of this invidious policy, and that Mueller was 'instrumental' in adopting and executing it." *Id.* at 680–81 (quoting complaint). The Court determined that "[t]hese bare assertions, much like the pleading of conspiracy in *Twombly*, amount[ed] to nothing more than a 'formulaic recitation of the elements of' a constitutional discrimination claim," and concluded on that basis that they were insufficient to state a plausible claim for relief. *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555).

The plaintiff in *Iqbal* also alleged in support of his claim of unconstitutional discrimination that "the [FBI], under the direction of [Mueller], arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11 [, 2001]." *Iqbal*, 556 U.S. at 681 (quoting complaint) (first alteration in *Iqbal*).  In addition, the plaintiff alleged that Mueller and Ashcroft had approved the practice of holding detainees in highly restrictive conditions while the detainees were investigated by the FBI. *Id.*  The Court acknowledged that, "[t]aken as true, these allegations are consistent with [Mueller and Ashcroft's] purposefully designating detainees 'of high interest' because of their race, religion, or national origin." *Id.*  Of import here, the Court also said that, "given more likely explanations," the allegations "do not plausibly establish this purpose." *Id.*  The Court reasoned, *id.* at 682:

> It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks [of September 11, 2001] would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests, and the purposeful, invidious discrimination respondent asks us to

infer, discrimination is not a plausible conclusion. (quoting *Twombly*, 550 U.S. at 567).

In this case, "[t]aken as true, [plaintiffs'] allegations" that, *inter alia*, defendants granted MPIA request 21-2452 more promptly that plaintiffs' own requests, ECF ¶¶ 50–52, and delayed providing or entirely withheld from Soderberg files that in some form had already been provided to other requesters, *id.* ¶ 53, could be "consistent with" viewpoint discrimination by defendants. *Iqbal*, 556 U.S. at 681.   However, as the Supreme Court made clear in *Twombly* and *Iqbal*, "a complaint [that] pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short'" of stating a plausible claim for relief.   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).   This is especially so when there exists an "'obvious alternative explanation'" for the conduct that the plaintiff alleges was taken with discriminatory intent.   *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

Here, the exhibits appended by plaintiffs to their Amended Complaint make clear that there is an "obvious alternative explanation" for defendants' alleged shortcomings in responding to plaintiffs' requests: plaintiffs' numerous and broad requests exceeded defendants' capacity to respond as quickly and inexpensively as plaintiffs demanded.[6]

For example, the BPD's "Document Compliance Unit" sent a letter responding to plaintiffs' request for all citizen or administrative complaints closed during the period of July 1, 2020 to June 30, 2021, and all citizen or administrative complaints open for more than twelve months.   ECF 14-1 at 17-22.   The letter stated that fulfilling that request would require "13,203 hours" of document review of "3,247 files" by fifteen contract attorneys.   *Id.* at 19; *id.* at 37–44

---

[6] As discussed in ECF 32 at 28–30, in evaluating the sufficiency of a complaint, I may "consider documents that are explicitly incorporated into the complaint by reference, and those attached to the complaint as exhibits."   *Goines v. Valley Cmty. Servs. Bd.*, 822 F.2d 159, 167 (4th Cir. 2016) (citations omitted).

(emails relating to this request).  Moreover, the cost of this review was estimated at $723,210.  *Id.* at 34.

In a subsequent email, plaintiffs' counsel demanded that defendants fulfill the request, "at no cost" to plaintiffs, "within thirty days."  *Id.* at 40.  Plaintiffs' counsel asserted that, by previously agreeing to waive internal costs related to the fulfillment of plaintiffs' requests, defendants had also agreed to waive outside counsel fees related to the request.  *Id.* at 41.  In reply, a representative of defendants explained that "the fees [that defendants] agreed to waive in our previous estimate were the City's internal costs, not those of our outside vendor."  *Id.* at 40.  Defendants' representative continued: "Should you be interested in narrowing the scope of the request, or identifying certain documents (or even categories of documents), we would be more than willing to work with you on that process.  But we cannot simply embark on this project that will still involve hundreds of thousands of dollars in cost and thousands of review hours for free."  *Id.* at 43.

These exchanges suggest that defendants worked in good faith to respond to plaintiffs' numerous and voluminous requests, which would have required thousands of work hours and several hundred thousand dollars in costs to fulfill.  They do not support a reasonable inference of viewpoint discrimination.

I am also unpersuaded that viewpoint discrimination can be reasonably inferred from defendants' alleged delay in providing Soderberg with files concerning officers who were the subjects of already-fulfilled requests made by different requesters.  ECF 14, ¶ 53.  The fact that one request concerning a particular officer has been previously satisfied does not mean that a distinct request, made later in time, concerning the same officer, must also be granted, or granted immediately.  Indeed, to hold otherwise would be inconsistent with the MPIA itself, which permits

a custodian to deny disclosure if, *inter alia*, disclosure would "interfere with a valid and proper law enforcement proceeding." MPIA § 4-351(b)(1); *see also id.* § 4-351(b)(2)–(7). The fact that no "law enforcement proceeding," or other ground for denial, existed at one time does not mean that such a proceeding or other ground for denial has not since arisen. The "obvious alternative explanation," *see Iqbal*, 556 U.S. at 682, for the delay alleged by plaintiffs is that defendants were simply discharging their responsibility to evaluate each request individually.

Finally, the records maintained by defendants, appended in barely legible form to the Amended Complaint, *see* ECF 14-1 at 227–229, also fail to provide any plausible basis for plaintiffs' claim of viewpoint discrimination. These records show that defendants fulfilled requests, *inter alia*, from reporter Justin Fenton, whose book *We Own This City: A True Story of Crime, Cops, and Corruption* documented corruption rampant in the BPD's Gun Trace Task Force; *The Daily Record*; WBAL News; and the *Washington Post*. *Id.* at 227. The allegations, if proven, would provide no basis for concluding that other media requesters were provided with their requests because they lacked the "critical" viewpoint plaintiffs appear to claim as uniquely their own.

Moreover, the records show that, to the extent that plaintiffs' requests were not immediately fulfilled, they were among many other "pending" requests. So, for example, although Soderberg's four requests of June 30, 2022, are listed as "pending," so too is nearly every other contemporaneous request, including those made by, among others, the "FOP," or Fraternal Order of Police; the "OPD," or Office of the Public Defender; and several "inmate[s]." *Id.* at 227. The Court can discern no pattern in defendants' records except that more recent requests are less likely to have been fulfilled than older ones. *See id.* at 227–229.

25

*Twombly* and *Iqbal* empower a court reviewing the sufficiency of a complaint to make a judgment about whether the allegations plausibly—not merely possibly—establish wrongdoing. Moreover, they provide that a court's assessment of plausibility may be informed by the existence of an "obvious alternative explanation" for conduct that a plaintiff alleges was taken with wrongful intent. *See Iqbal*, 556 U.S. at 682. Having applied these principles to the allegations in this case, I am satisfied that my decision to dismiss plaintiffs' claim of viewpoint discrimination for failure to state a claim was the correct one.

### D.

I am also satisfied that it was appropriate to dismiss plaintiffs' claim of First Amendment retaliation for failure to state a claim.

To state a claim for retaliation in violation of the First Amendment, a plaintiff must allege that "(1) his speech was protected, (2) the 'alleged retaliatory action adversely affected' his protected speech, and (3) [there exists] a causal relationship between the protected speech and the retaliation." *Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685–86 (4th Cir. 2000)). The "causal requirement is 'rigorous.'" *Raub*, 785 F.3d at 885 (quoting *Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990)).

In particular, "'it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show [or plausibly allege] that 'but for' the protected expression the [state actor] would not have taken the alleged retaliatory action.'" *Raub*, 785 F.3d at 885 (quoting *Huang*, 902 F.2d at 1140) (second alteration in *Raub*); *see also Nieves v. Bartlett*, 587 U.S. ___, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury.

Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.").

Plaintiffs do not plausibly allege that a retaliatory motive was the "but for" cause of—or even a "motivating factor in"—defendants' alleged failure to fulfill plaintiffs' requests as promptly, completely, or inexpensively as plaintiffs demanded.  *See Raub*, 785 F.3d at 885.

For example, plaintiffs' principal allegation of retaliation is that, "[a]fter the filing of th[e] lawsuit, Defendants . . . refused to honor a $750,000.00 fee waiver and granted the lowest fee waiver it has ever granted to OJB."  ECF 35, ¶ 15 (citing ECF 14, ¶ 97).  However, plaintiffs' exhibits suggest that defendants' purported "refus[al] to honor" a fee waiver was, in fact, defendants' attempt to charge plaintiffs for the cost of intensive document review by outside counsel, costs that defendants had not previously agreed to waive.  *See* ECF 14-1 at 40.  The exhibits do not support any plausible inference that retaliatory motive was the but for cause of defendants' request that plaintiffs defray the considerable costs of engaging outside counsel.

Plaintiffs also contend that retaliation is evident in the alleged fact that, "[a]fter the filing of this lawsuit, the Law Department demanded payment of $7,000.00 for James Deasel's record, which it was ready to turn over at no cost . . . prior to the filing of the lawsuit."  ECF 35, ¶ 14 (citing ECF 14, ¶ 96).  However, this contention is also belied by plaintiffs' exhibits, which suggest that the files defendants were "ready to turn over at no cost"—and in fact did provide to plaintiffs— were *summaries* of the requested files, which the BPD offers "at little or no cost to the requestor." ECF 14-1 at 156.   In particular, on April 21, 2022, plaintiffs' counsel acknowledged receiving "summaries of James Deasel's file," but stated that he had expected to receive "the full file."  *Id.* at 94.  On May 24, 2022, Salsbury informed plaintiffs' counsel that that the Law Department "received the entire file and our review is ongoing."  *Id.* at 81.  In another email, sent to plaintiffs'

27

counsel on May 25, 2022, Salsbury stated: "The Law Department and BPD are faced with a number of MPIA requests in addition to yours." *Id.* at 86. Salsbury expected that Deasel's record would be produced "within the next week," but also noted: "We've had some staffing turnover that has slowed down our ability to turn all of these requests around." *Id.* On October 4, 2022, two months after this lawsuit was filed, the BPD sent plaintiffs' counsel a letter estimating that the cost of producing Deasel's full record—as distinguished from a summary of his record—would be $7,260.15. *Id.* at 103–106. This sequence of events may suggest bureaucratic dysfunction. It does not suggest that defendants acted with retaliatory motive.

Plaintiffs' other allegations of retaliation, *see* ECF 35, ¶¶ 14–21, if proven, also would not support a reasonable inference that defendants acted with retaliatory motive. For example, plaintiffs assert that "Defendants are treating Soderberg different than other requesters due to his past releases against BPD," ECF 14, ¶ 99, and "Defendants pressured Figueroa to reduce her request and accept mere summaries in lieu of her initial requested documents." *Id.* ¶ 105. These conclusory allegations fall far short of stating a claim for retaliation in violation of the First Amendment. Plaintiffs' assertion that defendants attempted to charge Soderberg and Figueroa for their requests after learning of their "position[s] as media" is also insufficient to state a claim for retaliation. ECF 35, ¶¶ 17–18. As noted, the MPIA authorizes an agency to charge for costs and fees incurred in "the search for, preparation of, and reproduction of a public record prepared, on request of the applicant, in a customized format; and the actual costs of the search for, preparation for, and reproduction of a public record in standard format, including media and mechanical processing costs." G.P. § 4-206(b)(i)–(ii). Plaintiffs' allegations, if proven, would provide no basis for concluding that defendants' assessment of charges to Soderberg and Figueroa was anything other than a lawful exercise of their statutory authority.

In sum, I see no basis for amending the judgment dismissing Count III of the Amended Complaint, which alleged retaliation in violation of the First Amendment.  *See* ECF 33, ¶ 3.

### E.

Finally, I do not see any reason to depart from my earlier conclusion that plaintiffs' allegations of wrongdoing by defendants do not suffice to plead municipal liability under *Monell*, 436 U.S. 658.  *See* ECF 32 at 51–52.

Under *Monell*, "[m]unicipalities are not liable under respondeat superior principles for all constitutional violations of their employees simply because of the employment relationship."  *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 692–94).  "Instead, municipal liability results only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  *Spell*, 824 F.2d at 1385 (citing *Monell*, 436 U.S. at 694).

"[M]unicipal 'policy' is found most obviously in municipal ordinances, regulations and the like which directly command or authorize constitutional violations."  *Spell*, 824 F.2d at 1385 (citation omitted).  However, "it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy."  *Id.* (citation omitted).  A "policy" is attributable to a municipality only if "(1) it is directly made by its lawmakers, *i.e.*, its governing body, or (2) it is made by a municipal agency or official, having final authority to establish and implement the relevant policy."  *Id.* at 1387 (citations and internal quotation marks omitted).

"Custom" or "usage," by contrast, "may be found in 'persistent and widespread . . . practices of [municipal] officials [which] [a]lthough not authorized by written law, [are] so permanent and well-settled as to [have] the force of law.'"  *Id.* at 1386 (quoting *Monell*, 436 U.S.

at 691) (alterations in *Spell*).  "Municipal fault for allowing such a developed 'custom or usage' to continue requires (1) actual or constructive knowledge of its existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices."  *Spell*, 824 F.2d at 1391.  "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body."  *Id.* at 1387.  "Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them."  *Id.*

Plaintiffs do not contend that defendants adopted a formal policy of viewpoint discrimination.  Rather, plaintiffs appear to argue that defendants condoned or ratified an unconstitutional custom of viewpoint discrimination.  In particular, plaintiffs allege "eighteen instances of abuse" by defendants.  ECF 35, ¶ 22 (citing ECF 14, ¶¶ 26–47).  This "presentation," plaintiffs claim, "was extensive and beyond mere scattershot accusations."  *Id.*

In at least two respects, plaintiffs' allegations are insufficient to plead municipal liability for defendants' alleged viewpoint discrimination.  First, plaintiffs have failed to allege that there existed a "persistent and widespread" practice of disfavoring requesters on the basis of their viewpoint.  To be sure, plaintiffs' allegations suggest that their own requests to defendants—by plaintiffs' count, eighteen requests—were "persistent" and numerous.  But, plaintiffs' own persistence is irrelevant to assessing whether defendants had a well-established practice sanctionable under *Monell*.  And, as noted, the only pattern discernible in defendants' treatment of record requests is that more recent requests are less likely to have been fulfilled than older ones.  ECF 14-1 at 227–229.  Second, plaintiffs have failed to allege that any policymaker had actual or

constructive knowledge of—let alone exercised deliberate indifference to—the alleged wrongdoing.

### IV.  Conclusion

A final order, such as an order granting a motion to dismiss for failure to state a claim, "trigger[s] heightened standards for reconsideration." *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003) (citing Fed. R. Civ. P. 59(e)).  "This is understandable," because "significant time and resources are often invested in arriving at a final judgment." *Murphy Farms*, 326 F.3d at 514.  For the reasons set forth above, I shall deny the Motion.

An Order follows, consistent with this Memorandum Opinion.


Date:  November 17 , 2023


                                    /s/
                          _____
                          Ellen Lipton Hollander
                          United States District Judge

31